# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

FILED
CHARLOTTE, NC

AUG 1 7 2012

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

vs.

REX VENTURE GROUP, LLC
d/b/a ZEEKREWARDS.COM, and
PAUL R. BURKS,

        Defendant,

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action
No. 3:12cv519

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission" or "SEC")

alleges as follows:

### SUMMARY OF ALLEGATIONS

1.    The Commission files this emergency action to halt the fraudulent

unregistered offer and sale of securities in an unregistered investment contracts

constituting securities in a combined Ponzi and Pyramid scheme perpetrated by

Defendants Rex Venture Group, LLC ("Rex Venture") d/b/a

www.ZeekRewards.com ("ZeekRewards") and its principal, Paul Burks ("Burks") (collectively "Defendants").

2.    Defendants solicit investors through the internet and over interstate wires to participate in the ZeekRewards program, a self-described "affiliate advertising division" for the companion website, www.zeekler.com ("Zeekler"), through which Defendants operate penny auctions.

3.    Since approximately January 2011 through the present, the Defendants have raised more than $600 million from approximately 1 million investors nationwide and overseas by making unregistered offers and sales of securities through the ZeekRewards website in the form of Premium Subscriptions and VIP Bids.

4.    Unbeknownst to its investors, ZeekRewards is, in reality, a massive Ponzi and pyramid scheme.

5.    Approximately 98% of ZeekRewards' total revenues, and correspondingly the purported share of "net profits" paid to current investors, are comprised of funds received from new investors.

6.    Defendants currently hold approximately $225 million in investor funds in approximately 15 foreign and domestic financial institutions, and those funds are at risk of imminent dissipation and depletion.

7. Defendants have violated, and unless enjoined will continue to violate, the antifraud and securities registration provisions of the federal securities laws. Unless restrained and enjoined, Defendants are likely to engage in future violations of the federal securities laws. Accordingly, the Commission (A) seeks to preserve investor funds through an asset freeze, (B) seeks orders (i) for an accounting, (ii) prohibiting the destruction of documents and (iii) appointing a temporary receiver over the Defendants' assets; and (C) seeks preliminary and permanent injunctions, disgorgement with prejudgment interest, and civil penalties against each of the Defendants.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(l) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(l) & 77v(a)] and Sections 21(d)(l), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(l), 78u(d)(3)(A), 78u(e) & 78aa]. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

9. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act, 15 U.S.C.

§ 78aa, because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. Both Defendant Burks and Defendant Rex Venture d/b/a/ ZeekRewards transacted business, and offered and sold the securities that are the subject of this action, to investors in this district.

## DEFENDANTS

10.     **Paul R. Burks**, age 65, is a resident of Lexington, North Carolina. Burks is the sole owner of Rex Venture Group, LLC, and exercises control over ZeekRewards, Zeekler, and other affiliated websites.

11.     **Rex Venture Group, LLC** ("Rex Venture") is a Nevada limited liability company with its principal place of business in Lexington, North Carolina. Rex Venture wholly owns and operates ZeekRewards, an internet website (www.zeekrewards.com) with physical operations in Lexington, North Carolina, and internet customers and contacts throughout the United States and internationally.

## FACTUAL ALLEGATIONS

### ORIGINS OF ZEEKREWARS

12.     Since 1997, Burks has operated through Rex Venture (and its corporate predecessor) several online, multi-level marketing businesses.

13.     In 2010, Burks created Zeekler.com, a penny auction website offering items ranging from personal electronics to cash. Penny auctions require participants to pay a non-refundable fee to purchase and place each incremental bid (typically one cent) on merchandise sold via auction. The penny auctions were not particularly successful until Burks launched ZeekRewards in January 2011.

14.     ZeekRewards is the self-described "private, invitation-only, affiliate advertising division" of Zeekler. Bidders on Zeekler.com penny auctions can acquire bids by purchasing bids on Zeekler.com, but ZeekRewards and its affiliates also sell or give away free sample bids to be used in the penny auctions.

### THE ZEEKREWARDS OFFERING

15.     Through publicly available websites that Defendants own, operate, control, or sponsor, Defendants solicit persons to become investors or "affiliates" in ZeekRewards.

16.     Through the ZeekRewards program, Defendants offer affiliates several ways to earn money, two of which involve the offer and sale of securities in the form of investment contracts: the "Retail Profit Pool" and the "Matrix."

17.     From at least January 2011 through the present, via the ZeekRewards website, Defendants have raised at least $600 million through the offer and sale of securities (via the Retail Profit Pool and the Matrix) to more than 1 million domestic and international investors.

18.     Defendants have not made any effort to determine if investors in fact have the financial wherewithal to invest, nor have they ever made any effort to determine if investors have any experience investing before investors commit any capital to ZeekRewards.

19.     No registration statement has been filed or has been in effect with the Commission in connection with the securities the Defendants are offering and selling, and have offered and sold.

### 1. THE RETAIL PROFIT POOL

20.     Defendants attracted new investors to ZeekRewards with the promise of daily profit-share awards distributed through a Retail Profit Pool, which operates as a Ponzi scheme. According to the ZeekRewards website, through the Retail Profit Pool the company shares "up to 50% of the daily net profits" with affiliates who meet certain qualifications ("Qualified Affiliates").

21.     To become a Qualified Affiliate, investors must satisfy four criteria: (i) enroll in a monthly subscription plan requiring payments of $10, $50, or $99 per month; (ii) enroll new penny auction customers personally, through the

6

ZeekRewards co-op program, or through third-party businesses endorsed by ZeekRewards; (iii) sell at retail or purchase and give away as samples a minimum of ten Zeekler.com bids, earning Profit Points; and (iv) place one free ad daily for Zeekler.com and submit proof to ZeekRewards.

22.     The requirements to become a Qualified Affiliate constitute an investment in a common enterprise and require little or no investor effort.

23.     Qualified Affiliates have no role in ZeekRewards' operations. The Defendants alone created, update and operate the websites, handle all payments, manage the bank accounts and payment service providers, manage affiliate and customer accounts, manage all affiliate and customer services, oversee and disburse all bids, operate the auctions, create all advertisements, sponsor recruiting videos and calls, create the advertisements, and decide the daily payout percentages for the Retail Profit Pool.

24.     Investor funds paid are pooled and comingled in a handful of financial institutions. Investor funds also are commingled with ZeekRewards and the penny auction website's overall revenues from all company operations.

25.     Qualified Affiliates earn Profit Points by either (a) selling penny auction bid packages directly to retail customers ("Retail Bids"), or (b) purchasing "VIP Bids" and giving them away as samples to retail customers or to other personally-sponsored affiliates.

26.     Most affiliates opt to simply purchase VIP Bids (up to a maximum $10,000 investment) and give them away as samples in order to earn Profit Points. Even then, affiliates need not exert any efforts in giving away the VIP Bids they purchase because Defendants have created automated programs, including the "Customer Co-Op" and the "5CC" programs, that generate or have generated purported customers to whom the bids can be given automatically without any further effort on the affiliates' part.

27.     Earning daily dividends also requires that affiliates place one free internet advertisement daily for the company, but that exercise requires little or no effort. Affiliates may merely copy and paste free ads – created by Defendants without input from affiliates – from a company-sponsored program, which the ZeekRewards website boasts should take no more than five minutes per day. Affiliates also may employ a third-party program to generate ads automatically for them; affiliates must simply verify that they've placed the ad by submitting an internet link to ZeekRewards. Placing more or better ads does not enhance an individual's share of profits.

28.     Qualified Affiliates are paid their share of net profits from the Retail Profit Pool in the form of daily "awards" or dividends on accumulated Profit Points, which function like shares of stock.

8

29.     The size of the each Qualified Affiliate's daily award is dependent solely on how many Profit Points that investor has accumulated, and is not based on rendering any significant service to ZeekRewards.  Thus, buying and giving away more VIP Bids earns greater Profit Points, hence a larger daily profit share award, without any additional effort required.

30.     Qualified Affiliates have the option to receive their daily "award" that typically has approximated 1.5% per day as: (i) a cash payment; (ii) additional Profit Points ; or (iii) a combination of both.

31.     ZeekRewards encourages Qualified Affiliates to convert at least 80% of their daily award as additional Profit Points.  Most Qualified Affiliates follow this suggested approach.

32.     The daily award has a compounding effect for those Qualified Affiliates who elect to receive the daily award as new Profit Points rather than cash.

33.     As a result of the compounding effect, Qualified Affiliates now have nearly 3 billion Profit Points outstanding.  Based on the ZeekRewards current outstanding Profit Point balance, the company would be obligated to pay out approximately $45 million per day if all Qualified Affiliates elected to receive their daily award in cash.

9

34.     Qualified Affiliates have no role in ZeekRewards' operations.  The Defendants alone created, update and operate the websites, handle all payments, manage the bank accounts and payment service providers, manage affiliate and customer accounts, oversee and disburse all bids, operate the auctions, manage the Customer Co-Op, manage the 5CC program, create all advertisements, sponsor recruiting videos and calls, create the advertisements, and decide the daily payout percentages for the Retail Profit Pool.

35.     Investor funds paid in the form of subscription payments and purchases of VIP Bids are pooled and commingled in a handful of financial institutions.   Investor funds also are commingled with ZeekRewards and the penny auction website's overall revenues from all company operations.

## 2.  THE MATRIX

36.     ZeekRewards also employs a pyramid "Matrix" to reward its investors for recruiting others to join the scheme.  The company places each newly recruited affiliate into a "2x5 forced-fill matrix," which is a multi-level marketing pyramid with 63 positions that pools new investors' money and pays a bonus to affiliates for every "downline" investor within each affiliate's personal matrix.

37.     Affiliates that have (i) enrolled in a monthly subscription plan requiring payments of $10, $50, or $99 per month; and (ii) recruited at least two

other "Preferred Customers" (i.e., investors who have likewise enrolled in a monthly subscription plan) qualify to earn bonuses through the Matrix.

38.     Once qualified, an affiliate earns bonuses and commissions for every paid subscription within her downline 2x5 pyramid, whether or not she personally recruited everyone within the matrix.  Furthermore, affiliates are rewarded merely for recruiting new investors without regard to any efforts by the affiliates to sell bids or otherwise support the retail businesses.

39.     The Defendants, not the investors,  created, update, and operate the websites, handle all payments, manage the bank accounts and payment service providers, manage affiliate and customer accounts, create all advertisements, sponsor recruiting videos and calls, sponsor training videos and calls, and track and determine all Matrix bonus payments.

40.     Investor funds paid in the form of subscription payments are pooled and commingled in a handful of financial institutions along with all of Rex Venture's other revenues.

41.     Investors' Matrix bonuses and the Defendants' profits are both derived from the same source:  the overall revenues generated from new investors to the ZeekRewards program and the penny auction website.

## DEFENDANTS' OPERATION OF A FRAUDULENT PONZI AND PYRAMID SCHEME

42.    Defendants represent that through the Retail Profit Pool they will pay investors, or Qualified Affiliates, "up to 50%" of the company's daily net profits in the form of daily profit share awards.

43.    Burks is solely responsible for determining the amount of "net profits" to share in the Retail Profit Pool.

44.    Defendants represent that daily awards are calculated by dividing "up to 50%" of daily net profits by the number of Profit Points outstanding among all Qualified Affiliates.  This calculation results in a daily dividend paid to each Qualified Affiliate that consistently has averaged approximately 1.5% per day.

45.    In fact, the dividend bears no relation to the company's net profits. Instead, Burks unilaterally and arbitrarily determines the daily dividend rate so that it averages approximately 1.5% per day, giving investors the false impression that the business is profitable.

46.    Despite encouraging affiliates to purchase and give away VIP Bids to promote and drive traffic to the Zeekler penny auction website, Defendants fail to disclose that almost none of the VIP Bids given away by Qualified investors are actually used on the Zeekler penny auction website.  Of approximately 10 billion VIP Bids purchased by or awarded to investors, less than one-quarter of one

12

percent have been actually used in auctions on the Zeekler penny auction website. Thus, the VIP Bids do little or nothing to actually promote the retail business.

47.     Moreover, Defendants fail to disclose that more than 90% of all revenues (and hence net profits) are derived from new investor deposits (in the form of VIP Bid purchases and subscription fees) rather than actual retail revenues.

48.     Defendants also fail to disclose that without new investor deposits (in the form of VIP Bid purchases and subscription fees), revenues would dwindle substantially as less than 10% of daily revenues come from actual retail sales, and the scheme would likely collapse immediately.

49.     Based on the average 1.5% daily dividend on 3 billion Profit Points outstanding, ZeekRewards would owe nearly $45 million per day in profit share awards to investors – ZeekRewards Qualified Affiliates – if investors requested cash rewards instead of points.  The company's actual daily revenues, which in July 2012 averaged approximately $5 million per day, cannot support the daily awards that have been consistently been "paid" or awarded at an average of approximately 1.5% per day.

50.     Defendants fail to disclose to investors that the company would quickly become insolvent if more Qualified Affiliates elected to take daily awards in cash from the Retail Profit Pool rather than converting their awards into ever-increasing accumulated Profit Points.

13

51.     Defendants also fail to inform investors of the substantial risk that the Matrix is prone to collapse if the promoters are unable to recruit ever-increasing numbers of paid affiliates into the Matrix pyramid, because without new investors there will be no source of revenue to pay existing participants in the scheme.

52.     Although to date ZeekRewards has paid out nearly $375 million to Qualified Affiliates through the Retail Profit Pool and the Matrix, the company has only approximately $225 million in deposits, which is insufficient to satisfy future awards based on outstanding Profit Points and Matrix commissions and bonuses.

### RISK OF FURTHER DISSIPATION OF INVESTOR FUNDS

53.     ZeekRewards' current investor payouts are approaching, and may soon exceed, total incoming revenue.  In July 2012, total revenue for ZeekRewards was approximately $162 million, while total investor cash pay-outs were approximately $160 million.  If more Qualified Affiliates in the Retail Profit Pool elect to receive cash payouts for daily awards rather than reinvestment into more VIP Points, ZeekRewards' cash outflows would eventually exceed total revenue.

54.     Burks has withdrawn approximately $11 million while operating Rex Venture and ZeekRewards, of which approximately $4 million remains in his possession, custody or control.

55.     Burks distributed approximately $1 million of the funds garnered from ZeekRewards to family members.

14

56.     Defendant Rex Venture currently hold approximately $225 million in investor funds in approximately 15 financial institutions.  These funds are in danger of rapid depletion.

57.     Approximately $40 million of those investor funds are held in the accounts of online payment service providers, of which approximately $30 million are held outside the United States.  The vast majority of these funds are being held by the payment processors as reserves against potential credit card "charge-backs" (i.e., claims for refunds for transactions involving fraud).

58.     The Retail Profit Pool's viability hinges on investors continuing to accept daily rewards in points instead of cash.  With approximately 3 billion VIP Points outstanding in the Retail Profit Pool, if Defendants continue to pay daily awards at their historical average rate of approximately 1.5%, and investors seek cash awards instead of points, investor claims for cash withdrawals could increase to approximately $45 million per day.  With only approximately $225 million on hand, the company would quickly be rendered insolvent.

## FIRST CLAIM FOR RELIEF

### UNREGISTERED OFFER AND SALE OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act

59.     The Commission realleges and incorporates by reference the foregoing paragraphs.

60. Defendants, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

61. No registration statement has been filed with the Commission or has been in effect with respect to any of the offerings or sales alleged herein.

62. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations of Section 17(a) of the Securities Act

63. The Commission realleges and incorporates by reference the foregoing paragraphs.

64. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

16

a.    with scienter, employed devices, schemes, or artifices to defraud;

b.    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

65.    By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

66.    The Commission realleges and incorporates by reference paragraphs 1 through 64 above.

67.    Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security,

by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

a.    employed devices, schemes, or artifices to defraud;

b.    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

68.    By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Securities and Exchange Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations described hereinabove.

## II.

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d),

permanently enjoining Defendants and their officers, agents, servants, employees,

and attorneys, and those persons in active concert or participation with any of

them, who receive actual notice of the judgment by personal service or otherwise,

and each of them, from violating, directly or indirectly, Sections 5(a), 5(c) and

17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17

C.F.R. § 240.10b-5].

## III.

Issue, in a form consistent with Fed. R. Civ. P. 65, as to all Defendants, a

permanent injunction freezing the assets of Rex Venture and any entity affiliated

with it, directing that all financial or depository institutions comply with the

Court's Order, appointing a temporary receiver over the assets of Rex Venture,

prohibiting each of the Defendants from destroying documents, requiring

accountings from each of the Defendants, and ordering expedited discovery.

## IV.

Order that Defendants, and any employees or agents of Rex Venture, be

restrained and enjoined from destroying, removing, mutilating, altering,

concealing, or disposing of, in any manner, any of their books, records and

documents relating to the matters set forth in the Complaint, or the books, records and documents of any entities under their control, until further order of the Court.

## IV.

Order Rex Venture to disgorge all ill-gotten gains, including prejudgment interest, resulting from the illegal acts or courses of conduct alleged in this Complaint.

## V.

Order Burks to pay $4 million in civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: August 17, 2012                Respectfully submitted,

20

John J. Bowers (NC Bar No. 23950)
Stephen L. Cohen
J. Lee Buck, II
Brian M. Privor
Alfred C. Tierney
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-xxxx
Telephone:  (202) 551-4645  (Bowers)
Facsimile:  (202) xxx-xxxx
*Email: BowersJ@sec.gov*

Attorney for Plaintiff
Securities and Exchange Commission