IN THE UNITES STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

vs.

REX VENTURES GROUP, LLC
d/b/a ZEEKREWARDS.COM, and
PAUL BURKS,

        Defendants.

Civil Action No. 3:12 cv 519

**PRELIMINARY LIQUIDATION PLAN**

      Kenneth D. Bell, Esq., the Court-appointed Temporary Receiver (the "Receiver") for and over the estate of Rex Venture Group, LLC d/b/a ZeekRewards.com, any of its subsidiaries, whether incorporated or unincorporated, and any businesses or business names under which it does business (the "Receivership Defendant"), submits this Preliminary Liquidation Plan (the "Plan") in accordance with the Order of this Court entered on August 17, 2012, and for the purpose of providing "a recommendation of further steps to effect the orderly resolution of this matter and efficient recovery management and liquidation of recoverable Receivership Property" as well as an update on the Receiver's work and findings to date (the "Investigation"). The facts presented in this Plan may be supplemented, amended and/or corrected as the Investigation continues, and include the preliminary assessment of the Receiver's counsel as well as the agents, consultants, and advisers retained by the Receiver's counsel (the "Receiver Team").

1

## I. INTRODUCTION

The Receivership Defendant is a group of interrelated entities and websites, all of which were either controlled or owned directly or indirectly by Defendants Rex Venture Group, LLC ("RVG") and Paul Burks. RVG and Burks operated a penny auction website, www.zeekler.com ("Zeekler"), and a self-described "private, invitation-only, affiliate advertising division" for Zeekler at www.zeekrewards.com ("ZeekRewards" or the "ZeekRewards Program"). The ZeekRewards Program had physical operations in Lexington, North Carolina and internet customers and contacts throughout the United States and internationally. The Zeekler participants were required to pay a non-refundable fee to purchase and place each incremental bid (typically one cent) on merchandise sold via auction. Bidders could acquire those bids by purchasing them on Zeekler.com, but ZeekRewards and its affiliates also purchased the vast majority of the sample bids that they sold or gave away for free to be used in the penny auctions.

On August 17, 2012, the Securities and Exchange Commission ("SEC") commenced a civil enforcement action (the "Enforcement Action") against Burks and the Receivership Defendant. *See* Complaint filed August 17, 2012 attached as <u>Exhibit 1</u> (the "SEC Complaint"). The SEC Complaint alleges that the Defendants engaged in (1) the unregistered offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act; (2) fraud in the offer or sale of securities in violation of Section 17(a) of the Securities Act; and (3) fraud in connection with the purchase or sale of securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. The SEC sought equitable relief, including injunctions against future violations of the securities laws, disgorgement, prejudgment interest, and civil monetary penalties.

Simultaneous with the filing of the SEC Complaint, the SEC, the Receivership Defendant and Burks agreed to an order granting emergency relief, including a preliminary injunction, in

the form of an order freezing the assets of the Receivership Defendant and appointing a Temporary Receiver over the estate of the Receivership Defendant. *See* Agreed Order Appointing Temporary Receiver And Freezing Assets of Defendant Rex Venture Group, LLC, filed August 17, 2012, ("Initial Receiver Order"), attached as <u>Exhibit 2</u>.[1]  An Amended Order Appointing Temporary Receiver was entered on August 30, 2012, expanding the definition of the Receivership Estate. *See* Order Granting in part and Denying in part Receiver's Motion Seeking Amendment of Agreed Order Appointing Temporary Receiver and Freezing Assets of Defendant Rex Venture Group, LLC ("Amended Receiver Order"), attached as <u>Exhibit 3</u>, (collectively with the Initial Receiver Order the "Receiver Orders").

As discussed in greater detail below, during the first 52 days of the Receivership the Receiver has begun the Investigation into the operation of the Receivership Defendant. The Investigation is still in its preliminary stages and is ongoing. To date, the Investigation has uncovered evidence that during the life of the ZeekRewards Program there were approximately 2.2 million unique users ("Affiliates") in ZeekRewards. The number of Affiliates may or may not reflect the number of unique individuals who participated in ZeekRewards, as some individuals appear to have had more than one user id. Approximately 1 million Affiliates paid money into the ZeekRewards Program ("Affiliate-Investors"). The Receiver will provide additional reports of the findings of the Investigation in a future status report.

## II. PROCEDURAL BACKGROUND

The Initial Receiver Order directs the Receiver to: (a) use reasonable efforts to determine the nature, location, and value of all property interests of the Receivership Defendant which the Receivership Defendant owns, possesses, has a beneficial interest in, or controls directly or indirectly ("Receivership Property" or collectively all such interests, the "Receivership Estate");

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed them in the Initial Receiver Order.

Case 3:12-cv-00519-GCM  Document 51  Filed 10/08/12  Page 3 of 26

(b) take custody, control, and possession of all Receivership Property and records relevant thereto, as well as sue for and collect, recover, receive, and take into possession from third parties all Receivership Property and records relevant thereto; (c) manage, control, operate, and maintain the Receivership Estate and hold in his possession, custody, and control all Receivership Property; (d) use Receivership Property for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver; (e) take any action which, prior to the entry of the Initial Receiver Order, could have been taken by the officers, directors, partners, members, managers, trustees and agents of the Receivership Defendant; (f) engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities; (g) take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property; (h) issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure; (i) bring such legal actions on behalf of the Receivership Defendant based on law or equity in any state, federal, or foreign court, tribunal or agency as the Receiver deems necessary or appropriate in discharging his duties as Receiver; (j) pursue, resist, defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and (k) take such other action as may be approved by this Court. *See* Initial Receiver Order, ¶ II.7.

The Receiver is submitting this Plan pursuant to Paragraph 53 of the Initial Receiver Order. The Final Liquidation Plan, pursuant to Paragraph 54 of the Initial Receiver Order, will follow at a later date. Absent further order of this Court, the Receiver's First Quarterly Status Report required pursuant to Paragraphs 55 and 56 shall be filed on or before October 30, 2012.

4

According to the SEC Complaint, Burks and RVG engaged in the fraudulent unregistered offer and sale of securities in unregistered investment contracts constituting securities in a combined Ponzi and Pyramid scheme (the "Scheme") involving hundreds of millions of dollars of money supplied by domestic and foreign investors. *See* SEC Complaint ¶¶ 1 and 3. The Defendants solicited investors through the internet and over interstate wires to participate in the ZeekRewards program, the "affiliate advertising division" of Zeekler, the penny auction site purporting to engage in retail sales. *See* SEC Complaint ¶ 2. Approximately 98% of ZeekRewards' total revenues, and correspondingly the purported share of profits paid to current investors, were comprised of funds received from new investors. *See* SEC Complaint ¶ 5. At the time the SEC Complaint was filed, the Defendants were in such a position that without new investor deposits, revenues would have dwindled substantially as less than 10% of daily revenue came from actual retail sales, and the Scheme would have likely collapsed immediately. *See* SEC Complaint ¶ 48. ZeekRewards paid out nearly $375 million to Affiliate-Investors, but the Defendants had only approximately $225 million in deposits, which was insufficient to satisfy the future returns the Defendants represented to the investors that the investors had earned. *See* SEC Complaint ¶ 52.

The Receiver Team has been cooperating with the SEC, the United States Secret Service (USSS), and the United States Attorney's Office (USAO) to locate, gather, and preserve assets, both domestically and internationally. The Receiver has also responded to inquiries by various State Attorneys General offices and other consumer protection agencies.

## III. DESCRIPTION OF RECEIVERSHIP ENTITIES

### A.    Rex Venture Group, LLC

RVG is a Nevada Limited Liability Company that was established in or around January 2003 and is registered to do business in Nevada and North Carolina. RVG's principal place of business was Lexington, North Carolina.

### B.    Zeekler.com

RVG wholly owned and operated Zeekler, an internet website (www.zeekler.com) with physical operations in Lexington, North Carolina, and internet customers and contacts throughout the United States and internationally. Zeekler was a penny auction site that charged bidders to make bids on retail goods in increments of one penny.

### C.    ZeekRewards.com

RVG wholly owned and operated ZeekRewards, an internet website (www.zeekrewards.com) with physical operations in Lexington, North Carolina, and internet customers and contacts throughout the United States and internationally. ZeekRewards was a multi-level marketing company that was allegedly the advertising arm of Zeekler.

### D.    Lighthouse America

Lighthouse America was a company owned and operated by RVG and Burks. Lighthouse America was the predecessor company for RVG.

## IV. SUMMARY OF RECEIVERSHIP OPERATIONS AND FINDINGS TO DATE

As described above, the Receiver Orders direct the Receiver to identify, locate, recover, and preserve all assets of the Receivership Estate for liquidation and distribution to the appropriate parties in accordance with a Final Liquidation Plan. Accordingly, the Receiver Team has been primarily focused on the following activities: (1) establishing and operating the

6

Receivership Estate for the benefit of the creditors of the Receivership Estate; (2) investigating the Receivership Defendant's financial condition; (3) evaluating and preserving Receivership Estate assets; and (4) investigating and analyzing claims of the Receivership Defendant against third parties. This section of the Plan summarizes the actions taken to date by the Receiver Team within each of these broad categories.

A.    **Establishing and Operating the Receivership Estate**

Upon the Receiver's appointment on August 17, 2012 he retained McGuireWoods LLP ("MW") to act as his counsel. The Receiver then directed MW to retain the forensic accounting firm of FTI Consulting, Inc. ("FTI") as consultants to assist with the analysis of the financial condition and activities of the Receivership Defendant. The Receiver also directed MW to retain Ricoh USA, Inc. as a vendor for hard copy document capturing, check imaging, and document information coding. Additionally, the Receiver directed MW to retain Kroll Ontrack as a vendor to assist with the collection of electronically stored information obtained from the Receivership Defendant. Finally, the Receiver also directed MW to retain Gilardi & Company, LLC to host the receivership website and provide a means to communicate with Affiliates regarding the activities of the Receiver Team and to collect initial investor or Affiliate information.

The Receiver has opened three bank accounts on behalf of the Receivership Estate. One account has been used to deposit Affiliate-Investor payments (the "Affiliate Account"). Another account is reserved for the funds seized from financial institutions and payment processors (the "Seized Asset Account"). A third account is reserved for funds held or controlled by the Receivership Defendant pre-Initial Receiver Order (the "Pre-Filing Account"). Each of these accounts was opened in August 2012. The Pre-Filing Account has been used to pay necessary operating expenses, including the final payroll checks and payroll taxes for all employees, who

7

were all terminated by August 17, 2012, as described more fully below. Creating such segregated accounts controlled by the Receiver will ensure accuracy in the forensic accounting and complete control by the Receiver.

The Receiver personally approves all payments made by the Receivership Estate and has implemented procedures and internal controls to ensure that all payments and transactions are authorized by the Receiver Orders and are necessary to preserve the Receivership Estate. The Receiver Team ensures that all such transactions are accurately recorded and monitored.

1.    Assets Marshaled As of October 5, 2012

Paragraph 15 of the Initial Receiver Order authorizes the Receiver to take possession of all of the assets of the Receivership Defendant. Likewise, Paragraph 16 of the Initial Receiver Order requires all parties holding Receivership Defendant assets to turn such assets over to the Receiver or his agents.

Since the Receiver was appointed on August 17, 2012, in accordance with Paragraphs 15 and 16 of the Initial Receiver Order, the Receiver Team has recovered approximately $293.7 million in cash, minus any necessary disbursements as outlined below. A chart listing the assets recovered to date and expenses is attached as Exhibit 4. These funds were collected by (1) consolidating the Receivership Defendant's bank accounts and other funds and collecting outstanding amounts from certain payment processors that were utilized by the Receivership Defendant prior to the appointment of the Receiver; (2) presenting for deposit non-negotiated financial instruments in the possession of the Receivership Defendant; and (3) other miscellaneous assets, including receivables.

The collection of these assets has been primarily accomplished through the Receiver Team's coordination with the USSS. During the infancy of the Receivership, the Receiver

8

enlisted the help of the USSS in order to ensure that he would be able to quickly and efficiently recover the assets of the Receivership Defendant. Specifically, agents of the USSS, acting under the Consent Order of Seizure dated August 22, 2012, and the Warrants issued pursuant to the Consent Order of Seizure, have actively pursued the known bank accounts of the Receivership Defendant. The USSS has been instrumental in seizing the vast majority of the $217.1 million in Receivership Assets that has been recovered from the banks and payment processors that held or controlled the Receivership Assets at the time the Receiver was appointed.

The Receiver Team and the USSS have been largely successful in obtaining the majority of the known Receivership Estate assets. However, as discussed below, certain of the Receivership Estate assets have not yet been recovered. The Receiver Team continues to seek to recover these additional assets and to locate other assets.

2.    Disbursements as of October 5, 2012

For the period from August 17, 2012 through October 5, 2012, the Receiver has made approximately $55,707.18 in disbursements for: employee payroll and associated benefits; taxes due to the United States, North Carolina, and Arkansas; rent; utilities; internet service; telephone service; and for Receivership operating expenses, which include, but are not limited to, overnight courier service, security services, IT support, and communications costs.[2]  The Receiver has also identified more than $922,000 in accounts payable, including certain invoices for professional services that were due or coming due when the Receiver was appointed. As discussed more fully below, the Receiver is still in the process of determining the validity and amounts of these accounts payable, and ascertaining the priority in which each such expense should be paid.

---

[2] The Receivership Defendant maintained the majority of its electronic data at a third party data host in Miami, Florida. The USAO and the USSS required the Receiver to maintain these data sites to ensure complete imaging and extraction of all files stored by this data host, and the Receiver has made disbursement to the necessary vendors in order to continue storing that data.

9

### 3. Ongoing Business Expenses

Currently, the Receivership Defendant owns two buildings in Davidson County, North Carolina: the main office building in Lexington from which the Scheme was operated and a warehouse. Neither property is encumbered by a mortgage. The Receivership Defendant also is a tenant under leases for an office building and two apartments in Davidson County, North Carolina as well as a lease for a virtual corporate office in Las Vegas, Nevada. The Receivership Defendant maintained electronic data on equipment in the main office and leased office building and also maintained a significant amount of its electronic data at hosting facilities in Miami, Florida. Working in conjunction with the USAO and the USSS, the Receiver has undertaken to image and extract all data from the servers located in Davidson County, North Carolina and Miami, Florida. Because of this effort, it has been necessary to maintain each of the owned and leased facilities in modified working order, including security, internet access, and certain utility services for certain facilities while continuing to pay for the third party server facilities in Florida.

The Receiver is in the process of terminating the leases on the Davidson County, North Carolina and Las Vegas, Nevada facilities and has reduced services to those facilities where appropriate. It is anticipated that the Receiver will continue to incur limited operating expenses and utilities for the leased Davidson County properties until termination of the leases can be accomplished. With respect to the owned properties, the Receiver will continue to incur necessary operating expenses to maintain the facilities, including utilities, property taxes and any necessary maintenance costs until the properties and the personal property contained therein (generally consisting of office furnishings, office equipment, telephones, computers, and electronics) can be liquidated under the Final Liquidation Plan.

10

B. **Investigating the Receivership Defendant's Financial Condition**

The Receiver has identified numerous accounts in which the Receivership Defendant may have held an interest, and is in the process of securing and marshaling those assets where appropriate. The Receiver Team has also begun analyzing financial records of the Receivership Defendant. Certain financial information in the Receivership Defendant's financial records has been found to be inadequate or incomplete. The Receiver Team is currently in the process of reconstructing over 18 months of financial information. Because of the significant lack of documentation and the organization of this data, this process will be time-consuming, but it is necessary for the Receiver to identify additional assets, trace the proceeds of any fraudulent conduct, evaluate claims of creditors and investors, and identify potential claims against former employees, third parties (including Affiliate-Investors), and others that may have received assets of the Receivership Estate.

C. **Evaluating and Preserving the Receivership Estate Assets**

As part of the effort to marshal, identify and secure potential assets of the Receivership Estate, the Receiver Team has communicated – through counsel when appropriate – with numerous individuals and entities who are believed to have information about Receivership Assets. Initial interviews of the Receivership Defendant's employees and officers who were willing to be interviewed, as well as communications with various third parties, have revealed the identities of numerous other individuals and entities that might have relevant information regarding the Scheme, including potential business associates and investors of the Receivership Defendant and its principals. A substantial portion of the Receiver's work has consisted of the domestic and international investigation, collection, and preservation of the assets described below.

11

1.    Bank and Brokerage Accounts

As discussed above, the Receiver Team sought to locate and identify all domestic and foreign bank accounts controlled by the Receivership Defendant, as well as any banks, brokerage houses and other financial institutions that had conducted or were conducting business with the Receivership Defendant. The Receiver relied in part on a list of financial institutions provided by the SEC, USAO, and USSS from the investigation that they had conducted prior to the appointment of the Receiver. The Receiver also sought to ensure that all identified accounts were frozen and is in the process of following up with each financial institution to obtain historical account information and account opening documents. The Receiver served on each bank, brokerage house, and financial institution that may have held Receivership Estate assets a Notice of Commencement of Receivership and Freeze of Assets and Instructions Regarding Cashier's Checks, which (1) directed recipients to the receivership website where they can view the Receiver Orders; (2) requested from each institution from which assets have been seized a statement of all accounts and their balances held in the name of or for the benefit of the Receivership Defendant; and (3) requested that those financial institutions provide the Receiver's consultant, FTI, all requested information and access to any accounts related to the Receivership Defendant. The process of identifying and seizing Receivership Estate assets is ongoing. It is possible that not all funds have been recovered.

To date, the Receiver Team has identified the following financial institutions with which the Receivership Defendant held accounts and has seized the following funds:

a. *Domestic Accounts – Seizures*

| Financial Institution | Amount Seized |
|---|---|
| Global E Telecom | $65,533,065.18 |
| First Premier Bank | $30,933,089.00 |
| Bancorp/Planet Payment | $19,538,332.12 |
| Bank of America | $18,723,326.11 |
| Charles Schwab | $15,016,644.98 |
| NxPay | $14,424,178.65 |
| New Bridge Bank | $11,645,207.36 |
| Preferred Merchants | $11,518,581.78 |
| Edward Jones | $1,004,281.63 |
| Bank of Carolina | $384,745.73 |
| PayPal | $9,952.09 |
| Citizens Bank (NY) | $0.00 |

Certain of the accounts listed above were closed, inactive or had a zero balance before the Receiver was appointed. The Receiver Team is still investigating these accounts to confirm that no amounts are due to the Receiver in regard to those accounts.

b. *Domestic Accounts – Future Seizures*

The Receiver does not believe that there are any material accounts of the Receivership Defendant in domestic locations that have not been seized. However, the Receiver Team is still investigating the financial records of the Receivership Defendant to determine whether other institutions in the United States hold Receivership Assets. Likewise, the Receiver Team has not

13

yet reconciled the Receivership Defendant's account records with the amount of funds recovered from the Receivership Defendant's accounts at the above institutions. As such, the Receiver has reserved all of his rights in that regard.

c.    *Foreign Accounts – Seizures*

| Financial Institution | Amount Seized |
|---|---|
| SolidTrustPay | $19,499,925.00 |
| Payza/Alert Pay | $8,921,733.18 |

d.    *Foreign Accounts – Future Seizures*

The Receiver has determined that there is at least one foreign account which has not yet been seized and the assets contained therein provided to the Receiver. Upon the discovery of this account, the Receiver caused the Freeze Order to be served on the bank which holds the identified account. The Receiver Team, USSS, SEC, and USAO are in the process of determining the most efficient and cost effective manner to recover the funds from the entity that controls or the bank that holds this account so that the funds can be used in the distribution plan for this case. It is not clear whether the Receiver Team will be successful in recovering these funds at this time.

The Receiver Team is still investigating whether other institutions outside of the United States hold Receivership Assets in their accounts. Moreover, the Receiver Team has not yet reconciled the Receivership Defendant's account records with the amount of funds that has been recovered from these accounts. As such, the Receiver has reserved all of his rights in that regard.

e.   *Funds Recovered From Bank and Brokerage Accounts*

As of October 5, 2012, the Receiver has recovered $217.1 million from accounts controlled by the Receivership Defendant. However, as noted above, these numbers must be reconciled with the records of the Receivership Defendant to determine whether amounts in excess of the amounts recovered by the Receiver Team should have been turned over to the Receiver. Likewise, this balance does not reflect the funds held in the foreign account the Receiver Team has identified, but has not yet seized.

f.   *ACH Chargebacks amongst Certain Banks*

Certain of the banks and payment processors utilized by the Receivership Defendant have received significant numbers of automatic clearing house ("ACH") chargebacks. An ACH chargeback occurs when the customer who authorized an ACH transfer from his account asserts that such ACH transfer was not validly authorized and receives a credit in his account from his bank (an "ACH Chargeback"). In such an instance, the customer's bank (the "Originating Bank") seeks to recover the amount of the ACH Chargeback from the bank to whom the ACH transfer was made (the "Receiving Bank"). Under the rules by which ACH payments are made between banks, the Receiving Bank has an obligation to return these funds to the Originating Bank which originated the ACH transfer for the customer. In normal instances, the ACH Chargeback would be debited from the account of the entity that received the ACH transfer. However, in the current case, the Initial Receiver Order has frozen and subsequently seized the funds held for the Receivership Defendant. Thus, the Receiving Banks in this case do not have funds to debit on account of the ACH Chargeback.

Certain of the Receiving Banks have requested that the Receiver seek relief from this Court to halt ACH Chargebacks. After researching the applicable law and industry rules, and

15

consulting with certain industry professionals and organizations, the Receiver has taken the position that he has no standing to stop ACH Chargebacks as the ACH Chargebacks are not being asserted against the Receivership Assets or the Receivership itself. It appears that the obligation to honor such ACH Chargebacks arises from a contractual obligation between banks completely unrelated to the obligations of the applicable bank regarding the Receivership Defendant and the Receivership Assets. Moreover, any obligation that is incurred in regard to such ACH Chargebacks would reduce claims of other claimants of the Scheme. Absent an injury to the estate of the Receivership Defendant, the Receiver does not believe he has standing to seek to stop any ACH Chargebacks between banks.

The amount of ACH Chargebacks asserted against the various banks is unknown at this time.

## 2. Financial Instruments Originating with Affiliates of the Receivership Defendant

The Receiver Team has worked to ascertain and collect all non-negotiated financial instruments originating from the Affiliate-Investors of the Receivership Defendant. The Receiver identified three main sources for non-negotiated financial instruments: (1) those collected from the Receivership Defendant's facilities in Lexington, North Carolina; (2) those contained in continuing mail and carrier deliveries directed to the Receivership Defendant; and (3) those in the custody of third party payment processing vendors at the time the Initial Receiver Order was entered. The non-negotiated financial instruments consist of cashier's checks, non-personal money orders, personal money orders, and personal checks.

The Receiver Team prioritized the presentment and deposit of Affiliate-Investor payments identified as cashier's checks and non-personal money orders as these items were determined to have a higher rate of successful negotiation and total return for the Receivership

16

Estate. As of October 5, 2012, the Receiver has presented and attempted to deposit all non-negotiated financial instruments collected from the Receivership Defendant's main office in Lexington, North Carolina. The Receiver has also presented and attempted to deposit all such items received as of October 1, 2012, through the mail or other carrier deliveries.

The Receiver is continuing to analyze, identify, and segregate those Affiliate-Investor payment items obtained from the Receivership Defendant's third party payment processors that were not previously presented for deposit from those presented for deposit. There are 90,000-100,000 items left to be presented, but we anticipate the majority of these items have been presented for deposit already. In light of the quantity of items received and the record-keeping of the third-party payment processors, this analysis and segregation is cumbersome and taking considerable time. Once the process of analyzing, identifying, and segregating is complete, the Receiver will present these items for deposit as well. We anticipate it will take between ten and twelve days to deposit these items once we begin that process.

As of October 5, 2012, 60,826 financial instruments totaling approximately $100 million originating from Affiliate-Investors of the Receivership Defendant have been presented for attempted deposit by the Receiver. 11,641 items have been returned as unable to be deposited due to stopped payments, lack of endorsement, and cancellation. The majority of the 11,641 items were returned for a stop payment. Following receipt of the Receiver's Notice of Commencement of Receivership and Freeze of Assets and Instructions Regarding Cashier's Checks, these financial institutions will now allow payment of these items. It will take between three and five days to re-present all these financial instruments for deposit.

As of October 5, 2012, the balance of the account reserved for the deposit of these items is $71,510,783.

17

### 3. Miscellaneous Assets Recovered

To date, the Receiver Team has identified and collected the following additional Receivership Estate Assets:

| Asset | Amount Seized |
|---|---|
| Cashier's Checks from BB&T located in RVG's main office | $5,000,000 |
| RVG Attorney Retainer | $61,929.50 |
| Gift Cards From Various Retailers | $20,670.00 |
| Petty Cash | $7,569.35 |

### 4. Real Property

As noted above, the Receivership Defendant currently owns two buildings in Davidson County, North Carolina: the main office building and a warehouse. Neither property is encumbered by a mortgage. Such property will be liquidated under the Final Liquidation Plan once such property is not needed by the Receivership Defendant. The Receiver will attempt to secure expert appraisals or opinions to the extent practicable to determine the value of this property and will sell this property in accordance with reasonable business terms.

### 5. Personal Property

The Receivership Defendant appears to hold household furnishings in one of the apartments in Davidson County as well as Zeek-branded merchandise in the warehouse facility. Such property will be liquidated under the Final Liquidation Plan. The Receiver will attempt to secure expert appraisals or opinions to the extent practicable to determine value. The Receiver is also currently investigating whether any other personal property was purchased with assets of the Receivership Estate and whether any such property is titled to others. The Receiver intends to

vigorously pursue, with leave of the Court, the recovery of any and all personal property traceable to investor assets but held by others.

6. Business Property Located in RVG Offices

The Receivership Defendant appears to hold office furnishings, office equipment, telephones, computers and electronics in the main office and in the leased office. Such property will be liquidated under the Final Liquidation Plan. The Receiver will attempt to secure expert appraisals or opinions to the extent practicable to determine value.

7. District Courts in Locations Where Reeeivership Estate Property Is Or May Be Located

The Receiver is in the process of determining the locations of property that may be assets or traceable to assets of the Receivership Defendant or held in constructive trust for the Receivership Defendant. The Receiver, if appropriate, may file the Receiver Orders and SEC Complaint in the judicial districts where the Receiver understands the Receivership Assets may be located.

8. County Clerks in Locations Where Receivership Estate Real Property is Located

The Receiver is in the process of determining the locations of the real property, vehicles and/or other tangible property that may be assets or traceable to assets of the Receivership Defendant or held in constructive trust for the Receivership Defendant. The Receiver, if appropriate, may in the future seek an Order and Notice of Pendency to file with the County Clerk's office in each county where such real property, vehicles or other tangible property is located.

19

D.     **Analyzing Claims Against Third Parties**

As discussed above, the Receiver Team has focused its initial efforts primarily on locating and securing assets of the Receivership Estate. As more evidence is uncovered, the Receiver will increasingly broaden its recovery efforts to include claims against officers, employees, participants, professionals and others who benefited from the Scheme. These claims will include common law claims and "clawback" claims under applicable fraudulent transfer statutes against those who ran the operations and "net-winner" participants, i.e. those who received back more (of other Affiliate-Investor's money) than they paid into the Receivership Defendant. According to information contained in the RVG electronic databases, which has not yet been verified with bank records, approximately 1 million Affiliate-Investors paid money into ZeekRewards. Also, the Receiver intends to investigate potential claims against professionals and others involved in the Scheme who may be liable for the role they played in facilitating the operation and will file suit accordingly if the Receiver believes that such a suit is warranted.

The Receiver's investigations of these claims against third parties are in the preliminary stages. Thus, the Receiver is not yet able to predict the likelihood, amount or cost-effectiveness of any particular claims or the claims as a whole. The Receiver does, however, plan to first offer those who are required to return money to the Receivership Estate the opportunity to do so cooperatively in an effort to avoid costly litigation for all concerned.

With respect to potential claims against the Receivership Estate, the Receiver has, pursuant to the Court's earlier order, moved to stay a putative class action filed in Davidson County, North Carolina Superior Court and plans to do so if necessary in a similar action filed in the United States District Court for the Eastern District of Louisiana. Other claims or threatened claims have been asserted against the Receiver / Receivership Estate but no other court actions

20

have been filed. The Receiver is continuing to evaluate if there is any merit to such claims and will act accordingly. At this preliminary stage, it does not appear that the claims asserted in these lawsuits will significantly impact the Receivership Estate.

## V. ASSET LIQUIDATION AND DISTRIBUTION OF PROCEEDS

As detailed above, the Receiver has undertaken the marshaling of Receivership Assets and will continue to do so as he identifies other Receivership Assets. To the extent that the Receiver believes that the Receivership Defendant holds causes of action that would provide a net benefit to the estate of the Receivership Defendant, the Receiver will pursue those actions. At this stage, it is not clear how long these tasks will take.

While the time frame for recovering assets is unclear, the Receiver is mindful that the process of distributing these assets to the victims of the Scheme is of paramount importance in this case. The preliminary investigation done by the Receiver Team has shown that there may have been as many as 1 million Affiliate-Investors involved in the Scheme. The sheer volume of potential claimants has caused the Receiver to examine all possible avenues to streamline the claims and distribution process in this case so that he can return as much of the marshaled assets to the victims of the scheme as possible. The Receiver is, therefore, in the process of formulating a claims process and will seek court approval of that process as soon as practicable. Additionally, the Receiver is in the process of formulating a distribution plan which will provide for the distribution of the marshaled assets to the various creditors of the Receivership Defendant as expeditiously as possible. The Receiver is considering whether it will be feasible to provide a preliminary distribution in this case.

## VI. CLAIMS PROCESS

Case 3:12-cv-00519-GCM   Document 51   Filed 10/08/12   Page 21 of 26

The Receiver Team is in the process of investigating the claims of potential creditors. As part of that process, the Receiver is working to enhance the receivership website established for creditors and other interested parties to obtain information about the Receivership Defendant, www.zeekrewardsreceivership.com. The Receiver has received various communications regarding the claims and claims process from various creditors of the Receivership Defendant through the website. The entities sending these communications generally fall into three categories: (1) general trade creditors of the Receivership Defendant (including independent contractors that were utilized by the Receivership Defendant prior to the appointment of the Receiver); (2) individual Affiliate-Investors of the Receivership Defendant; and (3) entities comprised of organized groups of Affiliate-Investors of the Receivership Defendant. Each group of potential claimants has voiced its own particular needs and concerns regarding the claims process. Many have even provided suggested data that they believe would be needed to establish the amount of an individual claim. The Receiver has taken note of these needs and concerns and has incorporated them into his consideration of the claims process. However, none of the information submitted by these individuals will be considered a valid submission of a claim against the Receivership Defendant.

As touched upon above, the Receiver has begun to formulate a claims process to address the claims of the approximate 1 million Affiliate-Investors in the Scheme, as well as the general trade creditors in these cases. However, because of the vast number of potential claimants and the complexity of the claims that are likely to be asserted, the decision on how to obtain claim information and what to obtain from claimants cannot be made lightly. Without careful planning and consideration regarding the method of filing claims, the manner in which claims are to be classified, the data necessary to establish the allowable amount of a claim asserted by each

creditor, and the ability for the Receiver to reconcile the claims asserted by creditors, the Receiver could incur significant expenses undertaking an incomplete process that could require additional filings in order to establish the allowed amount of a creditors' claims. The Receiver is also mindful that he must provide due process of law to each of the holders of claims in this case. The Receiver is, therefore, carefully formulating a formal claims process that will address the needs and concerns of the creditors of the Receivership Defendant (including the victims of the Scheme), provide each such entity due process of law, provide a fair determination of the amount of claims due creditors, and provide the greatest possible return to holders of allowed claims against the Receivership Defendant.

Once the Receiver has determined what he believes the claims process will entail, including an appropriate claim form and the basis for calculating the allowed amount of a creditor claims, the Receiver will seek this Court's approval of the claims process and the claim form. The Receiver anticipates seeking approval of the claims process prior to the date on which the Plan of Liquidation is to be filed.

Seeking Court approval of the claims process will guarantee that the claims process is orderly, efficient and effective for all parties in interest in these cases. Obtaining approval of the claims process by this Court will also lead to a more efficient distribution process under the Plan of Liquidation as the Receiver will have the ability to determine the allowance of claims in accordance with bright line rules established in advance of seeking to fund distributions to creditors. This will permit the fairest process for all creditors of the Receivership Estate.

A.     **Types of Claims**

In addition to establishing a claims process, the Receiver is determining how to compute the amount of a creditor's claims against the Receivership Estate. Currently, the Receiver has identified the following types of claims: (1) general unsecured claims of trade vendors (e.g., the power company, the telephone provider, the internet service provider, independent contractors, advisors, etc.); (2) claims of former employees of the Receivership Defendant; and (3) claims of Affiliate-Investors of the Receivership Defendant. The claims of Affiliate-Investors can generally be bifurcated into claims asserted on account of bids purchased from the Receivership Defendant and claims asserted on account of certain program costs that Affiliate-Investors incurred in order to be part of the Scheme. The Receiver is evaluating each of these types of claims to determine to what extent these claims should be permitted to recover from the Receivership Estate. These issues will be fully addressed in the Plan of Liquidation.

## VII.    CONSIDERATION OF BANKRUPTCY FILING

The Initial Receiver Order permits the Receiver to determine whether it would be in the best interest of the Receivership Estate to cause the Receivership Defendant to seek bankruptcy protection. *See* Initial Receiver Order ¶ 46. At this time, the Receiver does not believe filing a bankruptcy case would be beneficial to the estate of the Receivership Defendant. This is due, in large part, to the efficiencies and cost savings that can be realized in the receivership process over the increased costs of a bankruptcy case. Specifically, commencing a bankruptcy case may cause, among other things, the creation and appointment of multiple official committees, each with its own counsel and professionals whose fees are charged to the estate. Likewise, filing a bankruptcy case now would likely result in substantial transition costs. Moreover, it does not appear that there would be any advantage in recovery of assets of the Receivership Defendant from seeking bankruptcy protection at this time. However, the Receiver is continuing to evaluate

his position on whether to seek bankruptcy protection for the Receivership Defendant and reserves his rights to cause the Receivership Defendant to seek such protection in the future.

## VIII.  CONCLUSION

The Receivership Investigation is ongoing.  The next steps will involve increasingly broad recovery efforts, including the assertion of third party claims against officers, employees, Affiliate-Investors, professionals and others who benefited from the Scheme.  The complexity of the Scheme, the high numbers of transactions, Affiliates, and Affiliate-Investors, and missing or incomplete financial records will require additional and significant investigatory efforts.

Dated: October 8, 2012

By:    /s/ Kenneth D. Bell
       Kenneth D. Bell, Receiver, Esq.

and

MCGUIREWOODS LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202
Telephone: 704-343-2000
Facsimile: 704-343-2300
*Attorneys for Receiver, KENNETH D. BELL, ESQ.*

25

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have electronically filed the foregoing PRELIMINARY

LIQUIDATION PLAN with the Clerk of Court using the CM/ECF system which will send notification to the

following parties in this case:

> John J. Bowers
> Securities and Exchange Commission
> 100 F Street, NE
> Washington, DC 20815
> bowersj@sec.gov
>
> C. Melissa Owen
> Jacob H. Sussman
> Noell P. Tin
> Sarah Elizabeth Bennett
> Tin, Fulton, Walker & Owen
> 301 East Park Avenue
> Charlotte, North Carolina 28203
> cmowen@tinfulton.com
> jsussman@tinfulton.com
> ntin@tinfulton.com
> sbennett@tinfulton.com

This the 8th day of October, 2012.

> */s/ Kenneth D. Bell*
> Kenneth D. Bell, Receiver, Esq.