IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

vs.

REX VENTURE GROUP, LLC
d/b/a ZEEKREWARDS.COM, and
PAUL BURKS,

      Defendants.

Civil Action No. 3:12 cv 519

**APPLICATION FOR FEES AND
EXPENSES BY THE RECEIVER AND
HIS ADVISORS FOR THE FOURTH
QUARTER OF 2014**

      Kenneth D. Bell, Esq., the Court-appointed Temporary Receiver (the "Receiver") for and over the estate of Rex Venture Group, LLC d/b/a ZeekRewards.com, any of its subsidiaries, whether incorporated or unincorporated, and any businesses or business names under which it does business (the "Receivership Defendant"), and McGuireWoods LLP ("MW"), as counsel for the Receiver, hereby submit this application (the "Application") for allowance of compensation and reimbursement of expenses incurred by the Receiver, MW, and FTI Consulting, Inc. ("FTI"), consultants for the Receiver (collectively, the "Receiver Team"), during the period from October 1, 2014 through December 31, 2014 (the "Compensation Period").

I. **SUMMARY OF PROFESSIONAL FEES AND REIMBURSEMENT OF
EXPENSES REQUESTED**

      This Application has been prepared in accordance with the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Guidelines").

1

The Receiver and MW attorneys and paraprofessionals have expended a total of 2,383.6 hours working on this matter during the Compensation Period. The Receiver and MW seek allowance of compensation for services rendered during the Compensation Period with respect to the Receivership Estate in the amount of $834,542.22 (which reflects a 15% discount of the regular billing rates of the Receiver and all MW personnel), and reimbursement of actual and necessary expenses in the amount of $49,745.30. In addition to the 15% discount identified above, the Receiver and MW have applied an additional discount of more than 25% to the claims and distribution related fees. This represents a cost-saving to the estate of more than $68,000, over and above the already-discounted fees.

The Receiver retained FTI as the forensic accountants and litigation and database consultants for the Receivership Estate. FTI professionals expended a total of 2,456.5 hours working on this matter during the Compensation Period, and seek allowance of compensation for services rendered in the amount of $685,904.50 (which reflects a 15% discount from FTI's regular billing rates[1]), and reimbursement of actual and necessary expenses in the amount of $6,513.83. In addition to the 15% discount identified above, FTI has applied an additional discount of 5% to its overall fees. This represents a cost-saving to the estate of more than $36,000, over and above the already-discounted fees.

Pursuant to the SEC Guidelines, the following exhibits are attached:

1. Certification regarding compliance by the Receiver and MW with the SEC Guidelines (attached as Exhibit A);

2. Certification regarding compliance by FTI with the SEC Guidelines (attached as Exhibit B);

---

[1] In keeping with the rate discounts applied by MW, FTI reduced the hourly rates for its Senior Managing Directors to $495, Managing Directors to $410, Senior Directors to $395, Directors to $350, Senior Consultants to the range of $270-$320, and Consultants to the range of $210-$225. The average reduction in bill rates is 20.8% per hour.

3. Fee Schedule setting forth all MW professionals and paraprofessionals who have performed services in this case during the Compensation Period, the capacity in which each individual is employed by MW, each individual's customary hourly billing rate, the hourly billing rate charged by MW for services performed by each individual, the aggregate number of hours expended in this matter, and the fees billed (attached as Exhibit C);

4. Fee Schedule setting forth all FTI professionals and paraprofessionals who have performed services in this case during the Compensation Period, the capacity in which each individual is employed by FTI, each individual's customary hourly billing rate, the hourly billing rate charged by FTI for services performed by each individual, the aggregate number of hours expended in this matter, and the fees billed (attached as Exhibit D);

5. Schedule specifying the categories of expenses for which the Receiver and MW seek reimbursement, and the total amount for each such expense category (attached as Exhibit E);

6. Schedule specifying the categories of expenses for which FTI seeks reimbursement, and the total for each such expense category (attached as Exhibit F);

7. All MW time records billed during the Compensation Period by activity categories and a description of the services rendered, arranged in chronological order (attached as Exhibit G);

8. All FTI time records billed during the Compensation Period by activity categories and a description of the services rendered, arranged in chronological order (attached as Exhibit H); and

9. All activity categories and subcategories created in conjunction with SEC and pursuant to SEC Guidelines (attached as Exhibit I).

The Receiver and FTI have previously requested and the Court previously granted interim applications for fees and services and payments have been made on those applications in the cumulative amount of $13,345,283.00 (less applicable holdbacks). The Receiver and MW have not been previously compensated for the fees and expenses in this Application. The Receiver, MW, and FTI request that the Court order a holdback of 20% of MW's and FTI's fees for this quarter. The fees and expenses herein were incurred through the discharge of the

3

Receiver's duties specified in the Court's Initial Receiver Order, Amended Receiver Order, and Order Reappointing Temporary Receiver. We believe the charges are necessary and proper, and that our efforts have brought significant benefit to the Receivership Estate. In accordance with SEC Guidelines, the Receiver and MW have not billed for their work on this Application. The SEC has informed the Receiver that it objects to this Fee Application, and plans to submit a written objection under separate cover. The SEC asks the Court to withhold approval of the fee application until it has had an opportunity to be heard.

## II. SUMMARY OF ACTIVITIES OF THE RECEIVER BETWEEN OCTOBER 1, 2014 AND DECEMBER 31, 2014

### A. <u>Operations of the Receiver</u>

#### 1. Investigating the Receivership Defendant's Financial Information

During the fourth quarter, the Receiver Team continued to work with FTI and various government agencies to collect, analyze, and further reconcile information from financial institutions, e-wallet vendors, payment processors, and other related entities and individuals to identify and recover potential outstanding Receivership Assets. During the fourth quarter, these efforts primarily focused on analysis of documents and information contained in supplemental productions in response to the Receiver's subpoenas or that were produced during the course of discussions with these entities and individuals regarding outstanding Receivership Assets. In addition, the Receiver Team continued to assist various government agencies in their own investigations concerning the Receivership Defendant, principals, affiliates, and the entities and financial institutions that provided services to or transacted with the Defendants.

#### 2. Marshaling and Preserving Receivership Assets

##### a. Accounts for Holding Receivership Assets

The Receiver currently maintains six bank accounts on behalf of the Receivership Estate for holding Receivership Assets: the "Affiliate Account," the "Seized Asset Account," the "Pre-Filing Account," the "Settlement Account," the "Withholding Account," and the "Holdback Account."

Excluding earned interest and transfers between accounts, the Receiver deposited the following funds into its accounts during the fourth quarter of 2014:

- $3,977,188.96 turned over by e-wallet provider NxSystems, Inc. This amount was originally deposited to the Pre-Filing Account and then transferred to the Seized Asset Account.

- $323,592.12 into the Settlement Account from settlements with net winners.

As of December 31, 2014, the Receivership Estate held approximately $90.7 million in the Affiliate Account, approximately $118 million in the Seized Asset Account, approximately $294,000 in the Pre-Filing Account, approximately $4.7 million in the Settlement Account, $0 in the Withholding Account, and approximately $1.1 million in the Holdback Account.

### b. Cashier's Checks

In the quarter ending December 31, 2014, the Receiver's conflicts counsel, Erwin, Bishop, Capitano & Moss, P.A. ("EBCM") continued working to resolve claims against financial institutions arising from dishonored cashier's checks, teller's checks and bank money orders. As of December 31, 2014, EBCM had resolved six claims pending completion of settlement documentation, and continued work on thirty-two active claims with a gross adjusted value of $465,668. Discussions with responsible parties on the thirty-two remaining claims are at impasse such that litigation will be required to resolve these claims.

EBCM also assisted the Receiver by preparing and administering claim stipulations for eligible banks and related parties that paid money to the Receivership to resolve claims for dishonored instruments after the court-authorized extended December 1, 2013 claims deadline for certain financial instruments. As of December 31, 2014, claim stipulations are complete or in process for thirty-two financial institutions. Thirty financial institutions that are potentially eligible to file claims against the estate did not respond to the Receiver's invitation to enter into a claim stipulation.

The Receiver is at an impasse in negotiations with several banks over the cashier's check claims. As a result, the Receiver has decided to pursue those claims through turnover / civil contempt motions under the freeze order.

### c.    Funds Held by E-Wallets

The Receiver Team filed a Motion for an Order Directing NxSystems, Inc. to Turn Over Receivership Assets and/or Find them in Contempt of the Court's Order Freezing Receivership Assets seeking to recover the approximately $9 million in outstanding assets that should have been frozen and remitted to the Receivership pursuant to the Court's Freeze Order.

### d.    Additional Asset Recovery

During the fourth quarter, the Receiver Team continued litigating against Preferred Merchants and Jaymes Meyer to recover the approximately $4.8 million they improperly transferred and failed to return in violation of the Freeze Order. The Receiver Team filed supplemental briefing supported by an affidavit from the SEC in connection with its contempt motion, apprising the Court of new information that was just recently brought to the Receiver's attention regarding Preferred Merchants' and Meyer's notice of the asset freeze prior to the Court's Freeze Order; false and/or incomplete representations made to the SEC about the assets held or controlled by Preferred Merchants and/or Meyer when the SEC requested that Meyer

6

freeze all RVG accounts and assets; and failure to freeze the assets that were held in trust for RVG despite the Court's Order and the SEC's specific instructions to do so.

Upon learning this information, given the apparent increased risk of dissipation of the $4.8 million, the Receiver Team moved for a temporary restraining order in connection with these funds, asking the Court to order Preferred Merchants and Jaymes Meyer to segregate and protect these funds until the other motions are resolved on the merits. Pursuant to Court Order, the parties are currently engaged in discovery relating to these assets to assist the Court in its ruling, including supplemental productions of financial information from Preferred Merchants and Jaymes Meyer and the deposition of Jaymes Meyer. Finally, in response to a request from the Court, the parties submitted briefing on whether a plenary proceeding may be conducted within the context of the pending contempt motion. As set forth in his brief, it is the Receiver's position that the Court should uphold the litigation stay and resolve these matters in a plenary proceeding within the context of the existing SEC Action and the Receiver's contempt motion, which would allow for the resolution of all issues and also the protection of all parties' rights and interests, including the important interests served by the litigation stay.

During the fourth quarter, the Receiver Team also filed a Motion for an Order Directing Plastic Cash International LLC and Brian Newberry to Turn Over Receivership Assets and/or Find them in Contempt of the Court's Order Freezing Receivership Assets, in connection with the approximately $8.3 million of Receivership Assets that they failed to freeze and return to the Receivership Estate.

### e. Foreign Accounts

The Receiver Team is continuing its investigation and pursuit of outstanding funds from Payza, Payment World, Solid Trust Pay, and Cyber Profit. With regard to the approximately $13.2 million outstanding from Payza and/or Payment World, the Receiver Team met and

conferred with Payment World's counsel, seeking the production of outstanding information and documents responsive to the Receivership's subpoena and information about individuals who may have information to assist in recovering the assets from VictoriaBank in Moldova. The Receiver Team also continues to pursue avenues of communication with and options to recover assets directly from VictoriaBank in Moldova and will continue to explore all available options in its efforts to recover the outstanding funds.

### 3. Analyzing the Operations of the Receivership Entity

#### a. Investigating and Validating the Receivership Defendant's Electronic and Financial Data

During the fourth quarter, FTI's activities primarily related to resolving claimant disputes and reviewing claims requiring manual reconciliation. Claims were reviewed further during the quarter as new information was made available through the objection process.

FTI continued to assist the Receivership in pursuing outstanding Receivership assets from various financial vendors and institutions. Specifically, FTI assisted by reviewing documents, preparing asset tracing analyses, and compiling documents, facts and analyses to support legal pleadings against several financial vendors. Additional work included updating the Receivership's financial books and records as new data was received. More updates will likely continue as new information is received.

FTI also provided litigation support service to the Receivership. FTI continued to receive new document productions from several financial institutions (including NxPay and Preferred Merchants). It assisted McGuireWoods with the litigation process related to actions against NxPay and Preferred Merchants/Jaymes Meyer, including document review and deposition preparation. FTI reviewed the new documents received and worked closely with MW to trace funds for both the Meyer accounts and the Settlement Account at NxPay, and it incorporated this

new financial data into the RVG books and records as necessary. Further, FTI continued to review disbursement and payment data for additional net-winner defendants at the direction of McGuireWoods. Similar to last quarter, FTI compiled ZeekRewards payments related to these defendants and compared transactions to RVG bank records and e-wallet transactional data. FTI sent summaries of these analyses to McGuireWoods to assist with the litigation. In addition, FTI prepared an Expert Report regarding the determination of payments into and out of the scheme, which will be used in all clawback actions. FTI also assisted the Receivership in preparing for depositions of specific financial vendors in order to trace Receivership Assets.

### b. Investigating the Receivership Defendant's Operations

During the fourth quarter, the Receiver's investigation of RVG's operations included analyzing the interactions and financial transactions among RVG and certain vendors and third-party advisors. This analysis was performed for various purposes, including the pursuit of Receivership Assets from financial institutions, support for the Receiver's ongoing fraudulent transfer lawsuits, analysis of claims against foreign net winners, and analysis of potential claims against third parties.

### 4. Communicating with Affiliates and Creditors

The Receiver Team continued to communicate with individual Affiliates and other Creditors on a daily basis throughout the final quarter of 2014. These communications were largely focused on the claims determination and allowance process. These communications were usually in relation to objections to specific claim determinations and addressing questions regarding distribution payments. Additionally, the Receiver Team had discussions with various Affiliates regarding pending net-winner litigation that has been filed against such Affiliates.

The final approximately 7,000 claim determinations were issued to Affiliate claimants in the final quarter of 2014. The total approximate number of claim determinations issued by the Receiver

through the final quarter of 2014 was 175,000. Claim determinations for subrogation claims of financial institutions have not been issued at this time, but should be issued in the first quarter of 2015.

In addition to individual communications, the Receiver Team posted three updates on the Receivership website regarding the claim and distribution process.  Additionally, the Receiver Team updated the claim portal in December 2014 so that Affiliate Claimants are now able to check the status of their claim determination and distribution, if any.

### 5.    Issues Concerning Federal Taxes

During the fourth quarter, FTI and the Receiver Team tracked and reviewed 1099-related correspondence from affiliates.  This work included responding to various affiliate questions and comments and reviewing transaction data for each affiliate who inquired on a 1099 received from the Receiver.  Additional work included performing any necessary analysis and research to support various tax-related obligations of the Receiver and in some cases working with National Law Forms to generate amended 1099s.

During the fourth quarter, the Receiver Team reviewed the applicable federal tax laws in connection with its first interim, partial distribution payments made to net losers.  The Receiver Team had discussions with the Internal Revenue Service regarding potential withholding requirements.  Eventually, the Receiver Team determined that there are no withholding requirements with respect to the first interim, partial distribution payments, and the Receiver disbursed to claimants the amounts that had been initially withheld from these distributions.

As previously reported for the third quarter of 2014, the Receiver Team had begun preparing a request seeking a penalty waiver. This waiver had been prepared for outstanding employment-related taxes and related penalties and interest owed because of RVG's failure to pay these taxes prior to the inception of the Receivership.  The Receiver Team continues to work

on preparing the penalty waiver and had discussions with the Internal Revenue Service in this regard.

6. **Litigation in the SEC Enforcement Action**[2]

The Receiver Team litigated the following matters in the SEC Action:

- The Receiver Team filed multiple motions and associated briefing regarding claims discussed above for the return of Receivership Assets from various payment processors, e-wallets, and financial institutions.

- The Receiver and his counsel deposed James Meyer.

- The Receiver Team filed an objection to the attorney charging lien filed by the attorney for the *Belsome* movants and litigated a subsequent motion to stay filed with the Fourth Circuit Court of Appeals by that attorney. This Court granted the Receiver's motion to strike the charging lien, and the motion to stay was denied by the Fourth Circuit.

- The Receiver Team filed a consent motion extending the Temporary Restraining Order freezing funds in an individual's account that had been transferred from RVG in July and August 2012, which funds the Receiver will obtain pursuant to a settlement agreement returning approximately $1.37 million to the Receivership Estate.

These various matters required significant analysis and briefing by the Receiver Team.

B. **The Receiver's Fund Accounting**

The Receiver's Second Standardized Fund Accounting Report ("SFAR") is included with the Receiver's Status Report for the Fourth Quarter of 2014.

C. **The Receiver's Receipts and Disbursements**

---

[2] This section discusses litigation in the SEC Enforcement Action. The Receiver's efforts related to the recovery of fraudulently transferred funds and other damages incurred by RVG are discussed later in this Report.

The Receiver's Schedule of Receipts and Disbursements ("Schedule") from October 1, 2014 through December 31, 2014, is included with the Receiver's Status Report for the Fourth Quarter of 2014. The Schedule sets forth the following receipts and disbursements:

1. Received funds of $3,977,188.96 that were seized by the U.S. Secret Service,

2. Received funds of $323,592.12 from third-party litigation settlements;[3]

3. Received interest income totaling $54,796.81; and,

4. Disbursed funds from the Receiver's accounts of $112,452,773.79, which includes $110,772,395.52 of disbursements to investors. The remaining funds were disbursed for fees previously approved for payment to FTI and McGuireWoods; bank fees related to management of the Receiver's accounts; claims process expenses; RVG website and database hosting; legal services; check return charges; and other professional services.

Between October 1, 2014 and December 31, 2014, the Receivership Estate received $4,355,577.89 and disbursed $112,452,773.79. The Receiver has marshaled total assets of approximately $342.7 million during the period between August 17, 2012 and December 31, 2014, while disbursing approximately $128.2 million during the same period.[4]

**D. Description of All Known Non-Cash Receivership Property**

In the fourth quarter, the Receiver took possession of a residential home at 5600 Roundhouse Lane in Charlotte, NC, as part of a settlement with the estate of Defendant Roger Plyler. The Receiver retained a real estate agent to sell the home, which went to market in the first quarter of 2015.

---

[3] As of the end of the fourth quarter, the Receiver has agreed to approximately $4.8 million in settlements with third parties.

[4] A significant amount of the available funds on hand are being reserved in light of the more than 60,000 claimants who have yet to accept their claims as well as thousands of subrogation claims that are being resolved.

E.    **Description of Claims Held by the Receivership Estate**

1.    **Identifying and Pursuing Fraudulently Transferred Funds Held by Net-Winner Affiliate-Investors**

a.    **U.S. Net Winner Lawsuit**

In the case of *Bell v. Disner et al.*, No. 3:14-cv-91 (W.D.N.C.), the Receiver Team litigated the defendants' motions to stay discovery pending resolution of the multiple motions to dismiss during the fourth quarter. On December 9, the Court denied each of the defendants' motions to dismiss, moving the lawsuit along to its next stages of discovery and resolution of the motion for class certification.[5]

Further, the Court granted the Receiver's motions for default judgment against Defendants Todd Disner and David Sorrells and entered Judgments against them for $2,079,757.88 and $1,197,241.12, respectively, which will incur post-judgment interest until satisfied.

b.    **Claims Against Foreign Net Winners**

i.    **Claims Against Canadian Net Winners**

In the Receiver's lawsuit against net winners residing in Canada, *Bell v. Parker et al.*, No. 3:14-cv-444 (W.D.N.C.), the Receiver worked closely with Canadian counsel and an investigation firm to locate and serve the defendants with legal process. The Receiver obtained entries of default against eight Canadian net winners. Two of these net winners subsequently settled with the Receiver.[6] The Receiver is pursuing default against the remaining defendants who have failed to answer the Amended Complaint and will file these motions in the first quarter of 2015.

---

[5] In addition, on January 14, 2015, the Court granted the Receiver's motion to dismiss the defendants' counterclaims and dismissed all such counterclaims.

[6] The Receiver obtained default judgments against the other six defaulted defendants on January 6, 2015.

### ii. Claims Against Australian Net Winners

On December 29, 2014, the Receiver filed a lawsuit against net winners residing in Australia. *See Bell v. Bjerring, et al.*, No. 3:14-cv-724 (W.D.N.C.). The Receiver Team is working with Australian counsel in order to serve these defendants with legal process. It is expected that service efforts in this lawsuit will continue throughout the first quarter of 2015.

### 2. Investigating Claims against Receivership Defendant Insiders

The Receiver has now settled with each of the defendants named in the lawsuit against insiders of the ZeekRewards scheme other than Darryle Douglas, against whom the Receiver has obtained a default judgment. On October 2, 2014, the Receiver filed a motion in the SEC Action seeking Court approval of these settlements. (Doc. No. 259). On October 14, 2014, the Court granted the Receiver's motion. (Doc. No. 261). The case currently remains open on the Court's docket pending satisfaction of the terms of the various settlement agreements.

### 3. Investigating Claims against the Receivership Defendant's Third-Party Advisors and Others

In the Receiver's action against attorney Kevin Grimes and his former law firm and business entity, the defendants filed motions to dismiss. *See Bell v. Grimes et al.*, No. 3:14-cv-351 (W.D.N.C.). The Receiver filed responses in opposition to these motions to dismiss, and the Court is in the process of resolving these motions. The parties are now discussing the prospects of a settlement conference, which may occur during the first quarter of 2015.

In addition, in the Receiver's lawsuit against attorney Howard Kaplan, the Court is in the process of resolving the defendant's motion to dismiss. The Receiver will pursue discovery in this matter during the first quarter of 2015.

### F. Potential Creditors of the Receivership Estate

As set forth above, the Receiver Team has initiated litigation against NxPay, Plastic Cash, and their principals and affiliates, and it continues to litigate against Preferred Merchants and its principal, Jaymes Meyer. These entities appear to have transferred assets in violation of the Freeze Order. As part of these litigation proceedings, the Receiver Team is defending against any claim that the entities or individuals are entitled to the funds improperly held or transferred whether outright or as a set off against amount owed to the Receivership Estate.

Of these entities, only Plastic Cash filed a claim as part of the Court-approved claims process, which the Receiver denied. The parties have agreed to begin planning for potential mediation, subject to certain agreed terms and conditions, in an effort to resolve the parties' respective claims.

### G. Status of Creditor Claims Proceedings, After Such Proceedings Have Been Commenced

In December, the Receiver determined in consultation with his professionals that he was not required to withhold taxes from distributions to be made on account of Affiliate claims. As such, on December 23, 2014, the Receiver caused 58,000 additional checks to be issued to all affiliates who had taxes withheld from their first, interim partial distributions. These checks were issued in the amount of the tax that was previously withheld in regard to the applicable Affiliate claimant. Additionally, the Receiver also caused certain checks that were returned as undeliverable or where issued improperly to be reissued on December 23, 2014 if the recipient had requested such reissuance.

FTI provided significant assistance with the claims process during the fourth quarter. It reviewed and responded to claimant disputes, organized and tracked correspondence while providing dispute support, and requested additional information from claimants to verify

disputes. The magnitude of claimants and disputes in a claims process that has seen more than 175,000 claims required a substantial effort by FTI to manage the claims reconciliation process. To this end, FTI developed a claims review tool that allowed automating the review of over 170,000 of the 175,000 claims filed. Approximately 2,000 claims were unable to be automated and required manual review and additional research to verify the specific information related to the each of the claims.

The completion of the issuance of claim determinations for Affiliate claimants also occurred in the fourth quarter of 2014. As noted above, claim determinations for subrogation claims should be issued in the first or second quarter of 2015. No further review of claims in the different classes of claims are anticipated because, pursuant to an order of the Court, the Receiver does not need to review any additional class of claims until the class of Affiliate claimants and their subrogees are paid in full.

Finally, almost 113,000 Affiliate claimants have accepted their claim determinations and have been or will be issued a distribution shortly. However, more than 59,000 Affiliate claimants have failed to respond to the claim determination that was issued on account of his/her claim. Each such claimant is required to act further if he/she would like to have his/her claim allowed and to receive a distribution from the Receivership Estate. Failure to act further may cause a claimant to eventually forfeit his/her distribution. The Receiver intends to contact the Affiliate claimants who have failed to respond to their claim determination to request that such claimants respond to the claim determination.

## III. FEES AND EXPENSES REQUESTED

In connection with the Compensation Period, the Receiver and MW request compensation for services in the amount of $834,542.22 and reimbursement of expenses in the amount of $49,745.30.

16

In connection with the Compensation Period, FTI requests compensation for services in the amount of $685,904.50 and reimbursement of expenses in the amount of $6,513.83.

These amounts reflect the hours worked by the Receiver and MW attorneys and legal assistants, and the hourly rates in effect at the time that the services were rendered, as modified by the discount provided by the Receiver and MW and additional write-offs of attorney time. These amounts also take into account all relevant circumstances and factors as set forth in the N.C. Code of Professional Responsibility and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and MW under the Receiver Order and the Amended Receiver Order.

Pursuant to the Receiver Order and Amended Receiver Order and the public service discount and additional fees and write-offs as described above, the fees of the Receiver and MW have been reduced from $1,128,318.22 to $834,542.22, a reduction of $293,776.

The majority of the work described in this Application was performed by a small group of attorneys and a paralegal.[7] In addition to the Receiver and the paralegal, the primary team consists of: three associates whose responsibilities include case management, motions and discovery drafting including negotiations with opposing counsel, document review supervision, status report drafting, and legal research related to litigation and fact investigation, each of whom dedicate between 10 and 70 percent of their time to the

---

[7] The remainder of the timekeepers consist of MW professionals and paraprofessionals working in specialized capacities, such as bankruptcy, tax, employee benefits and information technology, who were consulted for a limited purpose and who charged limited time to the Estate. The total number of timekeepers will decrease going forward.

Receivership matter; one associate who focuses on asset analysis and recovery from financial institutions who dedicates approximately 10 percent of her time to the Receivership; one senior counsel who focuses on claims administration and reconciliation who dedicates 40 to 50 percent of his time to the Receivership matter; and one partner who supervises litigation and settlement issues who dedicates approximately 80 percent of his time to the Receivership. This structure is purposeful, effective, and efficient for the Receivership, as the attorneys most experienced in their field are conducting certain key portions of the Receivership work.

The Receiver and MW have submitted previous fee applications in this case, which were approved by this Court. MW has not received a retainer in this case.

As required by the SEC Guidelines, the Receiver and MW professionals recorded all services performed in time increments of one-tenth of an hour. All services by MW legal assistants and other paraprofessionals were professional in nature.

In accordance with the SEC Guidelines, this Application does not seek payment for time spent preparing the Application or any documentation in support.

## IV. SUMMARY OF SERVICES RENDERED BY THE RECEIVER AND MW DURING THE COMPENSATION PERIOD

Pursuant to the SEC Guidelines and discussions with the SEC, MW has segregated its time during the Compensation Period into twelve activity categories and additional subcategories. A description of the activity categories and subcategories is attached hereto as Exhibit I. Narrative summaries of these activity categories and subcategories are provided below.

**A.** *Asset Analysis and Recovery (AAR), Asset Disposition (AD), Business Analysis (BA), Litigation Consulting (LC), and Data Analysis (DA) AMOUNT: $494,944.30*

Listed above are certain activity categories which are required under the SEC's Guidelines to track the Receiver's efforts and, while the Receiver will not necessarily conduct all of the above-referenced activities in a given quarter, we have grouped the above categories together for convenience. As outlined above, the activities in this category consist of the Receiver Team's efforts to identify, recover, and consolidate the Receivership Defendant's assets by collecting funds and outstanding amounts from certain financial institutions which have not released all Receivership Assets. The Receiver continues to investigate transfers involving key insiders, third-party advisors and companies affiliated with RVG and/or its key insiders. Additionally, the Receiver's factual investigation and litigation activities fall into this category, including filings and court appearances related to the clawback litigation, conducting witness interviews, and review of RVG and third-party documents related to Receivership Assets and the operation of RVG. Additional subcategories, which were created in conjunction with the SEC, further break out and clarify many of the activities listed above:

1. *Clawback Litigation (CLA, CLG, CLLR, CLSUB, CLNDM, CLDM, CLSET)* AMOUNT:  $134,783.62

The above subcategories of the AAR activity category relate specifically to Clawback Litigation. These Clawback Litigation subcategories consist of efforts to aid in the recovery of funds fraudulently transferred by the Receivership Defendant, including activities described above related to the lawsuits against insiders, third-party advisors, and net winners described above. In addition, the Receiver has contacted thousands of net winners for the purpose of settling potential claims, and has negotiated settlements promising approximately $4.8 million.

**2.** *Other Litigation (OLG, OLLR, OLSUB, OLNDM, OLDM, OLDEP, OLSET) <u>AMOUNT: $107,628.22</u>*

The above subcategories of the AAR activity category relate to litigation other than Clawback Litigation. The Other Litigation subcategories include responding to various related cases filed by victims of the Scheme, and responding to motions filed in the SEC Enforcement Action by non-party net winners and others, including plaintiffs in the *Belsome* class action lawsuit.

**3.** *Other AAR Subcategories (FI, FNA, LR, SAP) <u>AMOUNT: $251,689.46</u>*

The above subcategories of the ARR activity category relate to Fact Investigation (FI), Financial Institution Negotiations/Analysis (FNA), Legal Research (LR), and Strategic Analysis and/or Planning (SAP). These activities consist of factual investigation and efforts related to negotiations with financial institutions for the release and recovery of funds belonging to the Receivership Estate and certain legal research. This category includes work related to the receiver's efforts to reconcile information from various financial institutions, e-wallet vendors, and payment processors for the purpose of recovering potential outstanding Receivership Assets. This category also includes work related to the Receiver's continuing investigation of RVG's operations, including numerous interviews of key insiders, analysis of documents and data produced by various subpoenaed entities and individuals, and providing assistance to various governmental entities.

**4.** *Remaining Activities (BA, LC, DA, AD) <u>AMOUNT: $663.00</u>*

The above activity categories are included in the amount listed in Subsection A, above, and comprise the remainder of work performed under that subsection, including efforts involving business analysis, litigation consulting,

asset distribution, and analysis of assorted data relevant to the administration of the Receivership Estate, including work by the Receiver Team with the Receiver's retained forensic consultants, FTI.

**B.** *Business Operations (BO), Employee Benefits/Pensions (EBP), Tax Issues (TI)* AMOUNT: $28,299.97

Listed above are certain activity categories which are required under the SEC's Guidelines to track the Receiver's efforts and, while the Receiver will not necessarily conduct all of the above-referenced activities in a given quarter, we have grouped the above categories together for convenience. The activities in this category consist of the Receiver Team's efforts related to the Receivership Defendant's business operations, including review of receivables, review and payment of payables, administration of employee benefits, and assuring federal and state tax compliance for independent contractors and employees. Because these matters relate to the winding-up of the Receivership Defendant, a portion of these fees are likely to be non-recurring.

**1.** *Tax Issues (TI) and Employee Benefits/Pensions (EBP)* AMOUNT: $26,712.15

The fees associated with the activity categories listed above are included in the amount listed in Subsection B, above, and include the work on federal and state tax issues outlined above.

2. *Business Operations (BO)* <u>*AMOUNT: $1,587.82*</u>

The fees associated with the activity category listed above are included in the amount listed in Subsection B, above, and primarily represent efforts directed at winding up the business operations of the Receivership Defendant discussed above.

**C.** *Case Administration (CA), Status Reports (SR), Claims Administration and Objections (CAO)* <u>*AMOUNT: $361,297.95*</u>

Listed above are certain activity categories which are required under the SEC's Guidelines to track the Receiver's efforts and, while the Receiver will not necessarily conduct all of the above-referenced activities in a given quarter, we have grouped the above categories together for convenience. The activities in this category consist of regular meetings and status conferences among members of the Receiver Team and the Receiver Team's efforts to comply with the directives of the Court. The category also includes administration of the claims process. Other activities include the Receiver's management and oversight of the Receiver Team and MW's participation in calls and conferences with FTI, the SEC, and other entities. The Receiver has also engaged in motions practice when necessary.

1. *Claims Administration and Objections Subcategories (CAO) (RES, RA, DR, CAF, CIN, OTH)* <u>*AMOUNT: $255,510.32*</u>

The Claims Administration and Objections activity category and the above subcategories of the CAO category, including Research (RES), Review/Analyze (RA), Draft/Revise (DR), Communicate Affiliates (CAF), Communicate Internal (CIN), and Other (OTH), are part of the amount listed in Subsection C above. As discussed above, during the fourth quarter, this work included reconciling claims and issuing claims determination letters, addressing objections to claim determinations, and the issuance of checks to affiliates who had taxes withheld

from their first, interim partial distribution checks. The Receiver team also continued to work closely with FTI on claims determination and communicate with affiliates regarding the claims process.

**2.** *Case Administration (CA - $89,810.03) and Status Reports (SR - $15,977.60)* <u>*AMOUNT: $106,345.13*</u>

The Case Administration (CA) and Status Report (SR) activity categories listed above are included in the amount listed in Subsection C above, and include the management and oversight of the receivership generally, as well as the preparation of the Quarterly Status Report and other reports. Such time in the fourth quarter included senior members of the Receiver Team supervising a variety of ongoing matters, including the filing of the status report for the previous quarter, and coordinating with FTI, the SEC, and other government entities.

**D.** *Travel:* <u>*AMOUNT: $1,591.66*</u>

The activities in this category cover all non-working travel time of the Receiver and MW professionals outside a 20-mile radius of the relevant offices during the Compensation Period. These activities are billed at a 50 percent rate, and are incorporated into the total fees described in categories above.

## V. SUMMARY OF SERVICES RENDERED BY FTI DURING THE COMPENSATION PERIOD

**A.** *Case Administration (FTI Code 1) and Quarterly Status Reports (FTI Code 2.1),* <u>*AMOUNT: $4,915.50*</u>

FTI spent most of the time related to these task codes on creating and editing weekly billing reports that detail FTI's work on this engagement. Weekly billing reports are later compiled and used to create the quarterly Fee Application that reports and details FTI's

activities.  FTI does not bill time creating the weekly billing reports or Fee Applications to the Receivership.

Additional work in these task codes include creating and revising Quarterly Status Report narrative sections, footnotes, and exhibits including the Standardized Fund Accounting Report. These additional work streams, primarily related to the Quarterly Status Reports, are billed to the Receivership.

**B.** *Claims Administration (FTI Code 3), <u>AMOUNT: $500,016.00</u>*

This task code includes work streams related to the claims filing and reconciliation process.  During the fourth quarter, FTI continued to act as the liaison between claimants and the Receivership by reviewing and responding to claimant disputes, tracking and organizing claimant responses, requesting additional information to determine claim statuses, and quality control of claims.  Additionally, FTI continued to index data, claim amounts, usernames associated with claimants, and letters of determination sent to claimants.  FTI also provided information to Garden City Group ("GCG") and McGuireWoods to finalize claim determinations.

During the fourth quarter, FTI prepared for a distribution related to approximately 59,000 Affiliate claimants who had taxes withheld from the first distribution.  At the Receivership's request, FTI initiated a distribution of approximately $24 million to these Affiliate claimants on December 23, 2014.  FTI will continue to assist in reconciling claims and preparing additional distributions to claimants in the future.

**C.** *Accounting/Auditing (FTI Code 5) and Forensic Accounting (FTI Code 6), <u>AMOUNT: $58,529.00</u>*

For these task codes, FTI analyzes RVG financial operations, provides forensic accounting work related to RVG financial institutions, vendors, and affiliates, and performs accounting work related to Receivership financial books and records.

In the fourth quarter, FTI received new document productions related to a specific RVG vendor. FTI reviewed various email correspondence, financial account statements, and additional documents to assist the Receiver in tracing outstanding financial assets. Additionally, FTI assisted in reviewing and confirming information related to NXPay and Preferred Merchants with McGuireWoods. Finally, FTI analyzed and reconciled Net Winner disbursement data to assist the Receiver in multiple clawback actions and settlements.

FTI also worked on accounting for Receivership funds. Tasks included indexing and providing information to the Receivership regarding deposits, disbursements, and fees related to the Receivership's bank accounts.

**D.** *Data Analysis (FTI Code 7), <u>AMOUNT: $59,919.50</u>*

FTI performed analyses of the Zeek Databases to reconcile updated frozen funds analyses provided by NXPay, analyzed returned checks, and tracked affiliate bankruptcy notices. Additionally, FTI used the Zeek Databases to reconcile addresses associated with foreign Net Winners included in the clawback litigation and Net Losers included in the claims process.

E. *Tax Issues (FTI Code 8), <u>AMOUNT: $10,990.50</u>*

FTI continued to review transactional data and responded to affiliate correspondence regarding 1099s. Additionally, FTI compiled relevant 2012 RVG financials at the request of the IRS.

F. *Asset Analysis and Recovery (FTI Code 10), <u>AMOUNT: $87,634.00</u>*

In this task code, FTI traced assets related to an RVG vendor that produced various documents in the fourth quarter. FTI reconciled transactional detail related to this vendor with RVG financial records. FTI also continued to track and account for settlement agreements received from scheme Net Winners.

FTI also prepared an expert report related to a Net Winner complaint. The expert report explained FTI's procedures in determining Net Winner amounts.

## VI. EXPLANATION OF EXPENSES AND RELATED POLICIES

The Receiver and MW seek reimbursement for their out-of-pocket costs in the amount of $49,745.30. Exhibit E sets forth the various categories of expenses for which reimbursement is sought. These expenses include document management services from Kroll Ontrack, Inc., which hosts and processes the documents being collected and reviewed by MW. MW will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Guidelines and will provide the SEC with copies upon request.

MW observed the following policies in connection with its expenses during the Compensation Period:

A. With respect to all expenses, MW seeks reimbursement only for the actual costs of its expenses. MW has not included the amortization of any investment, equipment or capital outlay in any request for expense reimbursement.

**B.**     In accordance with the SEC Guidelines, MW has not sought reimbursement for local travel expenses (within a 20-mile radius of MW's offices), including mileage, taxis and meals.

**C.**     MW has not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

## VII.    COST SAVINGS TO THE ESTATE

In total, the Receiver and MW seek $884,287.52 for fees and expenses, and request a holdback of 20% of its fees. This represents a cost savings to the estate of more than $293,000.00. MW recognized the public service nature of the engagement, and accordingly discounted all professionals' and paraprofessionals' rates.

In total, FTI seeks $692,418.33 for fees and expenses, and requests a holdback of 20% of its fees. This represents a cost savings to the estate of more than $319,000. FTI recognized the public service nature of the engagement, and accordingly discounted all of its professionals' rates. Additionally, FTI has agreed to not charge for travel time and has waived its customary administrative expense that is usually 6% of fees charged.

## VIII.  THE REQUESTED COMPENSATION SHOULD BE ALLOWED

The Receiver's compensation and the fees and expenses of the Receiver's professionals may be determined at the Court's discretion and, in making those determinations, the Court should consider the complexity of the problem faced, the benefit of the services to the Receivership Estate, the quality of the work performed and the time records presented.  SEC v. Fifth Ave. Coach Lines, Inc., 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); see also SEC v. Elliott, 953 F.2d 1560, 1577 (11th Cir. 1992) (per curiam) (if a receiver reasonably discharges his duties, the receiver is entitled to compensation and the circumstances surrounding the receivership, including the results, are relevant).

While guidelines and standards for assessing compensation are set forth in case law, the unique facts and situations of each case make it impossible to rely directly on those guidelines alone.  SEC v. W.L. Moody & Co., 374 F. Supp. 465, 485 (S.D. Tex 1974), aff'd, 519 F.2d 1087 (5th Cir. 1975).

In the instant case, the Receiver, MW and FTI respectfully submit that the services for which they seek compensation in this Application were necessary for, and beneficial to, the orderly administration of the Receivership Estate.

The issues addressed by the Receiver and MW have been and continue to be highly complex, requiring investigation of an alleged fraud that included approximately 2.2 million Affiliates and 1 million Affiliate-Investors (1 million Affiliate-Investors, and an additional 1.2 million non-investor Affiliates). We respectfully submit that compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the problems, issues or tasks involved. The professional services were performed expediently and efficiently.  Accordingly, the Receiver and MW submit that the compensation requested herein is

reasonable and warranted in light of the nature, extent and value of such service to the Receivership Estate and all parties in interest.

As of December 31, 2014, the Receiver marshaled approximately $342.7 million for the Receivership Estate. Combined, MW and FTI request $1,520,446.72 in fees and services. The fees requested are less than 0.45% of the approximate recovery for the Estate.[8]

The compensation requested for this quarterly Application amounts to approximately $0.69 per Affiliate or approximately $1.52 per Affiliate-Investor.

## IX. RELIEF REQUESTED

WHEREFORE, the Receiver and MW respectfully request that this Application be granted and that they be awarded an allowance of $834,542.22 (of which $166,908.44 will be held back) for legal services rendered during the Compensation Period and $49,745.30 for the reimbursement of expenses; that FTI be awarded an allowance of $685,904.50 (of which $137,180.90 will be held back) for services rendered during the Compensation Period and $6,513.83 for the reimbursement of expenses, and that the Receivership Estate be allowed to pay such amounts and reimburse MW and FTI for approved expenses, together with such other and further relief as necessary and proper.

---

[8] Combined with the $13,345,283.00 in fees and services from prior quarters, the total fees and expenses are less than 4.4% of the approximate recovery of the Estate.

Case 3:12-cv-00519-GCM   Document 359   Filed 04/24/15   Page 29 of 31

Dated: April 24, 2015        By:     /s/ Kenneth D. Bell
                                     Kenneth D. Bell, Esq., Receiver


                              and

                              MCGUIREWOODS LLP
                              201 North Tryon Street
                              Suite 3000
                              Charlotte, NC 28202
                              Telephone: 704-343-2000
                              Facsimile: 704-343-2300

                              *Attorneys for Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have electronically filed the foregoing **APPLICATION FOR FEES AND EXPENSES BY THE RECEIVER AND HIS ADVISORS FOR THE FOURTH QUARTER OF 2014** with the Clerk of Court using the CM/ECF system which will send electronic copies to counsel of record registered to receive electronic service.

This, the 24th day of April, 2015.


/s/ **Kenneth D. Bell**
Kenneth D. Bell, Esq., Receiver