IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. 3:12 cv 519 |
| vs. | **APPLICATION FOR FEES AND EXPENSES BY THE RECEIVER AND HIS ADVISORS FOR THE FIRST QUARTER OF 2015** |
| REX VENTURE GROUP, LLC d/b/a ZEEKREWARDS.COM, and PAUL BURKS, | |
| Defendants. | |

Kenneth D. Bell, Esq., the Court-appointed Temporary Receiver (the "Receiver") for and over the estate of Rex Venture Group, LLC d/b/a ZeekRewards.com, any of its subsidiaries, whether incorporated or unincorporated, and any businesses or business names under which it does business (the "Receivership Defendant"), and McGuireWoods LLP ("MW"), as counsel for the Receiver, hereby submit this application (the "Application") for allowance of compensation and reimbursement of expenses incurred by the Receiver, MW, and FTI Consulting, Inc. ("FTI"), consultants for the Receiver (collectively, the "Receiver Team"), during the period from January 1, 2015 through March 31, 2015 (the "Compensation Period").

I. **SUMMARY OF PROFESSIONAL FEES AND REIMBURSEMENT OF EXPENSES REQUESTED**

This Application has been prepared in accordance with the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Guidelines").

1

The Receiver and MW attorneys and paraprofessionals have expended a total of 1,462.9 hours working on this matter during the Compensation Period. The Receiver and MW seek allowance of compensation for services rendered during the Compensation Period with respect to the Receivership Estate in the amount of $692,004.98 (which reflects a 15% discount of the regular billing rates of the Receiver and all MW personnel), and reimbursement of actual and necessary expenses in the amount of $50,880.17.

The Receiver retained FTI as the forensic accountants and litigation and database consultants for the Receivership Estate. FTI professionals expended a total of 1,963.3 hours working on this matter during the Compensation Period, and seek allowance of compensation for services rendered in the amount of $540,437.00 (which reflects a 15% discount from FTI's regular billing rates[1]), and reimbursement of actual and necessary expenses in the amount of $71.62.

Pursuant to the SEC Guidelines, the following exhibits are attached:

1.  Certification regarding compliance by the Receiver and MW with the SEC Guidelines (attached as Exhibit A);

2.  Certification regarding compliance by FTI with the SEC Guidelines (attached as Exhibit B);

3.  Fee Schedule setting forth all MW professionals and paraprofessionals who have performed services in this case during the Compensation Period, the capacity in which each individual is employed by MW, each individual's customary hourly billing rate, the hourly billing rate charged by MW for services performed by each individual, the aggregate number of hours expended in this matter, and the fees billed (attached as Exhibit C);

4.  Fee Schedule setting forth all FTI professionals and paraprofessionals who have performed services in this case during the Compensation

---

[1] In keeping with the rate discounts applied by MW, FTI reduced the hourly rates for its Senior Managing Directors to $495, Managing Directors to $410, Senior Directors to $395, Directors to $350, Senior Consultants to the range of $270-$320, and Consultants to the range of $210-$225. The average reduction in bill rates is 20.8% per hour.

Period, the capacity in which each individual is employed by FTI, each individual's customary hourly billing rate, the hourly billing rate charged by FTI for services performed by each individual, the aggregate number of hours expended in this matter, and the fees billed (attached as <u>Exhibit D</u>);

5.    Schedule specifying the categories of expenses for which the Receiver and MW seek reimbursement, and the total amount for each such expense category (attached as <u>Exhibit E</u>);

6.    Schedule specifying the categories of expenses for which FTI seeks reimbursement, and the total for each such expense category (attached as <u>Exhibit F</u>);

7.    All MW time records billed during the Compensation Period by activity categories and a description of the services rendered, arranged in chronological order (attached as <u>Exhibit G</u>);

8.    All FTI time records billed during the Compensation Period by activity categories and a description of the services rendered, arranged in chronological order (attached as <u>Exhibit H</u>); and

9.    All activity categories and subcategories created in conjunction with SEC and pursuant to SEC Guidelines (attached as <u>Exhibit I</u>).

The Receiver and FTI have previously requested and the Court previously granted interim applications for fees and services and payments have been made on those applications in the cumulative amount of $14,865,729.72 (less applicable holdbacks). The Receiver and MW have not been previously compensated for the fees and expenses in this Application.    The Receiver, MW, and FTI request that the Court order a holdback of 20% of MW's and FTI's fees for this quarter. The fees and expenses herein were incurred through the discharge of the Receiver's duties specified in the Court's Initial Receiver Order, Amended Receiver Order, and Order Reappointing Temporary Receiver. We believe the charges are necessary and proper, and that our efforts have brought significant benefit to the Receivership Estate.    In accordance with SEC Guidelines, the Receiver and MW have not billed for their work on this Application. The SEC reserves its right to object to this application.

## II. SUMMARY OF ACTIVITIES OF THE RECEIVER BETWEEN JANUARY 1, 2015 AND MARCH 31, 2015

### A. Operations of the Receiver

#### 1. Investigating the Receivership Defendant's Financial Information

During the first quarter, the Receiver Team continued to work with FTI and various government agencies to collect, analyze, and further reconcile information from financial institutions, e-wallet vendors, payment processors, and other related entities and individuals to support the Receiver's efforts to identify and recover potential outstanding Receivership Assets. These efforts are focused primarily on analysis of documents and information contained in supplemental productions in response to the Receiver's subpoenas, produced during discussions with these entities and individuals regarding outstanding Receivership Assets, and provided in connection with court filings and court-ordered discovery. In addition, the Receiver Team continued to assist various government agencies in their own investigations concerning the Receivership Defendant, principals, affiliates, and the entities and financial institutions that provided services to or transacted with the Defendants.

#### 2. Marshaling and Preserving Receivership Assets

##### a. Accounts for Holding Receivership Assets

The Receiver currently maintains six bank accounts on behalf of the Receivership Estate for holding Receivership Assets: the "Affiliate Account," the "Seized Asset Account," the "Pre-Filing Account," the "Settlement Account," the "Withholding Account," and the "Holdback Account."

Excluding earned interest and transfers between accounts, the Receiver made the following deposits into these accounts during the first quarter of 2015:

4

- $1,577,043.06 into the Settlement Account from settlements with non-affiliate third parties;

- $520,250.00 into the Affiliate Account from payments from various financial institutions relating to previously dishonored cashier's checks, teller's checks, official checks, and bank money orders.

As of March 31, 2015, the Receivership Estate held approximately $91.3 million in the Affiliate Account, approximately $89.3 million in the Seized Asset Account, approximately $293,000 in the Pre-Filing Account, approximately $6.3 million in the Settlement Account, $0 in the Withholding Account, and approximately $1.1 million in the Holdback Account.

### b.    Outstanding and Dishonored Negotiable Instruments

In the quarter ending March 31, 2015, the Receiver's conflicts counsel, Erwin, Bishop, Capitano & Moss, P.A. ("EBCM") continued work to resolve claims against various financial institutions arising from outstanding and dishonored cashier's checks, teller's checks, official checks, and bank money orders.  During the quarter, EBCM received payments on behalf of the Receiver from three financial institutions in the gross amount of $520,250.00.  Four additional claims are in the process of being resolved, and EBCM anticipates that this will result in a recovery of $74,941.00 during the second quarter.

As of March 31, 2015, EBCM was working thirty-one active claims against financial institutions currently valued at $310,261.  The thirty-one remaining claims are at an impasse and require litigation activity for collection.  EBCM filed a motion seeking an order to show cause or turnover Receivership Assets against the financial institution with the largest outstanding claim, and it anticipates this claim being resolved during the second quarter.  Similar proceedings on

remaining claims relating to outstanding and dishonored cashier's checks and other instruments are planned for the second quarter.

EBCM also prepared claim stipulations for eligible financial institutions and related parties that paid money to the Receivership to resolve claims for outstanding or dishonored negotiable instruments after the court-authorized December 1, 2013 claims deadline for certain financial instruments. As of March 31, 2015, claim stipulations were complete or in process for thirty-four financial institutions. In addition, the Receiver Team has been working on stipulated claims for affected individuals.

### c. Funds Held by E-Wallets

The Receiver Team is awaiting a ruling on its Motion for an Order Directing NxSystems to Turn Over Receivership Assets and/or Find them in Contempt of the Court's Order Freezing Receivership Assets regarding the approximately $9 million outstanding.

### d. Additional Asset Recovery

During the first quarter, the Receiver Team continued litigation against Preferred Merchants and Jaymes Meyer to recover the approximately $4.8 million they improperly transferred and failed to return in violation of the Freeze Order. Pursuant to the Court's Orders on the pending motions relating to these outstanding assets, the Receiver Team deposed Jaymes Meyer and collected additional documents and information relating to these assets. In addition, the Receiver Team filed motions to secure the properties purchased and/or improved with Receivership Assets that Preferred Merchants and Jaymes Meyer received or improperly transferred to themselves from the Receivership Defendant. One property in the Turks & Caicos Islands has been frozen, and the Court has issued an order directing that it be transferred to the Receiver. The estimated value of this property is believed to be over $2 million. In addition,

Mr. Meyer agreed to a lis pendens upon California real property that he purchased with Receivership Assets for over $400,000.

The Receiver Team also continued litigation against Plastic Cash and Brian Newberry, including Plastic Cash's and Brian Newberry's production of additional information and a mediation among the parties. The parties are still in discussions toward finalizing a settlement.

### e. Foreign Accounts

The Receiver Team is continuing its investigation and pursuit of outstanding funds from Payza, Payment World, Solid Trust Pay, and Cyber Profit. With regard to the outstanding Receivership Assets from Payza and/or Payment World, the Receiver Team issued a demand to Payza, Payment World, and VictoriaBank in Moldova. The Receiver Team also continues to pursue options to recover assets directly from VictoriaBank in Moldova. The Receiver Team will continue to explore all available options, including litigation, to recover the outstanding funds. With respect to Solid Trust Pay, the Receiver Team has issued a demand to Solid Trust Pay for approximately $1.6 million in outstanding Receivership Assets and is awaiting additional information from Solid Trust Pay to evaluate its response to the Receiver's Demand.

### 3. Analyzing the Operations of the Receivership Entity

#### a. Investigating and Validating the Receivership Defendant's Electronic and Financial Data

During the first quarter, FTI did not receive additional financial data of the Receivership Defendant. There is no indication that additional financial data will be received in future quarters. Therefore, the validation of the Receivership Defendant's financial data is complete and the Receivership now has a complete accounting of the Receivership Defendant's financial records for the data and information received to date. As additional financial data is produced,

those records will be validated and used to update the Receivership Defendant's books and records.

The Receiver Team and FTI continued to investigate the Receivership Defendant's financial data during the first quarter to support efforts to recover Receivership Assets. FTI's financial data investigation activities primarily consisted of (1) reconciling the ZeekRewards database records to disbursement information for specific net winners and insiders to support clawback actions; (2) providing analysis and financial records to support efforts to recover Receivership Defendant assets held by several financial institutions; and (3) research and analysis of specific financial institution transactions to determine potential claims against financial service providers to the Receivership Defendant.

### b.  Investigating the Receivership Defendant's Operations

During the first quarter, the Receiver's investigation of RVG's operations included the continued analysis of interactions and financial transactions among RVG and certain vendors and third-party advisors. This analysis was performed for various purposes, including the pursuit of Receivership Assets from financial institutions, support for the Receiver's ongoing fraudulent transfer lawsuits, analysis of additional claims against foreign net winners, and analysis of additional claims against third parties.

### 4.  Communicating with Affiliates and Creditors

The Receiver Team continued to communicate with Affiliates and other Creditors on a daily basis throughout the first quarter of 2015. These communications were largely in regard to the claim allowance and objection processes. Most of these communications were in relation to specific objections raised to claim determinations and addressing questions regarding status of claims and distribution payments previously made or being made in the early portion of the first quarter.

Additionally, the Receiver Team had discussions with various Affiliates regarding pending net-winner litigation.

In addition to individual communications, the Receiver Team posted two updates on the Receivership website, one regarding the claim and distribution process and the other regarding net-winner litigation. Finally, the Receiver Team sent blast emails to affected Affiliates in order to update Affiliates that might be subject to a deadline or other event that could affect their rights.

5. **Issues Concerning Federal Taxes**

During the first quarter, FTI and the Receiver Team tracked and reviewed IRS Form 1099-related correspondence from affiliates. This work included responding to various affiliate questions and comments, and reviewing transaction data for each affiliate who inquired about a 1099 received from the Receiver. Additional work included performing any necessary analysis and research to respond to various requests from the Receiver and claimants and in some cases working with National Law Forms to generate amended 1099s.

The Receiver Team reviewed the tax filing obligations of the Receivership entity in the first quarter. In conducting the review, the Receiver Team determined that there are no reporting requirements with respect to the first interim, partial distribution payments, and the Receiver filed no such information returns.

Additionally, the Receiver Team determined that it would be necessary to file certain tax returns relating to the Receivership entity as ordered by the Court. The Receiver Team is in the process of determining whether the Receiver is required to file additional tax returns on behalf of any other persons. Efforts were focused on collecting the necessary information for tax reporting, including analyzing the tax liability for payments received for the sale of assets that closed in the fourth quarter of 2014.

6. **Litigation in the SEC Enforcement Action[2]**

The Receiver Team litigated the following matters in the SEC Action:

- The Receiver Team filed a response brief in the Fourth Circuit Court of Appeals regarding the Belsome movants' appeal of the striking of attorney charging liens.

- The Receiver Team continued litigation seeking the return of Receivership Assets from NxSystems.

- The Receiver's conflicts counsel filed a Motion for Order to Show Cause or Turn Over Receivership Assets Against Compass Bank.

- The Receiver team continued litigation to recover Receivership Assets from Jaymes Meyer and Preferred Merchants Solutions, LLC.

The Receiver team also took part in various communications, negotiations, and settlement discussions in seeking the return of Receivership Assets from multiple third party financial institutions and operators.

**B.    The Receiver's Fund Accounting**

The Receiver's Second Standardized Fund Accounting Report ("SFAR") was filed with the Receiver's Status Report for the First Quarter of 2015.

**C.    The Receiver's Receipts and Disbursements**

The Receiver's Schedule of Receipts and Disbursements ("Schedule") from January 1, 2015 through March 31, 2015, is attached hereto as Exhibit B.   The Schedule sets forth the following receipts and disbursements:

1. The Receivership received funds in the amount of $520,250.00 from the deposit of Affiliate-Investor financial instruments;[3]

---

[2]  The Receiver's efforts related to the recovery of fraudulently transferred funds and other damages incurred by RVG are discussed later in this Report.

[3] These funds are the result of financial institutions paying the Receiver for affiliates' cashier's checks upon which those financial institutions had previously wrongfully stopped payment.

2. Received funds of \$1,577,043.06 from third-party litigation settlements;[4]

3. Received income from other sources, such as interest income and return of pre-paid funds, totaling \$43,702.57; and

4. Disbursed \$29,026,983 from the Receiver's accounts. Of that sum, the Receiver disbursed \$28,615,086.80 to investors; the balance consisted of bank fees related to management of the Receiver's accounts; claims process expenses; RVG website and database hosting; legal services; property insurance, maintenance, and taxes; and other professional services.[5]

Between January 1, 2015 and March 31, 2015, the Receivership Estate deposited \$2,140,995.63 and disbursed \$29,026,983.67. The Receiver has marshaled total assets of approximately \$344.8 million during the period between August 17, 2012 and March 31, 2015, while disbursing approximately \$157.2 million[6] during the same period.[7]

**D.  Description of All Known Non-Cash Receivership Property**

In the fourth quarter, the Receiver took possession of a residential home at 5600 Roundhouse Lane in Charlotte, NC, as part of a settlement with the estate of Defendant Roger Plyler. The Receiver retained a real estate agent to sell the home, which went to market in the first quarter of 2015. The Receiver accepted an offer on the home in late March.[8] In the first quarter, the Receiver also took possession of several motor vehicles as part of the settlement with

---

[4]  As of the end of the first quarter, the Receiver has agreed to approximately \$2.9 million in settlements with net winner affiliates. The Receiver has collected over \$6.2 million in total litigation-related settlements since the inception of the Receivership.

[5] See the Receiver's Status Report for the First Quarter of 2015 for further detail regarding disbursements and receipts.

[6] Disbursements to claimants from September 2014 to the present total approximately \$145 million.

[7] A significant amount of the available funds on hand are being reserved in light of the more than 50,000 claimants who have yet to accept their claims and potential future payments on subrogation claims.

[8] The sale of this property is set to close on April 30, 2015.

Defendant Dawn Wright-Oliveras. The Receiver has retained an auctioneer and intends to liquidate these vehicles during the second quarter of 2015.[9]

> ### E. Description of Claims Held by the Receivership Estate

> #### 1. Identifying and Pursuing Fraudulently Transferred Funds Held by Net-Winner Affiliate-Investors

> ##### a. U.S. Net Winner Lawsuit

On February 10, 2015, the Court granted the Receiver's Motion for Class Certification, certifying a class of approximately 9,400 defendants who obtained at least $1,000 in net gains from the ZeekRewards scheme. The Court approved the Receiver's Motion to Approve Notice of Class Certification on March 11, 2015, and the Receiver sent court-authorized notice to all class members beginning on March 18, 2015.

Discovery has continued in this lawsuit, and during the first quarter, the Receiver conducted depositions of defendants Durant Brockett and Aaron Andrews. The Receiver noticed depositions for certain other named defendants, but they failed to appear for their depositions.

Regarding judgment collection, the Receiver continued work to collect a judgment obtained against Michael Van Leeuwen. During the quarter ending March 31, a Notice of Filing of Foreign Judgment in Cumberland County was served, via Sheriff, on Mr. Van Leeuwen. On March 11, 2015, following Mr. Van Leeuwen's return from a trip to the Philippines, the Cumberland County Clerk of Court issued a Notice of Rights to Have Exemptions Designated. The Notice of Rights to Have Exemptions Designated was delivered to Cumberland County Sherriff's Department for service. The Receiver anticipates a Writ of Execution and commencement of post judgment discovery in the second quarter following completion of the Notice of Rights procedure.

---

[9] The vehicles were sold at auction on May 9, 2015.

### b.    Claims Against Foreign Net Winners

During the first quarter, the Receiver filed additional lawsuits against foreign net winners in the British Virgin Islands, New Zealand, Norway, and the United Kingdom.  In addition, the Receiver previously filed actions against net winners in Canada and Australia.  The Receiver has worked extensively with local counsel in each of these countries to locate and serve as many of these defendants as possible.  In addition, the Receiver Team has researched and analyzed jurisdictional and judgment enforcement issues specific to each of the countries in question in support of the Receiver's claims and eventual enforcement of judgments in these countries.  Further, the Receiver Team corresponded with individual foreign defendants and attorneys for certain foreign defendants regarding potential settlements and extensions for filing responses to the respective lawsuits.

The Receiver expects to file lawsuits against foreign net winners in additional countries during the second quarter of 2015.

### 2.    Investigating Claims against Receivership Defendant Insiders

The Receiver has settled with each of the defendants named in the lawsuit against insiders of the ZeekRewards scheme other than Darryle Douglas, against whom the Receiver has obtained a default judgment.  The Court has approved each of these settlements, and the case currently remains open on the Court's docket pending satisfaction of the terms of the various settlement agreements.

### 3.    Investigating Claims against the Receivership Defendant's Third-Party Advisors and Others

During the first quarter, the Receiver continued to litigate the claims against Kevin Grimes and his former law firm and business entity, as well as the claims against attorney

Howard Kaplan. The Court recently stayed consideration of Mr. Kaplan's motion to dismiss pending the Receiver's mediation efforts in the case against the Grimes defendants.

Further, the Receiver filed a lawsuit against USHBB, Inc. and its principals, James Moore, O.H. Brown, and Robert Mecham, who provided marketing and advertising materials in promoting the ZeekRewards scheme. *See Bell v. USHBB, Inc. et al.*, No. 3:15-cv-137 (W.D.N.C. filed Mar. 26, 2015). This lawsuit alleges claims for fraudulent transfer, aiding and abetting breach of fiduciary duty, unfair and deceptive trade practices, and unjust enrichment, and it seeks the imposition of a constructive trust.

In addition, the Receiver's conflicts counsel worked with the Receiver to identify and evaluate claims against a financial institution that provided services to Rex Venture Group.

**F.  Potential Creditors of the Receivership Estate**

As set forth above, the Receiver Team continues to litigate against NxPay, Plastic Cash, Preferred Merchants, and their principals and affiliates, which appear to have transferred assets in violation of the Freeze Order. As part of these proceedings, the Receiver Team is defending against any claim that the entities or individuals are entitled to the funds improperly held or transferred whether outright or as a set off against amounts owed to the Receivership Estate.

Of these entities, only Plastic Cash filed a claim as part of the Court-approved claims process. The Receiver participated in a mediation with Plastic Cash to resolve the respective claims, and as reported above, the parties are working toward finalizing a settlement.

**G.  Status of Creditor Claims Proceedings, After Such Proceedings Have Been Commenced**

On January 30, 2015, the Receiver issued checks to approximately 8,100 Affiliate claimants as part of the second interim distribution. Claimants receiving a check in the second interim distribution held an allowable claim, were not issued a distribution as part of the first

14

interim distribution on September 30, 2014, agreed to their claim determination, and provided the required Release and OFAC Statement.

During the first quarter, the Receiver Team identified a small group of claims asserted by Affiliates that were improperly filed on the Claim Portal. These claims had been timely filed, but had been filed in the wrong category. The Receiver Team determined that the most equitable course was to treat those claims as properly filed and reconciled those claims. The Receiver Team has now begun issuing letters of determination for such claimants. All but a handful of subrogation claims have been determined. The letters of determination for subrogation claims are slated to be sent in the early portion of the second quarter of 2015. No further review of claims in the different classes of claims are anticipated because, pursuant to an order of the Court, the Receiver does not need to review any additional class of claims until the class of Affiliate claimants and their subrogees are paid in full.

To date, almost 121,000 Affiliate claimants have accepted their claim determinations and have been or will be issued a distribution in the near term. The next distribution date for claimants who have not already received a distribution is April 30, 2015. However, in excess of 50,000 Affiliate claimants have failed to respond to their claim determinations. Each claimant is required to act further if they would like to receive a distribution from the Receivership Estate. Failure to act further may eventually cause a claimant to forfeit the distribution. The Receiver contacted each of the Affiliate claimants who failed to respond to their claim determination to request that such claimants respond to the claim determination by April 15, 2015 and notified them that, pursuant to authority granted by court order, they would be deemed to have accepted their claim determination if they failed to respond by that date.

Case 3:12-cv-00519-GCM   Document 363   Filed 05/15/15   Page 15 of 31

Approximately 1,800 Affiliates have objected to the claim determination issued by the Receiver Team. The Receiver Team is continuing to address these objections in an effort to resolve such objections before intervention by the Special Master or the Court would be needed. The Receiver Team has been successful in resolving the majority of these objections to date.

## III.    FEES AND EXPENSES REQUESTED

In connection with the Compensation Period, the Receiver and MW request compensation for services in the amount of $692,004.98 and reimbursement of expenses in the amount of $50,880.17.

In connection with the Compensation Period, FTI requests compensation for services in the amount of $540,437.00 and reimbursement of expenses in the amount of $71.62.

These amounts reflect the hours worked by the Receiver and MW attorneys and legal assistants, and the hourly rates in effect at the time that the services were rendered, as modified by the discount provided by the Receiver and MW and additional write-offs of attorney time. These amounts also take into account all relevant circumstances and factors as set forth in the N.C. Code of Professional Responsibility and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and MW under the Receiver Order and the Amended Receiver Order.

Pursuant to the Receiver Order and Amended Receiver Order and the public service discount and additional fees and write-offs as described above, the fees of the Receiver and MW have been reduced from $863,726.00 to $692,004.98, a reduction of $171,721.02.

The majority of the work described in this Application was performed by a small group of attorneys and a paralegal.[10] In addition to the Receiver and the paralegal, the primary team consists of: three associates whose responsibilities include case management, motions and discovery drafting including negotiations with opposing counsel, document review supervision, status report drafting, and legal research related to litigation and fact investigation, each of whom dedicate between 10 and 70 percent of their time to the Receivership matter; one associate who focuses on asset analysis and recovery from financial institutions who dedicates approximately 10 percent of her time to the Receivership; one senior counsel who focuses on claims administration and reconciliation who dedicates 40 to 50 percent of his time to the Receivership matter; and one partner who supervises litigation and settlement issues who dedicates approximately 80 percent of his time to the Receivership. This structure is purposeful, effective, and efficient for the Receivership, as the attorneys most experienced in their field are conducting certain key portions of the Receivership work.

The Receiver and MW have submitted previous fee applications in this case, which were approved by this Court.  MW has not received a retainer in this case.

As required by the SEC Guidelines, the Receiver and MW professionals recorded all services performed in time increments of one-tenth of an hour. All services by MW legal assistants and other paraprofessionals were professional in nature.

In accordance with the SEC Guidelines, this Application does not seek payment for time spent preparing the Application or any documentation in support.

---

[10] The remainder of the timekeepers consist of MW professionals and paraprofessionals working in specialized capacities, such as bankruptcy, tax, employee benefits and information technology, who were consulted for a limited purpose and who charged limited time to the Estate. The total number of timekeepers will decrease going forward.

**IV.     SUMMARY OF SERVICES RENDERED BY THE RECEIVER AND MW DURING THE COMPENSATION PERIOD**

Pursuant to the SEC Guidelines and discussions with the SEC, MW has segregated its time during the Compensation Period into twelve activity categories and additional subcategories. A description of the activity categories and subcategories is attached hereto as Exhibit I.   Narrative summaries of these activity categories are provided below.

      **A.**     *Asset Analysis and Recovery (AAR), Asset Disposition (AD), Business Analysis (BA), Litigation Consulting (LC), and Data Analysis (DA) AMOUNT: $446,504.44*

Listed above are certain activity categories which are required under the SEC's Guidelines to track the Receiver's efforts and, while the Receiver will not necessarily conduct all of the above-referenced activities in a given quarter, we have grouped the above categories together for convenience.   As outlined above, the activities in this category consist of the Receiver Team's efforts to identify, recover, and consolidate the Receivership Defendant's assets by collecting funds and outstanding amounts from certain financial institutions which have not released all Receivership Assets.   The Receiver continues to investigate transfers involving key insiders, third-party advisors and companies affiliated with RVG and/or its key insiders. Additionally, the Receiver's factual investigation and litigation activities fall into this category, including filings and court appearances related to the clawback litigation, conducting witness interviews, and review of RVG and third-party documents related to Receivership Assets and the operation of RVG.   Additional subcategories, which were created in conjunction with the SEC, further break out and clarify many of the activities listed above:

      **1.**     *Clawback Litigation (CLA, CLG, CLLR, CLSUB, CLNDM, CLDM, CLSET) AMOUNT:  $237,782.30*

The above subcategories of the AAR activity category relate specifically to Clawback Litigation. These Clawback Litigation subcategories consist of efforts to aid in the recovery of funds fraudulently transferred by the Receivership Defendant, including activities related to the lawsuits against insiders, third-party advisors, and net winners described above. In addition, the Receiver has contacted thousands of net winners for the purpose of settling potential claims, and has negotiated settlements promising approximately $6.2 million.

**2.** *Other Litigation (OLG, OLLR, OLSUB, OLNDM, OLDM, OLDEP, OLSET)* <u>*AMOUNT: $29,882.25*</u>

The above subcategories of the AAR activity category relate to litigation other than Clawback Litigation. The Other Litigation subcategories include responding to various related cases filed by victims of the Scheme, and responding to motions filed in the SEC Enforcement Action by non-party net winners and others, including plaintiffs in the *Belsome* class action lawsuit.

**3.** *Other AAR Subcategories (FI, FNA, LR, SAP)* <u>*AMOUNT: $178,206.63*</u>

The above subcategories of the ARR activity category relate to Fact Investigation (FI), Financial Institution Negotiations/Analysis (FNA), Legal Research (LR), and Strategic Analysis and/or Planning (SAP). These activities consist of factual investigation and efforts related to negotiations with financial institutions for the release and recovery of funds belonging to the Receivership Estate and certain legal research. This category includes work related to the receiver's efforts to reconcile information from various financial institutions, e-wallet vendors, and payment processors for the purpose of recovering potential outstanding

Receivership Assets. This category also includes work related to the Receiver's continuing investigation of RVG's operations, including interviews of key insiders, analysis of documents and data produced by various subpoenaed entities and individuals, and providing assistance to various governmental entities.

4.    *Remaining Activities (BA, LC, DA, AD)*  *AMOUNT: $633.26*

The above activity categories are included in the amount listed in Subsection A, above, and comprise the remainder of work performed under that subsection, including efforts involving business analysis, litigation consulting, asset distribution, and analysis of assorted data relevant to the administration of the Receivership Estate, including work by the Receiver Team with the Receiver's retained forensic consultants, FTI.

**B.**    *Business Operations (BO), Employee Benefits/Pensions (EBP), Tax Issues (TI)*  *AMOUNT: $31,328.51*

Listed above are certain activity categories which are required under the SEC's Guidelines to track the Receiver's efforts and, while the Receiver will not necessarily conduct all of the above-referenced activities in a given quarter, we have grouped the above categories together for convenience.   The activities in this category consist of the Receiver Team's efforts related to the Receivership Defendant's business operations, including review of receivables, review and payment of payables, administration of employee benefits, and assuring federal and state tax compliance for independent contractors and employees.   Because these matters relate to the winding-up of the Receivership Defendant, a portion of these fees are likely to be non-recurring.

1.    *Tax Issues (TI) and Employee Benefits/Pensions (EBP)*
    *AMOUNT:  $30,933.68*

The fees associated with the activity categories listed above are included in the amount listed in Subsection B, above, and include the work on federal and state tax issues outlined above.

**2.**     *Business Operations (BO)*  *AMOUNT: $394.83*

The fees associated with the activity category listed above are included in the amount listed in Subsection B, above, and primarily represent efforts directed at winding up the business operations of the Receivership Defendant discussed above.

**C.**     *Case Administration (CA), Status Reports (SR), Claims Administration and Objections (CAO)*  *AMOUNT: $214,172.03*

Listed above are certain activity categories which are required under the SEC's Guidelines to track the Receiver's efforts and, while the Receiver will not necessarily conduct all of the above-referenced activities in a given quarter, we have grouped the above categories together for convenience. The activities in this category consist of regular meetings and status conferences among members of the Receiver Team and the Receiver Team's efforts to comply with the directives of the Court. The category also includes administration of the claims process. Other activities include the Receiver's management and oversight of the Receiver Team and MW's participation in calls and conferences with FTI, the SEC, and other entities. The Receiver has also engaged in motions practice when necessary.

**1.**     *Claims Administration and Objections Subcategories (CAO) (RES, RA, DR, CAF, CIN, OTH)*  *AMOUNT: $124,815.39*

The Claims Administration and Objections activity category and the above subcategories of the CAO category, including Research (RES), Review/Analyze (RA), Draft/Revise (DR), Communicate Affiliates (CAF), Communicate Internal (CIN), and Other (OTH), are part of the amount listed in Subsection C above. As

discussed above, during the first quarter, this work included reconciling claims, addressing objections to claim determinations, and the issuance of claims checks. The Receiver team also continued to work closely with FTI on claims determination and communicate with affiliates regarding the claims process.

**2.** *Case Administration (CA - $78,191.41) and Status Reports (SR - $11,165.23)* *AMOUNT: $89,356.64*

The Case Administration (CA) and Status Report (SR) activity categories listed above are included in the amount listed in Subsection C above, and include the management and oversight of the receivership generally, as well as the preparation of the Quarterly Status Report and other reports. Such time in the first quarter included senior members of the Receiver Team supervising a variety of ongoing matters, including the filing of the status report for the previous quarter, and coordinating with FTI, the SEC, and other government entities.

**D.** *Travel:* *AMOUNT: $5,108.51*

The activities in this category cover all non-working travel time of the Receiver and MW professionals outside a 20-mile radius of the relevant offices during the Compensation Period. These activities are billed at a 50 percent rate, and are incorporated into the total fees described in categories above.

## V. SUMMARY OF SERVICES RENDERED BY FTI DURING THE COMPENSATION PERIOD

**A.** *Fee Application (MGW Code FAPP-OTH), Case Administration, and Quarterly Status Reports (MGW Code SR-QSR),* *AMOUNT: $13,914.00*

The majority of time spent on the FAPP-OTH task code includes the creation and editing of weekly billing reports provided to MGW that detail FTI's work and related fees. Time included in the FAPP-OTH task code also relates to the creation of the quarterly Fee Application

that summarizes all of FTI's fees and expenses for the quarter. FTI does not bill the Receivership for time related to the weekly billing reports or the quarterly Fee Application. FTI shows the time spent on the FAPP-OTH in the detail of the Fee Application; however, the rate for this work is $0.

Time spent on the SR-QSR task code includes the creation of documents and schedules related to the Quarterly Status Report (QSR) and the Standardized Fund Accounting Report (SFAR). FTI prepares and reviews narrative reports, quantitative reports, and additional supporting documentation for the QSR and SFAR. FTI bills time spent on the creation and review of these reports and supporting documentation.

**B.** *Claims Administration (MGW Codes CAO-RA, CAO-CAF, and CAO-CIN), AMOUNT: $470,735.00*

This task code involves time spent on the claims filing and reconciliation process. FTI continues to manage the relationship between claimants and the Receivership by reviewing and responding to claimant disputes, tracking and organizing claimant responses, requesting additional information to determine claim statuses, and quality control of claims. Additional work related to the claims process includes indexing and matching appropriate usernames with claimants and correspondence with GCG and MGW to finalize claim determinations.

During the first quarter, FTI prepared and issued approximately 8,100 checks to affiliate claimants as part of the second interim distribution. In addition, FTI also prepared and issued approximately 1,900 checks to claimants that either: 1) requested their check be reissued, or 2) had a check returned to GCG with a forwarding address provided. FTI will continue to manage the distribution process and issuance of checks to affiliate claimants in future quarters.

Other claims-related activity during the first quarter included working with GCG and MGW to develop a process to allow for the processing of additional valid claims asserted by

claimants through the objection process as well as processing claim stipulations. FTI worked

with MGW and GCG to identify the population of claimants that filed claims during the

November claims period and those claimants alerted to the claims portal being available but did

not finalize a claim submission. In addition, at the request of MGW, FTI reviewed and analyzed

claims filed as 1) "Other", 2) Government/Taxing Authority, 3) Former Employee, 4)

Subrogation, and 5) Trade Creditor to determine if the claims were filed incorrectly and should

be processed as affiliate claims.

     **C.**     *Accounting/Auditing (MGW Code AA-OTH), <u>AMOUNT: $1,026.00</u>*

FTI's time related to the AA-OTH task code involved creating, maintaining and

reviewing the Receivership's accounting records. Specifically, work in this tasks code includes

the review and monthly reconciliation of the Receivership's seven bank accounts as well as

providing transaction detail and account activity to the Receiver as requested.

     **D.**     *Tax Issues (MGW Code TI-OTH), <u>AMOUNT: $10,769.00</u>*

During the first quarter, FTI continued to track and review correspondence from affiliates

related to tax Form 1099s. This work included researching and analyzing specific affiliate

transactions to provide information to the Receiver allowing for an appropriate response to the

affiliates' questions regarding the Form 1099s. Additionally, FTI assisted in the preparation of

the Receivership's 2014 tax return by corresponding with MGW and David Bagley, CPA,

identifying and organizing specific documentation, and developing analyses related to claims

disbursements.

     **E.**     *Asset Analysis and Recovery (MGW Codes AAR-FNA, AAR-OLG, AAR-OLSUB, AAR-OLSET, and AAR-SUM), <u>AMOUNT: $43,993.00</u>*

Time spent on these task codes primarily relates to the review and analysis of data

produced by financial institutions to reconcile financial transaction data with RVG's books and

records.  Additional time was spent on tracking settlement agreements and payments from Net Winners and preparing various Net Winner analyses as requested to assist with the Receiver's clawback litigation.

Time spent on task code AAR-FNA involves activities related to the recovery of Receivership assets including assisting MGW with litigation efforts.  During the first quarter, FTI reviewed data produced by NXPay to confirm the movement of frozen eWallet funds. This task involved the review and analysis of key affiliate bank account activity related to NXPay, identifying all funds returned by NXPay to RVG, and assisting MGW with correspondence between NXPay and the Receiver.  Further work performed by FTI included reconciling NXPay transactional data with the of the Receivership's bank accounts and RVG's databases and eWallet data.

Additional time spent on task code AAR-FNA included FTI's assistance with litigation efforts related to recovering Receivership assets from one of RVG's financial institutions Solid Trust Pay.  This work included reviewing and summarizing Solid Trust Pay transaction data, reconciling newly produced data with data previously provided, and assisting MGW with communication to and from Solid Trust Pay, as requested by the Receiver and MGW.

Time spent on task code AAR-OLG included FTI's review of datasets from a specific financial institution including check images and account statements to identify payments to affiliates as requested by the Receiver.  FTI then analyzed the payments to affiliates and reviewed usernames and financial records to identify net winners and net losers in the RVG scheme.  Ultimately, FTI organized and indexed all analyses and supporting documentation related to the review of the specified financial institution and provided the data to the Receiver.

FTI's work related to task code AAR-OLSET includes the management of settlement agreements and payments with affiliates that includes tracking, indexing, and reviewing settlements, settlement payments, bankruptcy documentation, and correspondence received from affiliate-investors.

Tasks related to task code AAR-OLSUB included the review and analysis of a deposition of a former RVG financial vendor. FTI also spent time analyzing account information and other data related to the financial vendor. Additional work involved gathering a financial institution's financial data, specifically its account transfers and seizures, as requested by the Receiver.

Tasks related to task code AAR-SUM included working with MGW to locate RVG account activity for specific key affiliates and to assist with the Receivership with its clawback litigation. To complete these tasks, FTI compiled and reconciled Net Winner disbursement data with RVG's financial records. The Receivership used the reconciliations to evidence that the disbursements recorded by the ZeekRewards database were received by the Net Winners. FTI responded to other requests from MGW including the review of bank account data related to a key insider to the RVG scheme and providing specific transactional information related to an RVG account with a financial vendor. The work to trace funds disbursed by RVG to insiders, Net Winners and financial institutions has already led to recoveries of assets by the Receivership and additional recoveries are expected.

## VI.    EXPLANATION OF EXPENSES AND RELATED POLICIES

The Receiver and MW seek reimbursement for their out-of-pocket costs in the amount of $50,880.17. Exhibit E sets forth the various categories of expenses for which reimbursement is sought. These expenses include document management services from Kroll Ontrack, Inc., which hosts and processes the documents being collected and reviewed by MW. MW will retain the

documentation supporting these expenses for a period of seven years in accordance with the SEC Guidelines and will provide the SEC with copies upon request.

MW observed the following policies in connection with its expenses during the Compensation Period:

A.      With respect to all expenses, MW seeks reimbursement only for the actual costs of its expenses. MW has not included the amortization of any investment, equipment or capital outlay in any request for expense reimbursement.

B.      In accordance with the SEC Guidelines, MW has not sought reimbursement for local travel expenses (within a 20-mile radius of MW's offices), including mileage, taxis and meals.

C.      MW has not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

## VII.    COST SAVINGS TO THE ESTATE

In total, the Receiver and MW seek $742,885.15 for fees and expenses, and request a holdback of 20% of its fees. This represents a cost savings to the estate of more than $170,000.00 MW recognized the public service nature of the engagement, and accordingly discounted all professionals' and paraprofessionals' rates.

In total, FTI seeks $540,508.62 for fees and expenses, and requests a holdback of 20% of its fees. This represents a cost savings to the estate of more than $190,000.00. FTI recognized the public service nature of the engagement, and accordingly discounted all of its professionals' rates. Additionally, FTI has agreed to not charge for travel time and has waived its customary administrative expense that is usually 6% of fees charged.

## VIII.   THE REQUESTED COMPENSATION SHOULD BE ALLOWED

The Receiver's compensation and the fees and expenses of the Receiver's professionals may be determined at the Court's discretion and, in making those determinations, the Court

should consider the complexity of the problem faced, the benefit of the services to the Receivership Estate, the quality of the work performed and the time records presented.  <u>SEC v. Fifth Ave. Coach Lines, Inc.</u>, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); see also <u>SEC v. Elliott</u>, 953 F.2d 1560, 1577 (11th Cir. 1992) (per curiam) (if a receiver reasonably discharges his duties, the receiver is entitled to compensation and the circumstances surrounding the receivership, including the results, are relevant).

While guidelines and standards for assessing compensation are set forth in case law, the unique facts and situations of each case make it impossible to rely directly on those guidelines alone.  <u>SEC v. W.L. Moody & Co.</u>, 374 F. Supp. 465, 485 (S.D. Tex 1974), aff'd, 519 F.2d 1087 (5th Cir. 1975).

In the instant case, the Receiver, MW and FTI respectfully submit that the services for which they seek compensation in this Application were necessary for, and beneficial to, the orderly administration of the Receivership Estate.

The issues addressed by the Receiver and MW have been and continue to be highly complex, requiring investigation of an alleged fraud that included approximately 2.2 million Affiliates and 1 million Affiliate-Investors (1 million Affiliate-Investors, and an additional 1.2 million non-investor Affiliates). We respectfully submit that compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the problems, issues or tasks involved. The professional services were performed expediently and efficiently.  Accordingly, the Receiver and MW submit that the compensation requested herein is reasonable and warranted in light of the nature, extent and value of such service to the Receivership Estate and all parties in interest.

As of March 31, 2015, the Receiver marshaled approximately $344.8 million for the Receivership Estate. Combined, MW and FTI request $1,232,411.98 in fees and services. The fees requested are less than 0.36% of the approximate recovery for the Estate.[11]

The compensation requested for this quarterly Application amounts to approximately $0.56 per Affiliate or approximately $1.23 per Affiliate-Investor.

## IX.    RELIEF REQUESTED

WHEREFORE, the Receiver and MW respectfully request that this Application be granted and that they be awarded an allowance of $692,004.98 (of which $138,401.00 will be held back) for legal services rendered during the Compensation Period and $50,880.17 for the reimbursement of expenses; that FTI be awarded an allowance of $540,437.00 (of which $108,087.40 will be held back) for services rendered during the Compensation Period and $71.62 for the reimbursement of expenses, and that the Receivership Estate be allowed to pay such amounts and reimburse MW and FTI for approved expenses, together with such other and further relief as necessary and proper.

---

[11] Combined with the $14,865,729.72 in fees and services from prior quarters, the total fees and expenses are less than 4.7% of the approximate recovery of the Estate.

Dated: May 15, 2015                    By:     /s/ Kenneth D. Bell
                                                Kenneth D. Bell, Esq., Receiver


                                                and

                                                MCGUIREWOODS LLP
                                                201 North Tryon Street
                                                Suite 3000
                                                Charlotte, NC 28202
                                                Telephone: 704-343-2000
                                                Facsimile: 704-343-2300

                                                *Attorneys for Receiver*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that I have electronically filed the foregoing **APPLICATION FOR FEES AND EXPENSES BY THE RECEIVER AND HIS ADVISORS FOR THE FIRST QUARTER OF 2015** with the Clerk of Court using the CM/ECF system which will send electronic copies to counsel of record registered to receive electronic service.

This, the 15th day of May, 2015.


/s/ **Kenneth D. Bell**
Kenneth D. Bell, Esq., Receiver