IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>REX VENTURES GROUP, LLC d/b/a ZEEKREWARDS.COM, and PAUL BURKS,<br><br>Defendants. | Civil Action No. 3:12-CV-519 |

**RESPONSE IN OPPOSITION TO RECEIVER'S MOTION FOR AN ORDER DIRECTING BBVA COMPASS BANK TO TURN OVER RECEIVERSHIP ASSETS OR, ALTERNATIVELY, TO APPEAR AND SHOW CAUSE WHY IT SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATION OF THE COURT'S ORDERS FREEZING AND PRESERVING RECEIVERSHIP ASSETS**

NOW COMES Nonparty Compass Bank d/b/a BBVA Compass, through undersigned counsel, and hereby responds in opposition to the Receiver's Motion for an Order Directing BBVA Compass Bank to Turn Over Receivership Assets or, Alternatively, To Appear And Show Cause Why It Should Not Be Held In Contempt for Violation of the Court's Orders Freezing And Preserving Receivership Assets. In support thereof, BBVA Compass shows this Honorable Court as follows:

I.   Introduction

BBVA Compass has, at all times, acted in good faith and complied with the orders of this Court. The Court's August 17, 2012 order, (Doc. No. 4) (the "Freeze Order") requires that BBVA Compass and other entities freeze any assets of Rex Ventures in their possession, but it

1

does not require that any entity turn over those assets to the Receiver. In fact, the Freeze Order specifically gives the Receiver the authority to institute separate legal actions against any entity with assets in its possession—even in other courts—and to obtain a judgment from a court with jurisdiction over that entity. Instead, the Receiver, in an attempt to shortcut due process, has attempted to mold the court's Freeze Order into a judgment in the Receiver's favor.

As explained herein, BBVA Compass originally—and before notice of the Court's August 17, 2012 order—properly returned cashier's checks payable to Rex Ventures under both the Doctrine of Unclean Hands and the Uniform Commercial Code. Since receipt of the Freeze Order, BBVA Compass has complied with its terms, which do not require that any payment be made to the Receiver.

As to the Receiver's alternative motion for a Show Cause order, BBVA Compass should not be ordered to show cause as to why it should not be held in contempt because it has complied with the Court's order. There is no "unequivocal command" or "clear and unambiguous" decree of the court that has been violated by BBVA Compass.

**II.     Background**

1. Between June 18, 2012 and August 9, 2012, BBVA Compass issued 24 cashier's checks to its customers payable to Rex Ventures.

2. After that, on August 17, 2012, the court entered an order freezing all the assets of Defendant Rex Ventures and appointing the Receiver (Doc. No. 4). BBVA Compass did not receive notice of the order at that time.

3. Between August 21, 2012 and August 29, 2012, BBVA Compass' customers learned of the underlying fraud perpetrated by Rex Ventures and completed stop-payment requests on each of the twenty-four (24) cashier's checks payable to Rex Ventures. In completing

2

the stop-payment requests, the customers provided indemnity letters to BBVA Compass containing declarations of loss. Because BBVA Compass had no knowledge of the Freeze Order and had received declarations of loss from its customers, the stop-payment requests were honored. Ala. Code § 7-3-312 (outlining the procedures to be followed after receiving a declaration of loss).

4. In learning of the fraud and stopping payment on the cashier's checks, these customers were able to avoid becoming victims of Rex Ventures and increasing the total amount lost due to the fraud.

5. On August 30, 2012, the Court amended the Freeze Order to include specific language about the types of assets that were frozen and explicitly added checks to the list (Doc. No. 21). Prior to that date, BBVA Compass had already received the declarations of loss from its customers and processed stop-payment requests for all 24 (twenty-four) cashier's checks.

6. From August 29, 2012 until September 17, 2012, the Receiver presented twenty (20) cashier's checks for payment. BBVA Compass did not have notice of the Freeze Order and returned each check the day of or the day after presentment because its customers had provided stop-payment requests, including indemnity agreements and declarations of loss, for those cashier's checks.

7. The Receiver asserts that its agent, GCG, Inc., mailed the Freeze Order to BBVA Compass on September 28, 2012 (Doc. No. 331, p. 6).

3

8. While the Receiver asserts the Freeze Order was mailed on September 28, 2012, BBVA Compass still had not received it on October 9, 2012, when the Receiver again presented twenty (20) cashier's checks. Without knowledge of the Freeze Order and due to the customers' declarations of loss, those checks were returned the next day, on October 10, 2012.

9. At the same time, on October 9, 2012, the Receiver presented one (1) additional check for the first time. It was returned the next day, on October 10, 2012, because the customer had provided a stop-payment request, including an indemnity agreement and declaration of loss, for this cashier's check.

10. On October 10, 2012, the Receiver presented an additional cashier's check for the first time. Due to the customer's stop-payment request, including an indemnity agreement and declaration of loss, it was returned the next day on October 11, 2012. Ala. Code § 7-3-312. Further, this cashier's check was presented more than ninety (90) days after it was issued, and was thus overdue and properly returned under the Uniform Commercial Code and is not recoverable. Ala. Code § 7-3-304.

11. On October 11, 2012, BBVA Compass received the Freeze Order. No notice was given to BBVA Compass of the cashier's checks in the custody of the Receiver. BBVA Compass was not aware those cashier's checks were pending, nor was BBVA Compass on notice to search for them. Thus, following standard procedures, BBVA compass searched for accounts to comply with the Freeze Order, but found no accounts to freeze. The appropriate department of BBVA Compass responded by noting that the bank had

4

"no assets" of Rex Ventures because Rex Ventures was not a customer of BBVA Compass.

12. On October 17 and 18, 2012, the Receiver presented two (2) additional cashier's checks for the first time. Due to the customers' stop-payment requests, including indemnity agreements and declarations of loss, these cashier's checks were returned on October 18, 2012. Ala. Code § 7-3-312. Further, both checks were presented more than ninety (90) days after they were issued, and thus were overdue and properly returned under Alabama Law. Ala. Code § 7-3-304.

13. On August 26, 2013—nearly a year later, and over a year after the stop-payment requests from BBVA Compass' customers were honored—the Receiver provided the first notice to BBVA Compass of the cashier's checks and their returns.

14. A year and a half later, on February 5, 2015, the Receiver filed the instant motion, to which BBVA Compass now responds in opposition.

### III. Analysis

#### A. *The Freeze Order Does Not Allow the Receiver to Collect Funds from Third Parties Without a Judgment*

While correctly quoting the Freeze Order, the Receiver wholly mischaracterizes it. The Freeze Order *freezes* assets of third parties, but in no way does that order require that the same third parties *turn over* those assets to the Receiver. The language is clear that the assets are simply frozen:

> Except as otherwise specified herein, all Receivership Assets and Recoverable Assets are frozen until further order of this Court. Accordingly, all persons and entities with direct or indirect control over any Receivership Assets and/or any Recoverable Assets, other than the Receiver, are hereby restrained and enjoined

5

> from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing such assets. This freeze shall include, but not be limited to, Receivership Assets and/or Recoverable Assets that are on deposit with financial institutions such as banks, brokerage firms, and online or internet-based payment processors.

Freeze Order at ¶ 3.

BBVA Compass does not dispute that the Freeze Order requires that it *freeze* assets. The order prohibits BBVA Compass from "transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing such assets," after receipt of the order, but nowhere does it direct BBVA Compass or any other third party to transfer funds to the Receiver. To the contrary, the Freeze Order explicitly gives the Receiver the power to *sue* third parties to recover assets:

> [T]he Receiver shall have the following additional powers and duties: . . . to *sue for* and collect, recover, receive, and take into possession from third parties all Receivership Property and records relevant thereto . . . . to *bring legal actions* on behalf of Receivership Defendant based on law or equity in any state, federal, or foreign court, tribunal or agency as the Receiver deems necessary or appropriate in discharging his duties as Receiver; . . . to *pursue*, resist and defend all *suits, actions, claims and demands* which may now be pending or which may be brought by or asserted against the Receivership Estates.

Freeze Order at ¶ 7 (emphasis added).

If the Receiver wishes to seek funds from BBVA Compass, then pursuant to the Freeze Order, the Receiver must sue BBVA compass. The Freeze Order is explicit throughout that the Receiver may "*institute such legal actions and proceedings*, for the benefit and on behalf of the Receivership estate," Freeze Order at ¶ 43, and the Receiver may "*seek*, among other legal and equitable relief . . . asset turnover," *id.* Nowhere does the Freeze Order state—or is it even implied—that the Order itself is sufficient to require a third party to turnover assets. The Freeze Order—and the law—instead require that the Receiver institute an action against a third party from whom assets are sought.

6

The Receiver cannot use a prohibitory injunction to require a nonparty (or a party for that matter) to take action as if the order were a mandatory injunction. And there is no reasonable way to read the Freeze Order as a mandatory injunction. The standard for an injunction is high; the standard for a mandatory injunction is exceedingly higher. *See*, *e.g.*, *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) ("Furthermore, when the preliminary injunction is mandatory rather than prohibitory in nature, this Court's application of this exacting standard of review is even more searching.") (internal quotation marks omitted); *Wetzel v. Edwards*, 635 F.2d 283, 286-87 (4th Cir. 1980); *McFadden v. Fuller*, No. 5:13-CV-2290, 2014 WL 3671281 (D.S.C. July 22, 2014) ("[C]ourts apply the exacting preliminary injunction standard in an 'even more searching' manner when considering requests for mandatory preliminary injunctions than for the more common prohibitory preliminary injunctions."); *Wheelihan v. Bingham*, 345 F. Supp. 2d 550, 553 (M.D.N.C. 2004) ("Mandatory preliminary injunctions are granted even more rarely than prohibitory preliminary injunctions.").

Furthermore, a separate action by the Receiver—and thus a judgment against BBVA Compass—would require that the Court have personal jurisdiction over BBVA Compass.[1] The Freeze Order only finds jurisdiction over Rex Ventures. Freeze Order at p. 2 ("[T]his Court has . . . personal jurisdiction over Defendant . . . ."). Even if the Court has the authority to freeze assets of any third party, it requires personal jurisdiction over BBVA Compass (and a judgment) to order the bank to pay funds. *See generally United States v. First Nat. City Bank*, 379 U.S. 378, 384 (1965) ("Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under its control, whether the property be within or

---

[1] As to <u>subject matter</u> jurisdiction, the Court retains subject matter jurisdiction over other lawsuits brought by the Receiver to recover receivership property. *White v. Ewing*, 159 U.S. 36 (1895) (noting a court appointing a receiver has subject matter jurisdiction over an ancillary lawsuit brought by a receiver for the recovery of receivership property).

7

without the United States."). As admitted in the Receiver's motion, BBVA Compass is an Alabama corporation with a principal place of business in Alabama (Doc. No. 331, p. 4) ("Compass is an Alabama Banking Corporation headquartered in Birmingham, Alabama."). The burden is on the Receiver to either prove jurisdiction over BBVA Compass here in the Western District of North Carolina or bring an action in a court that properly has jurisdiction. *Sligh v. Doe*, 596 F.2d 1169, 1170 (4th Cir. 1979) ("It is hornbook law that a plaintiff seeking relief in a federal court has the burden of alleging and proving the jurisdictional facts."). Indeed, the Freeze Order specifically authorizes the Receiver to bring actions in other courts. Freeze Order at ¶ 7(I) (authorizing the Receiver to "bring such legal actions on behalf of the Receivership Defendant . . . in any state, federal, or foreign court"). So far, the Receiver has made no factual allegations upon which jurisdiction over BBVA Compass could be based.

Moreover, in a case between the bank and a fraudulent entity—as should be brought here—"the strong considerations of public policy favoring negotiability and reliability of cashier's checks are not germane:"

> It is critical to the basic issue in this case to emphasize that the dispute is between the FDIC, standing in the shoes of the Bank, and TPO, the party which participated in the allegedly fraudulent transactions in which the checks played a part. There are no third parties, or customers of the Bank, or holders in due course whose rights are involved, at least under the most favorable theory that may be advanced to support the defendant's counterclaim. Hence the strong considerations of public policy favoring negotiability and reliability of cashier's checks are not germane

*TPO Inc. v. Fed. Deposit Ins. Corp.*, 487 F.2d 131, 135 (3d Cir. 1973) on reh'g, (3d Cir. Oct. 31, 1973).

Thus, in order to recover monetary damages or specific performance from BBVA Compass, the Receiver must institute an action against BBVA compass and obtain a judgment. In any event, the plain language of the Freeze Order does nothing more than require BBVA

8

Compass to freeze relevant assets upon receipt of the order. BBVA Compass complied with that order upon its receipt.

### B. The Doctrine of Unclean Hands Applies Because the Receiver Steps into the Shoes of Rex Ventures

Furthermore, the doctrine of unclean hands permits BBVA Compass to cancel cashier's checks to bad actors before the cashier's checks are presented for payment and after BBVA Compass' customers learned of the fraud. While the Receiver has not acted in bad faith, the Receiver stands in the shoes of Rex Ventures, which perpetrated a massive fraud. "Unclean hands bars a party from receiving equitable relief because of that party's own inequitable conduct." *Food Lion, Inc. v. Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 228 (4th Cir. 2000); *see also JPMorgan Chase Bank, N.C. v. Mal Corp.*, No. 07-C-2034, 2009 WL 804049 (N.D. Ill. March 26, 2009) (applying "[c]ommon law principles of law and equity" to claims under the UCC).[2]

Moreover, at the time stop-payment orders were enacted, a receiver had not yet been appointed. BBVA Compass had received declarations of loss from its customers for each of the checks. Accordingly, there was no Freeze Order to violate at that time, and BBVA Compass properly followed procedures under the Uniform Commercial Code following receipt of a declaration of loss from a customer. Ala. Code § 7-3-312.

### C. The Checks Were Not Presented Within 90 Days of Issuance With Notice of the Freeze Order

Under the Uniform Commercial Code, as adopted in Alabama, a "check" is defined as "(i) a draft, other than a documentary draft, payable on demand and drawn on a bank or (ii) a

---

[2] It cannot be denied that BBVA Compass' customers have unquestionably clean hands. Yet to force their checks to be paid, and thus the customers to indemnify BBVA Compass, would make them victims of the fraud as well, enlarge the losses resulting from the fraud, and result in payment back to the customers as victims from the Receivership.

9

cashier's check or teller's check." Ala. Code § 7-3-104.  Thus, a cashier's check is explicitly a "check" under the code.  The Uniform Commercial Code further specifies that an instrument payable on demand "comes overdue . . . [i]f the instrument is a check, 90 days after its date." Ala. Code § 7-3-304; *see also* Official Comment Ala. Code § 7-3-304 ("A check becomes stale after 90 days."); *Anderson v. Experian Info. Solutions, Inc.*, No. 08-CV-5151(PJS/JJK), 2009 WL 3644923, at *5 (D. Minn. Nov. 2, 2009), *aff'd sub nom.*, *Anderson v. EMC Mortgage Corp.*, 631 F.3d 905 (8th Cir. 2011) ("Under the UCC, a check becomes overdue ninety days after its date.").  Thus, BBVA Compass had no obligation to honor a cashier's check more than 90 days from its issuance date.[3]

As admitted by the Receiver, (Doc. No. 331, p. 6), three of the checks presented were presented more than 90 (ninety) days after they were issued (Doc. No. 331, p. 6) (check numbers 7472, 3793, and 8219).  The remainder of the checks, while presented and returned earlier, were not presented to BBVA Compass after it had knowledge of the Freeze Order.  BBVA Compass became aware of the Freeze Order on October 11, 2012, and no check presented after that time was within the 90 day window.  Additionally, while BBVA Compass received notice of the Freeze Order on October 11, 2012, the Receiver did not provide notice of the cashier's checks until nearly a year later.

### IV. Conclusion

There is no current authority to require a *nonparty* to turn over assets to the Receiver, and the instant motion should therefore be denied.

Similarly, BBVA Compass has not violated the Freeze Order and thus should not be required to show cause as to why it should not be held in contempt.  Indeed, even if the Freeze

---

[3] Additionally, notice that a check is overdue deprives the holder of the instrument of status as a Holder in Due Course.  *Dorchester Financial Securities v. Banco BRJ, S.A.*, No. 02-CIV-7504, 2009 WL 5033954 at *4 n. 6 (S.D.N.Y. Dec. 23, 2009).

Order did require BBVA Compass to turn over assets to the Receiver without an action or judgment against it (which it does not), it falls far short of the "unequivocal command" and "clear and unambiguous" decree required to find even an actual party in contempt. *In re GMC*, 61 F.3d 256, 258 (4th Cir. 1995); *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991) ("Civil contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous."); (Doc. No. 331, p. 14) (Receiver's Memorandum of Law in Support of the instant motion citing the same standard); *see also In re GMC*, 61 F.3d at 258 ("The burden is on the complainant to prove civil contempt by clear and convincing evidence.").

At all times, BBVA Compass has acted in good faith. It has complied with the Freeze Order upon receiving it, and, prior to that, kept money in the hands of the victims of fraud—its customers—rather than the perpetrators of fraud, Rex Ventures. It also properly returned checks that were more than 90 (ninety) days old, pursuant to the Uniform Commercial Code.

Therefore, there is no authority to require BBVA Compass to turn over any funds to the Receiver. There is no judgment against BBVA Compass, or even an action that establishes jurisdiction and a sum certain due to the Receiver. Instead, there is an order requiring that BBVA Compass freeze any assets of Rex Ventures in its possession. BBVA Compass has no assets of Rex Ventures in its possession, and did not have any when it received notice of the Freeze Order.

Respectfully submitted this the 15 day of June, 2015,

                                         s/ Raboteau T. Wilder
                                         Raboteau T. Wilder (N.C. Bar No. 5891)
                                         Russ Ferguson (N.C. Bar No. 39671)
                                         Womble Carlyle Sandridge & Rice, LLP
                                         301 South College Street, Suite 3500
                                         Charlotte, NC 28202-6037
                                         Email: RFerguson@wcsr.com
                                                           RWilder@wcsr.com
                                         Telephone: (704) 331-4900
                                         Facsimile: (704) 331-4955

                                         *Attorneys for Third Party BBVA Compass*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be filed via the CM/ECF system, which will provide service to all attorneys of record.

The following *pro se* party will be served by U.S. Postal Service, first class mail, postage prepaid:

    **Nathaniel Woods**
    216 S.W. 11th Avenue
    Ocala, FL 34471

     s/ Raboteau T. Wilder
    Raboteau T. Wilder
    Russ Ferguson

    *Attorneys for Third Party BBVA Compass*