IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. 3:12 cv 519 |
| vs. | **APPLICATION FOR FEES AND EXPENSES BY THE RECEIVER AND HIS ADVISORS FOR THE SECOND QUARTER OF 2015** |
| REX VENTURE GROUP, LLC d/b/a ZEEKREWARDS.COM, and PAUL BURKS, | |
| Defendants. | |

Kenneth D. Bell, Esq., the Court-appointed Temporary Receiver (the "Receiver") for and over the estate of Rex Venture Group, LLC d/b/a ZeekRewards.com, any of its subsidiaries, whether incorporated or unincorporated, and any businesses or business names under which it does business (the "Receivership Defendant"), and McGuireWoods LLP ("MW"), as counsel for the Receiver, hereby submit this application (the "Application") for allowance of compensation and reimbursement of expenses incurred by the Receiver, MW, and FTI Consulting, Inc. ("FTI"), consultants for the Receiver (collectively, the "Receiver Team"), during the period from April 1, 2015 through June 30, 2015 (the "Compensation Period").

I.    **SUMMARY OF PROFESSIONAL FEES AND REIMBURSEMENT OF EXPENSES REQUESTED**

This Application has been prepared in accordance with the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Guidelines").

The Receiver and MW attorneys and paraprofessionals have expended a total of 1,044.1 hours working on this matter during the Compensation Period. The Receiver and MW seek allowance of compensation for services rendered during the Compensation Period with respect to the Receivership Estate in the amount of $482,219.66 (which reflects a 15% discount of the regular billing rates of the Receiver and all MW personnel), and reimbursement of actual and necessary expenses in the amount of $47,987.40.

The Receiver retained FTI as the forensic accountants and litigation and database consultants for the Receivership Estate. FTI professionals expended a total of 1,579.5 hours working on this matter during the Compensation Period, and seek allowance of compensation for services rendered in the amount of $421,113.00 (which reflects a 15% discount from FTI's regular billing rates[1]).

The fees requested (less applicable holdbacks) by MW and FTI for the Compensation Period and the three periods immediately preceding the Compensation Period are as follows:

|  | 3rd Quarter 2014 | 4th Quarter 2014 | 1st Quarter 2015 | 2nd Quarter 2015 |
|---|---|---|---|---|
| McGuireWoods | $810,160.08 | $834,542.22 | $692,004.98 | $482,219.66 |
| FTI | $537,954.50 | $685,904.50 | $540,437.00 | $421,113.00 |
| **Total** | **$1,348,114.58** | **$1,520,446.72** | **$1,232,441.98** | **$903,332.66** |

Pursuant to the SEC Guidelines, the following exhibits are attached:

1.    Certification regarding compliance by the Receiver and MW with the SEC Guidelines (attached as Exhibit A);

2.    Certification regarding compliance by FTI with the SEC Guidelines (attached as Exhibit B);

---

[1]  In keeping with the rate discounts applied by MW, FTI reduced the hourly rates for its Senior Managing Directors to $495, Managing Directors to $410, Senior Directors to $395, Directors to $350, Senior Consultants to the range of $270-$320, and Consultants to the range of $210-$225. The average reduction in bill rates is 20.8% per hour.

2

3. Fee Schedule setting forth all MW professionals and paraprofessionals who have performed services in this case during the Compensation Period, the capacity in which each individual is employed by MW, each individual's customary hourly billing rate, the hourly billing rate charged by MW for services performed by each individual, the aggregate number of hours expended in this matter, and the fees billed (attached as Exhibit C);

4. Fee Schedule setting forth all FTI professionals and paraprofessionals who have performed services in this case during the Compensation Period, the capacity in which each individual is employed by FTI, each individual's customary hourly billing rate, the hourly billing rate charged by FTI for services performed by each individual, the aggregate number of hours expended in this matter, and the fees billed (attached as Exhibit D);

5. Schedule specifying the categories of expenses for which the Receiver and MW seek reimbursement, and the total amount for each such expense category (attached as Exhibit E);

6. All MW time records billed during the Compensation Period by activity categories and a description of the services rendered, arranged in chronological order (attached as Exhibit F);

7. All FTI time records billed during the Compensation Period by activity categories and a description of the services rendered, arranged in chronological order (attached as Exhibit G); and

8. All activity categories and subcategories created in conjunction with SEC and pursuant to SEC Guidelines (attached as Exhibit H).

The Receiver and FTI have previously requested and the Court previously granted interim applications for fees and services and payments have been made on those applications in the cumulative amount of $16,098,234.68 (less applicable holdbacks). The Receiver and MW have not been previously compensated for the fees and expenses in this Application. The Receiver, MW, and FTI request that the Court order a holdback of 20% of MW's and FTI's fees for this quarter. The fees and expenses herein were incurred through the discharge of the Receiver's duties specified in the Court's Initial Receiver Order, Amended Receiver Order, and Order Reappointing Temporary Receiver. We believe the charges are necessary and proper, and

that our efforts have brought significant benefit to the Receivership Estate. In accordance with SEC Guidelines, the Receiver and MW have not billed for their work on this Application. The SEC reserves its right to object to this application, and expressed concern to the Receiver regarding FTI's billing in connection with this application.

## II. SUMMARY OF ACTIVITIES OF THE RECEIVER BETWEEN APRIL 1, 2015 AND JUNE 30, 2015

### A. <u>Operations of the Receiver</u>

#### 1. Investigating the Receivership Defendant's Financial Information

During the second quarter, the Receiver Team continued to work with FTI and various government agencies to analyze documents and information to support its recovery of Receivership Assets. In addition, the Receiver Team continued to assist government agencies in their own investigations concerning the Receivership Defendant, principals, affiliates, and the entities and financial institutions that provided services to or transacted with Defendants.

#### 2. Marshaling and Preserving Receivership Assets

##### a. Accounts for Holding Receivership Assets

The Receiver currently maintains five bank accounts on behalf of the Receivership Estate for holding Receivership Assets: the "Affiliate Payments Account," the "Seized Asset Account," the "Pre-Filing Account," the "Settlement Account," and the "Holdback Account." The "Withholding Account" referenced in previous reports was closed during the second quarter of 2015 because the Receiver is no longer withholding taxes from distribution payments.

Excluding earned interest and transfers between accounts, the Receiver deposited the following funds into its accounts during the second quarter of 2015:

- $3,283,771.91[2] into the Settlement Account from settlements with third parties who were holding Receivership Assets or against whom the Receiver asserted claims for professional negligence;

- $96,096.55 into the Seized Asset Account from auction proceeds relating to settlements of claims against former Rex Venture Group insiders; and

- $10,000.00 into the Affiliate Payments Account from payment by a financial institution relating to a previously dishonored cashier's check.

As of June 30, 2015, the Receivership Estate held approximately $91.3 million in the Affiliate Payments Account, approximately $75 million in the Seized Asset Account, approximately $292,000.00 in the Pre-Filing Account, approximately $9.5 million[3] in the Settlement Account, and approximately $1.4 million in the Holdback Account. The total of sums held in the Receiver Estate's accounts at the end of the second quarter was $177,492,000.00.

b. **Outstanding and Dishonored Negotiable Instruments**

In the quarter ending June 30, 2015, the Receiver's conflicts counsel, Erwin, Bishop, Capitano & Moss, P.A. ("EBCM") continued work to resolve claims against financial institutions arising from outstanding and dishonored cashier's checks, teller's checks, official checks, and bank money orders. As of June 30, 2015, EBCM was pursuing thirty-two active claims currently valued at $394,227.00. EBCM is holding one check for $1,505.00 subject to completion of settlement documentation. Two additional claims are in the process of being

---

[2] Of this amount, $1,000,000.00 was received from NXPay to be held in a segregated account as frozen funds not to be used or distributed in any manner until a further Order of the Court. To this end, this $1,000,000.00 was transferred to a newly opened segregated account on July 1, 2015 and will remain in this segregated account until further Order of the Court.

[3] As of July 1, 2015, the Settlement Account held approximately $8.5 million after the $1,000,000.00 from NxPay was transferred to the segregated account noted above.

5

resolved, and EBCM anticipates that this will result in a recovery of $23,436.00 during the third quarter. The thirty-two remaining claims require litigation activity for collection.

EBCM continues to work on motions seeking orders to show cause or to turnover Receivership Assets against financial institutions that have refused payment. During the quarter, EBCM worked on a reply brief in support of the Receiver's initial motion for the return of assets against the financial institution with the largest outstanding claim and prepared affidavits to support similar motions against fourteen other financial institutions.

### c. Funds Held by E-Wallets

On June 1, 2015, the Court entered an Order on the Receiver's Motion for an Order Directing NxSystems, Inc. to Turn Over Receivership Assets and/or Find it in Contempt of the Court's Agreed Order. The Court directed NxPay to pay the amount of $9,069,446.52 to the Receiver to be held frozen in a segregated account, so the assets would be preserved until a final resolution on the merits of the Receiver's Motion. In that Order, the Court also determined that a summary proceeding was an appropriate method to resolve these issues and directed the parties to appear for a status conference before the Court. On June 24, 2015, the parties appeared before the Court for a status conference and set a schedule for further proceedings through November 2015.

### d. Additional Asset Recovery

On June 1, 2015, the Court entered a Consent Order Approving Settlement Agreements with Plastic Cash International, Brian Newberry, BBN Holdings, LLC and Travelers Casualty and Surety Company.

### e. Foreign Accounts

The Receiver Team is continuing to investigate and pursue outstanding funds from Payza, Payment World, Solid Trust Pay, and CyberProfit. With respect to the outstanding assets

6

from Payza and/or Payment World, the Receiver Team continues to pursue the recovery of assets from VictoriaBank in Moldova.  To this end, the Receiver Team has elicited the assistance of McGuireWoods Consulting in Romania and the U.S. Embassy in Moldova in setting up a meeting with Moldovan authorities and VictoriaBank representatives as part of our ongoing efforts to recover the Receivership Assets being held by VictoriaBank.

3.    **Analyzing the Operations of the Receivership Entity**

a.    **Investigating and Validating the Receivership Defendant's Electronic and Financial Data**

The validation of the Receivership Defendant's electronic and financial data is complete. Should additional data be provided in the future, the Receiver Team will validate the data and update the Receivership Defendant's books and records.

During the second quarter, the Receiver Team and FTI continued to investigate the Receivership Defendant's financial data to support efforts to recover Receivership Assets.  FTI's financial data investigation activities primarily consisted of (1) reconciling the ZeekRewards database records to disbursement information for specific net winners and insiders to support clawback actions; (2) providing analysis and financial records to support efforts to recover Receivership Defendant assets held by several financial institutions; and (3) research and analysis of specific financial institution transactions to determine potential claims against financial service providers to the Receivership Defendant.

b.    **Investigating the Receivership Defendant's Operations**

During the second quarter, the Receiver's investigation of RVG's operations included the continued analysis of interactions and financial transactions among RVG and certain vendors and third-party advisors.  This analysis was performed for various purposes, including the pursuit of

7

Receivership Assets from financial institutions, support for the Receiver's ongoing fraudulent transfer lawsuits, and analysis of current and potential claims against third parties.

### 4. Communicating with Affiliates and Creditors

The Receiver Team continued to communicate with Affiliates on a daily basis throughout the second quarter of 2015. These communications were largely in regard to the claim allowance and objection processes. The Receivership Team sent broadcast emails to Affiliates who had received their claim determinations but had failed to respond to it in the months since its issuance. Additionally, the Receivership team communicated with many individual Affiliates in regard to specific issues and/or objections raised to claim determinations and addressing questions regarding status of claims and distribution payments made in the prior quarter. There were also a significant number of inquiries raised by Affiliates that failed to file claims, but sought to assert claims. Additionally, the Receiver Team continued to have conversations and negotiations with various Affiliates regarding the pending net-winner litigation.

In addition to individual communications and the blast email, the Receiver Team posted an update on the Receivership website, regarding the second interim, partial distribution process.

### 5. Issues Concerning Federal Taxes

During the second quarter, FTI and the Receiver Team tracked and reviewed IRS Form 1099-related correspondence from affiliates. This work included responding to various affiliate questions and comments and reviewing transaction data for each affiliate who inquired about an IRS Form 1099 received from the Receiver. Additional work included performing any necessary analyses and research to respond to various requests from the Receiver and claimants and in some cases working with National Law Forms to generate amended IRS Forms 1099.

In addition, the Receiver Team continued its work analyzing the tax liability for payments received for the sale of assets that closed in the fourth quarter of 2014. The Receiver

Team reviewed the documents prepared in connection with such sales and identified tax issues relating to the reporting of the sale information.

### 6. **Litigation in the SEC Enforcement Action**[4]

The Receiver Team litigated the following matters in the SEC Action:

- The Receiver obtained an order directing Bella Vita Ltd. to transfer title and ownership of property in the Turks & Caicos Islands, purchased with Receivership Assets by James Meyer of Preferred Merchants, to the Receiver along with all improvements, attachments and personal property within and related to the property. This property is currently frozen by authorities in the Turks & Caicos, and the Receiver is working to obtain a transfer of the property to the Receivership Estate.

- The Receiver obtained a favorable ruling from the Fourth Circuit, dismissing the Belsome movants' attorneys' appeal of the District Court's order regarding attorney charging liens.

- The Receiver continued litigation against NxPay regarding Receivership Assets that NxPay disputes being owed to the Receivership. A summary proceeding in this dispute has been ordered by the Court and will proceed with discovery during the next quarter.

- The Receiver's conflicts counsel continued litigating a claim against BBVA Compass, and the parties reached a settlement in this dispute shortly after the close of the second quarter.

---

[4] The Receiver's efforts related to the recovery of fraudulently transferred funds and other damages incurred by RVG are discussed later in this Report.

## B.    The Receiver's Fund Accounting

The Receiver's Standardized Fund Accounting Report ("SFAR") was included in the Receiver's Status Report for the Second Quarter of 2015.

## C.    The Receiver's Receipts and Disbursements

The Receiver's Schedule of Receipts and Disbursements ("Schedule") from April 1, 2015 through June 30, 2015, was included in the Receiver's Status Report for the Second Quarter of 2015.  The Schedule sets forth the following receipts and disbursements:

1. The Receivership received funds in the amount of $10,000.00 from the deposit of Affiliate-Investor financial instruments;[5]

2. Received funds of $2,283,771.91 from third-party litigation settlements;[6]

3. Received funds of $96,096.55 from auction proceeds;

4. Received funds of $1,000,000.00 from NXPay to be held in a segregated account as frozen funds not to be used or distributed in any manner until further Order of the Court;

5. Received income from other sources, such as interest income and return of pre-paid funds, totaling $36,116.67; and

6. Disbursed funds from the Receiver's accounts of $14,176,825.47, the vast majority of which consists of disbursements to victims.  These funds were also disbursed for: claims process expenses; fees previously approved for payment of FTI and MW; RVG website and database hosting; bank fees related to

---

[5] These funds are the result of financial institutions paying the Receiver for affiliates' cashier's checks upon which those financial institutions had previously wrongfully stopped payment.

[6] As of the end of the second quarter, the Receiver has agreed to approximately $3 million in settlements with net winner affiliates.  The Receiver has collected over $8.5 million in total litigation-related settlements since the inception of the Receivership.

management of the Receiver's accounts; other legal services; and utility payments.

Between April 1, 2015 and June 30, 2015, the Receivership Estate deposited $3,419,985.13 and disbursed $14,176,825.47. The Receiver has marshaled total assets of approximately $348.2 million during the period between August 17, 2012 and June 30, 2015, while disbursing approximately $171.4 million during the same period.[7] Disbursements to victims from September 2014 to the present total approximately $157 million.

### D.  Description of All Known Non-Cash Receivership Property

In the fourth quarter of 2014, the Receiver took possession of a residential home at 5600 Roundhouse Lane in Charlotte, NC, as part of a settlement with the estate of Defendant Roger Plyler. The Receiver retained a real estate agent to sell the home, which went to market in the first quarter of 2015. The Receiver accepted an offer on the home in late March, and sold the home on April 30, 2015. Proceeds in the amount of $214,533.51 were deposited into the Receiver's Settlement Account on April 30, 2015. In the first quarter of 2015, the Receiver also took possession of several motor vehicles as part of the settlement with Defendant Dawn Wright-Oliveras. The Receiver retained an auctioneer and liquidated the vehicles at auction on May 9, 2015. Proceeds in the amount of $96,096.55 were deposited into the Receiver's Seized Asset Account[8] on June 23, 2015.

---

[7] A significant amount of the available funds on hand are being reserved in light of the more than 44,000 claimants who have been deemed to have accepted their claims but have yet to complete the required Release and OFAC certification, as well as potential future payments on subrogation claims.

[8] This sum was later transferred to the Receiver's Settlement Account, as the funds were obtained pursuant to a settlement.

E.    **Description of Claims Held by the Receivership Estate**

1.    **Identifying and Pursuing Fraudulently Transferred Funds Held by Net-Winner Affiliate-Investors**

a.    **U.S. Net Winner Lawsuit**

The Receiver and his counsel attended a status conference with the Court and counsel for two of the named defendants on May 27, 2015.  At this conference, the Court determined that Berkeley Research Group ("BRG") will serve as experts for the defendant class and will report directly to the Court during the course of their engagement on behalf of the defendant class.  The Receiver Team has since worked to provide BRG with all records necessary for their review and analysis of the issues.

In addition, the Receiver obtained a default judgment against defendants Trudy Gilmond and Trudy Gilmond, LLC after they refused to appear at a deposition and failed to attend a show-cause hearing.  The Receiver's judgment against these defendants is for $2,129,522.27.

Regarding judgment collection, the Receiver continued work to collect a judgment obtained against Michael Van Leeuwen.  During the quarter, Mr. Van Leeuwen was served with the Notice of Rights to Have Exemptions Designated and the Receiver's counsel prepared a Writ of Execution for issuance by the Cumberland County Clerk of Court.

b.    **Claims Against Foreign Net Winners**

During the second quarter, the Receiver filed additional lawsuits against foreign net winners in Brazil, Denmark, France, Germany, Ireland, Israel, the Netherlands, and Sweden.[9]  In addition, the Receiver previously filed actions against net winners in Australia, the British Virgin Islands, Canada, New Zealand, Norway, and the United Kingdom.  The Receiver has worked extensively with local counsel in each of these countries to locate and serve as many of these

---

[9] The actions against net winners residing in Brazil and Ireland were subsequently dismissed without prejudice to the possibility of filing future actions against these defendants.

Case 3:12-cv-00519-GCM   Document 391   Filed 08/21/15   Page 12 of 30

defendants as possible, and this work is ongoing. Further, the Receiver Team corresponded with individual foreign defendants and attorneys for certain foreign defendants regarding potential settlements and extensions for filing responses to the respective lawsuits.

In the action against Canadian net winners, the Receiver is currently working on enforcing and collecting the judgments with the help of Canadian counsel. In addition, motions for default and default judgment will soon be filed against additional foreign defendants who have failed to respond to the lawsuits as required by federal rules.

### 2. Investigating Claims against Receivership Defendant Insiders

The Receiver has settled with each of the defendants named in the lawsuit against insiders of the ZeekRewards scheme other than Darryle Douglas, against whom the Receiver has obtained a default judgment. The Court has approved each of these settlements, and the case currently remains open on the Court's docket pending satisfaction of the terms of the various settlement agreements.

### 3. Investigating Claims against the Receivership Defendant's Third-Party Advisors and Others

During the second quarter, the Receiver filed a lawsuit against Peak USA, LLC; Peak Impact, LLC; and Gary Bessoni. *See Bell v. Peak USA, LLC, et al.*, No. 3:15cv233 (W.D.N.C. filed May 27, 2015). Bessoni, through these entities, sold "customers" to Zeek affiliates that served as a key mechanism in disguising the true nature of the investment scheme. This lawsuit alleges claims of fraudulent transfer and unjust enrichment and seeks the imposition of a constructive trust.

In addition, during the second quarter the Receiver finalized a settlement of the claims against Kevin Grimes and his former law firm, Grimes and Reese.

**F.**     **Potential Creditors of the Receivership Estate**

As part of the continued proceedings against NxPay, Preferred Merchants, and their principals and affiliates, the Receiver Team is defending against any claim that the entities or individuals are entitled to the funds improperly held or transferred outright or as a set off against amounts owed to the Receivership Estate.

**G.**     **Status of Creditor Claims Proceedings, After Such Proceedings Have Been Commenced**

On April 30, 2015, the Receiver issued checks to approximately 7,900 Affiliate claimants as part of the third payment of the first interim, partial distribution.  These were claimants that held an allowable claim, were not issued a distribution as part of the first interim distribution on 9/30/2014 or second interim distribution on 1/30/2015, agreed to their claim determination, and provided the required Release and OFAC Statement.  On May 29, 2015, the Receiver reissued checks to approximately 775 Affiliate claimants.  These checks were associated with claimants who had either requested that the check issued to them as their first interim, partial distribution be reissued or for whom such a check had been returned to the Receivership with a forwarding address provided.

Despite the issuance of approximately 175,000 claim determinations, approximately 44,000 Affiliates that hold an allowable claim have failed to provide all necessary documentation to be eligible to receive a first interim, partial distribution. By Order of this Court, an Affiliate who does not provide the required Release and the OFAC Certification is not eligible to receive a distribution from the Receivership. These Affiliates will remain ineligible to receive a distribution until they have completed the claim determination process. At this time, the Receivership Team has maintained adequate reserves to pay all Affiliates whose claims are ultimately allowed (by submission of the required Release and the OFAC Certification) in the

14

amounts in which such Affiliate's claim is recognized by the Receiver (the reserves are in the amount of either the applicable percentage of the as-recognized amount in an accepted Claim Determination, or the as-filed amount if the claimant has objected to such Claim Determination). In the month subsequent to the end of each quarter, the Receiver will make a first interim, partial distribution to those claimants who have become eligible to receive a distribution in that preceding quarter

The Receiver has determined that a second interim, partial distribution that will raise the rising-tide distribution percentage to sixty percent of an Affiliate claimant's agreed-upon investment in ZeekRewards will be made to claimants holding an allowable claim on July 31, 2015. The magnitude of a third interim and/or final distribution will depend on how much more money can be attained through settlements, clawback litigation, other litigation, and the pursuit of other Receivership Assets through additional avenues.

Approximately 1,900 Affiliates have objected to the claim determination issued by the Receiver Team. The Receiver Team is continuing to address these objections in an effort to resolve such objections before intervention from the Special Master or the Court would be needed. The Receiver Team has been successful in resolving the vast majority of these objections to date.

During the second quarter of 2015, the vast majority of the subrogation claims made by financial institutions against the Receivership Estate were processed and issued claim determinations. Nearly all of these claim determinations recognized claims in favor of the subrogees. The remaining subrogation claims will be issued claim determinations during the early part of the third quarter.

## III.    FEES AND EXPENSES REQUESTED

In connection with the Compensation Period, the Receiver and MW request compensation for services in the amount of $482,219.66 and reimbursement of expenses in the amount of $47,987.40.

In connection with the Compensation Period, FTI requests compensation for services in the amount of $421,113.00.

These amounts reflect the hours worked by the Receiver and MW attorneys and legal assistants, and the hourly rates in effect at the time that the services were rendered, as modified by the discount provided by the Receiver and MW and additional write-offs of attorney time. These amounts also take into account all relevant circumstances and factors as set forth in the N.C. Code of Professional Responsibility and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and MW under the Receiver Order and the Amended Receiver Order.

Pursuant to the Receiver Order and Amended Receiver Order and the public service discount and additional fees and write-offs as described above, the fees of the Receiver and MW have been reduced from $626,970.50 to $482,219.66, a reduction of $144,750.84.

The majority of the work described in this Application was performed by a small group of attorneys and a paralegal.[10] In addition to the Receiver and the paralegal, the

---

[10] The remainder of the timekeepers consist of MW professionals and paraprofessionals working in specialized capacities, such as bankruptcy, tax, employee benefits and information technology, who were consulted for a limited purpose and who charged limited time to the Estate. The total number of timekeepers will decrease going forward.

primary team consists of: three associates whose responsibilities include case management, motions and discovery drafting including negotiations with opposing counsel, document review supervision, status report drafting, and legal research related to litigation and fact investigation, each of whom dedicate between 10 and 70 percent of their time to the Receivership matter; one associate who focuses on asset analysis and recovery from financial institutions who dedicates approximately 10 percent of her time to the Receivership; one senior counsel who focuses on claims administration and reconciliation who dedicates 40 to 50 percent of his time to the Receivership matter; and one partner who supervises litigation and settlement issues who dedicates approximately 80 percent of his time to the Receivership. This structure is purposeful, effective, and efficient for the Receivership, as the attorneys most experienced in their field are conducting certain key portions of the Receivership work.

The Receiver and MW have submitted previous fee applications in this case, which were approved by this Court. MW has not received a retainer in this case.

As required by the SEC Guidelines, the Receiver and MW professionals recorded all services performed in time increments of one-tenth of an hour. All services by MW legal assistants and other paraprofessionals were professional in nature.

In accordance with the SEC Guidelines, this Application does not seek payment for time spent preparing the Application or any documentation in support.

IV.     **SUMMARY OF SERVICES RENDERED BY THE RECEIVER AND MW DURING THE COMPENSATION PERIOD**

Pursuant to the SEC Guidelines and discussions with the SEC, MW has segregated its time during the Compensation Period into twelve activity categories and additional subcategories. A description of the activity categories and subcategories is attached hereto as

17

<u>Exhibit H</u>.  Narrative summaries of these activity categories and subcategories are provided below.

A.  *Asset Analysis and Recovery (AAR), Asset Disposition (AD), Business Analysis (BA), Litigation Consulting (LC), and Data Analysis (DA)* <u>*AMOUNT: $350,603.40*</u>

Listed above are certain activity categories which are required under the SEC's Guidelines to track the Receiver's efforts and, while the Receiver will not necessarily conduct all of the above-referenced activities in a given quarter, we have grouped the above categories together for convenience.  As outlined above, the activities in this category consist of the Receiver Team's efforts to identify, recover, and consolidate the Receivership Defendant's assets by collecting funds and outstanding amounts from certain financial institutions which have not released all Receivership Assets.  The Receiver continues to investigate transfers involving key insiders, third-party advisors and companies affiliated with RVG and/or its key insiders. Additionally, the Receiver's factual investigation and litigation activities fall into this category, including filings and court appearances related to the clawback litigation, conducting witness interviews, and review of RVG and third-party documents related to Receivership Assets and the operation of RVG.  Additional subcategories, which were created in conjunction with the SEC, further break out and clarify many of the activities listed above:

1.  *Clawback Litigation (CLA, CLG, CLLR, CLSUB, CLNDM, CLDM, CLSET)* <u>*AMOUNT:  $181,966.24*</u>

The above subcategories of the AAR activity category relate specifically to Clawback Litigation.  These Clawback Litigation subcategories consist of efforts to aid in the recovery of funds fraudulently transferred by the Receivership Defendant, including activities related to the lawsuits against insiders, third-party

advisors, and net winners described above.    In addition, the Receiver has contacted thousands of net winners for the purpose of settling potential claims, and has negotiated settlements promising approximately $8.5 million.

**2.**    *Other Litigation (OLG, OLLR, OLSUB, OLNDM, OLDM, OLDEP, OLSET)* *AMOUNT:  $7,292.58*

The above subcategories of the AAR activity category relate to litigation other than Clawback Litigation.  The Other Litigation subcategories include responding to various related cases filed by victims of the Scheme, and responding to motions filed in the SEC Enforcement Action by non-party net winners and others.

**3.**    *Other AAR Subcategories (FI, FNA, LR, SAP)* *AMOUNT: $159,546.38*

The above subcategories of the ARR activity category relate to Fact Investigation (FI), Financial Institution Negotiations/Analysis (FNA), Legal Research (LR), and Strategic Analysis and/or Planning (SAP).  These activities consist of factual investigation and efforts related to negotiations with financial institutions for the release and recovery of funds belonging to the Receivership Estate and certain legal research. This category includes work related to the receiver's efforts to reconcile information from various financial institutions, e-wallet vendors, and payment processors for the purpose of recovering potential outstanding Receivership Assets. This category also includes work related to the Receiver's continuing investigation of RVG's operations, including interviews of key insiders, analysis of documents and data produced by various subpoenaed entities and individuals, and providing assistance to various governmental entities.

4. *Remaining Activities (BA, LC, DA, AD)* <u>*AMOUNT: $1,798.20*</u>

The above activity categories are included in the amount listed in Subsection A, above, and comprise the remainder of work performed under that subsection, including efforts involving business analysis, litigation consulting, asset distribution, and analysis of assorted data relevant to the administration of the Receivership Estate, including work by the Receiver Team with the Receiver's retained forensic consultants, FTI.

B. *Business Operations (BO), Employee Benefits/Pensions (EBP), Tax Issues (TI)* <u>*AMOUNT: $5,942.39*</u>

Listed above are certain activity categories which are required under the SEC's Guidelines to track the Receiver's efforts and, while the Receiver will not necessarily conduct all of the above-referenced activities in a given quarter, we have grouped the above categories together for convenience. The activities in this category consist of the Receiver Team's efforts related to the Receivership Defendant's business operations, including review of receivables, review and payment of payables, administration of employee benefits, and assuring federal and state tax compliance for independent contractors and employees. Because these matters relate to the winding-up of the Receivership Defendant, a portion of these fees are likely to be non-recurring.

1. *Tax Issues (TI) and Employee Benefits/Pensions (EBP)* <u>*AMOUNT: $5,870.14*</u>

The fees associated with the activity categories listed above are included in the amount listed in Subsection B, above, and include the work on federal and tax issues outlined above.

2. *Business Operations (BO)  AMOUNT: $72.25*

The fees associated with the activity category listed above are included in the amount listed in Subsection B, above, and primarily represent efforts directed at winding up the business operations of the Receivership Defendant discussed above.

C. *Case Administration (CA), Status Reports (SR), Claims Administration and Objections (CAO)  AMOUNT: $125,673.87*

Listed above are certain activity categories which are required under the SEC's Guidelines to track the Receiver's efforts and, while the Receiver will not necessarily conduct all of the above-referenced activities in a given quarter, we have grouped the above categories together for convenience.  The activities in this category consist of regular meetings and status conferences among members of the Receiver Team and the Receiver Team's efforts to comply with the directives of the Court. The category also includes administration of the claims process.  Other activities include the Receiver's management and oversight of the Receiver Team and MW's participation in calls and conferences with FTI, the SEC, and other entities.   The Receiver has also engaged in motions practice when necessary.

1. *Claims Administration and Objections Subcategories (CAO) (RES, RA, DR, CAF, CIN, OTH)  AMOUNT: $67,361.26*

The Claims Administration and Objections activity category and the above subcategories of the CAO category, including Research (RES), Review/Analyze (RA), Draft/Revise (DR), Communicate Affiliates (CAF), Communicate Internal (CIN), and Other (OTH), are part of the amount listed in Subsection C above.  As discussed above, during the second quarter, this work included reconciling claims, addressing objections to claim determinations, and the issuance of claims checks.

The Receiver team also continued to work closely with FTI on claims determination and communicate with affiliates regarding the claims process.

**2.** *Case Administration (CA - $49,363.34) and Status Reports (SR - $8,949.27) AMOUNT: $58,312.61*

The Case Administration (CA) and Status Report (SR) activity categories listed above are included in the amount listed in Subsection C above, and include the management and oversight of the receivership generally, as well as the preparation of the Quarterly Status Report and other reports. Such time in the second quarter included senior members of the Receiver Team supervising a variety of ongoing matters, including the filing of the status report for the previous quarter, and coordinating with FTI, the SEC, and other government entities.

**D.** *Travel: AMOUNT: $1,377.00*

The activities in this category cover all non-working travel time of the Receiver and MW professionals outside a 20-mile radius of the relevant offices during the Compensation Period. These activities are billed at a 50 percent rate, and are incorporated into the total fees described in categories above.

## V. SUMMARY OF SERVICES RENDERED BY FTI DURING THE COMPENSATION PERIOD

**A.** *Fee Application (MGW Code FAPP-OTH) and Quarterly Status Reports (MGW Code SR-QSR), AMOUNT: $4,672.00*

Time spent on the FAPP-OTH task code involves the preparation of FTI's quarterly Fee Application. This report details all of FTI's work by matter number, task code, and professional. FTI created and provided to McGuireWoods reports of fees on a weekly basis to allow real time tracking of FTI's fees. Time spent preparing weekly reports and the Fee Application is not billed

to the Receivership. FTI shows time spent on the FAPP-OTH task code, however the effective rate for this work is $0.

Time spent on the SR-QSR task code includes the preparation of various quantitative and narrative reports related to the Quarterly Status Report ("QSR") and the Standardized Fund Accounting Report ("SFAR"). FTI prepares summary schedules and other reports that detail FTI's work throughout the quarter. FTI bills time related to the SR-QSR task code to the Receivership.

**B.** *Claims Administration (MGW Codes CAO-RA, CAO-CAF, CAO-CIN, CAO-RES, and CAO-OTH), AMOUNT: $351,123.50*

Time spent on these task codes relates to the claims filing and reconciliation process. During the second quarter, FTI continued to manage the claims process by reviewing claim statuses and supporting information data, corresponding with claimants regarding specific inquiries, tracking and organizing claimant responses and disputes, and performing overall quality control of claims. FTI also continued to work with Garden City Group ("GCG") and McGuireWoods to finalize claim determinations.

During the second quarter, FTI prepared and disbursed approximately 7,900 checks to affiliate claimants as part of the third interim distribution. Additionally, FTI also prepared and issued approximately 773 checks to claimants that either: 1) requested a reissued check, or 2) had a check returned to GCG with a forwarding address provided. The distribution and check issuance process will likely continue in future quarters.

Additional work included validating additional claims submitted through the objection process. FTI worked with GCG to verify various claim stipulations received from claimants. FTI also continued to identify the population of claims that were previously filed but the claim

submission was never finalized.  FTI will continue to monitor filed claims and claim stipulations in future quarters.

      **C.**    *Accounting/Auditing (MGW Code AA-OTH), <u>AMOUNT: $9,054.00</u>*

Time spent on the AA-OTH task code involves the management and maintenance of the Receivership's bank accounts.  FTI reviews activity in each account and ultimately prepares account summaries that are used to create various quarterly schedules. FTI also provides transaction-level detail to the Receiver as requested.

      **D.**    *Tax Issues (MGW Code TI-OTH), <u>AMOUNT: $2,401.00</u>*

Time spent on the TI-OTH included the tracking and review of 1099-related correspondence received from affiliates.  During the second quarter, FTI responded to various requests from affiliates and reviewed transaction data to verify inquiries related to 1099s. Additionally, FTI assisted with the review and analysis of state tax payments made by the Receivership.

      **E.**    *Asset Analysis and Recovery (MGW Codes AAR-FNA, AAR-OLG, AAR-CLG, AAR-DISCM, AAR-EXP,  AAR-OLSET, and AAR-SUM), <u>AMOUNT: $60,350.50</u>*

Time spent on these task codes relates to various clawback and other litigation efforts. FTI reviewed transaction data to verify RVG's books and records and to assist with asset recoveries.  Additionally, FTI organized and reviewed settlement agreements and payments received from affiliates.

Time spent on the AAR-FNA task code involved the review of transaction data related to a former eWallet payment processor.  FTI analyzed newly produced data to assist the Receiver with clawback efforts.

Time spent on the AAR-OLG task code included the review and distribution of data and documents produced by a specific financial institution. FTI organized and indexed specific data to assist with litigation efforts as requested by the Receiver.

Time spent on the AAR-CLG task code primarily related to the production and review of Net-Winner and Net-Loser analyses. FTI analyzed RVG transactional data to verify and summarize paid-in and paid-out transactions to and from affiliates. FTI created summary schedules of affiliate transactions for both foreign and domestic Net-Winners and Net-Losers. These summaries were ultimately used to support various litigation efforts. Additional work included responding to requests from government entities and outside counsel, both foreign and domestic.

Time spent on the AAR-DISCM task code involved the review of data productions produced by NXPay. FTI responded to a request from the Receiver to compile information associated with fees sought by NXPay.

Time spent on the AAR-EXP task code included responding to requests from Berkeley Research Group. FTI also spent time reviewing and compiling data sets that were ultimately provided to Berkeley Research Group.

Time spent on the AAR-OLSET task code included the review and management of settlement agreements and settlement payments received from former affiliates. FTI organizes and tracks all settlement agreement statuses and summarizes payments received. Additionally, FTI spent time verifying specific settlement payments and reconciling the transactions with the Receivership's banking activity.

Time spent on the AAR-SUM task code involved the review of transactional data to assist with various summary judgment litigation efforts. FTI created summary schedules of paid-

25

in and paid-out RVG transactions for specific affiliates as requested by the Receiver. FTI then verified these summary schedules with RVG's books and records to evidence that the transactions were authentic. Transaction summaries were created and reviewed for both foreign and domestic affiliates.

## VI.    EXPLANATION OF EXPENSES AND RELATED POLICIES

The Receiver and MW seek reimbursement for their out-of-pocket costs in the amount of $47,987.40. Exhibit E sets forth the various categories of expenses for which reimbursement is sought. These expenses include document management services from Kroll Ontrack, Inc., which hosts and processes the documents being collected and reviewed by MW. MW will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Guidelines and will provide the SEC with copies upon request.

MW observed the following policies in connection with its expenses during the Compensation Period:

A.    With respect to all expenses, MW seeks reimbursement only for the actual costs of its expenses. MW has not included the amortization of any investment, equipment or capital outlay in any request for expense reimbursement.

B.    In accordance with the SEC Guidelines, MW has not sought reimbursement for local travel expenses (within a 20-mile radius of MW's offices), including mileage, taxis and meals.

C.    MW has not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

## VII.    COST SAVINGS TO THE ESTATE

In total, the Receiver and MW seek $530,207.06 for fees and expenses, and request a holdback of 20% of its fees. This represents a cost savings to the estate of more than $144,000.

MW recognized the public service nature of the engagement, and accordingly discounted all professionals' and paraprofessionals' rates.

In total, FTI seeks $421,113.00 for fees, and requests a holdback of 20% of its fees. This represents a cost savings to the estate of more than $169,000.00. FTI recognized the public service nature of the engagement, and accordingly discounted all of its professionals' rates. Additionally, FTI has agreed to not charge for travel time and has waived its customary administrative expense that is usually 6% of fees charged.

## VIII. THE REQUESTED COMPENSATION SHOULD BE ALLOWED

The Receiver's compensation and the fees and expenses of the Receiver's professionals may be determined at the Court's discretion and, in making those determinations, the Court should consider the complexity of the problem faced, the benefit of the services to the Receivership Estate, the quality of the work performed and the time records presented. SEC v. Fifth Ave. Coach Lines, Inc., 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); see also SEC v. Elliott, 953 F.2d 1560, 1577 (11th Cir. 1992) (per curiam) (if a receiver reasonably discharges his duties, the receiver is entitled to compensation and the circumstances surrounding the receivership, including the results, are relevant).

While guidelines and standards for assessing compensation are set forth in case law, the unique facts and situations of each case make it impossible to rely directly on those guidelines alone. SEC v. W.L. Moody & Co., 374 F. Supp. 465, 485 (S.D. Tex. 1974), aff'd, 519 F.2d 1087 (5th Cir. 1975).

In the instant case, the Receiver, MW and FTI respectfully submit that the services for which they seek compensation in this Application were necessary for, and beneficial to, the orderly administration of the Receivership Estate.

The issues addressed by the Receiver and MW have been and continue to be highly complex, requiring investigation of an alleged fraud that included approximately 2.2 million Affiliates and 1 million Affiliate-Investors (1 million Affiliate-Investors, and an additional 1.2 million non-investor Affiliates). We respectfully submit that compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the problems, issues or tasks involved. The professional services were performed expediently and efficiently. Accordingly, the Receiver and MW submit that the compensation requested herein is reasonable and warranted in light of the nature, extent and value of such service to the Receivership Estate and all parties in interest.

As of March 31, 2015, the Receiver marshaled approximately $348.2 million for the Receivership Estate. Combined, MW and FTI request $903,332.66 in fees and services. The fees requested are less than 0.26% of the approximate recovery for the Estate.[11]

The compensation requested for this quarterly Application amounts to approximately $0.41 per Affiliate or approximately $0.90 per Affiliate-Investor.

## IX.    RELIEF REQUESTED

WHEREFORE, the Receiver and MW respectfully request that this Application be granted and that they be awarded an allowance of $482,219.66 (of which $96,443.93 will be held back) for legal services rendered during the Compensation Period and $47,987.40 for the reimbursement of expenses; that FTI be awarded an allowance of $421,113.00 (of which $84,222.60 will be held back) for services rendered during the Compensation Period, and that the Receivership Estate be allowed to pay such amounts and reimburse MW and FTI for approved expenses, together with such other and further relief as necessary and proper.

---

[11] Combined with the $16,098,234.68 in fees and services from prior quarters, the total fees and expenses are less than 4.9% of the approximate recovery of the Estate.

Dated: August 21, 2015

By:     /s/ Kenneth D. Bell
        Kenneth D. Bell, Esq., Receiver


        and

        MCGUIREWOODS LLP
        201 North Tryon Street
        Suite 3000
        Charlotte, NC 28202
        Telephone: 704-343-2000
        Facsimile: 704-343-2300

        *Attorneys for Receiver*

29

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have electronically filed the foregoing **APPLICATION FOR FEES AND EXPENSES BY THE RECEIVER AND HIS ADVISORS FOR THE SECOND QUARTER OF 2015** with the Clerk of Court using the CM/ECF system which will send electronic copies to counsel of record registered to receive electronic service.

This, the 21st day of August, 2015.


/s/ **Kenneth D. Bell**
Kenneth D. Bell, Esq., Receiver