```
                    UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                        CHARLOTTE DIVISION

SECURITIES AND EXCHANGE         )
COMMISSION,                     )
                                )
            Plaintiff,          )    No. 3:12-CV-519
                                )
        vs.                     )
                                )
REX VENTURES GROUP, LLC,        )
ET AL,                          )
                                )
            Defendants.         )
_____)

                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE GRAHAM C. MULLEN
                UNITED STATES DISTRICT COURT JUDGE
                          MAY 3, 2017
```

APPEARANCES:

On Behalf of the Receiver for Rex Ventures Group:

```
        IRVING M. BRENNER, ESQ.
        KENNETH D. BELL, ESQ.
        MATTHEW E. ORSO, ESQ.
        McGuire Woods, LLP
        201 North Tryon Street, Suite 3000
        Charlotte, North Carolina 28202
```

On Behalf of Victoriabank:

```
        KIRAN H. MEHTA, ESQ.
        Troutman Sanders, LLP
        301 South College Street, Suite 3400
        Charlotte, North Carolina 28202

        KATHLEEN CAMPBELL, ESQ.
        LINDSEY B. MANN, ESQ.
        Troutman Sanders, LLP
        600 Peachtree Street NE, Suite 5200
        Atlanta, Georgia 30308
```

```
                    Cheryl A. Nuccio, RMR-CRR
                     Official Court Reporter
                    United States District Court
                     Charlotte, North Carolina
```

1    APPEARANCES:

2    On Behalf of Payment World:

3         C. KIEL GARELLA, ESQ.
          Garella Law, PC
4         409 East Boulevard
          Charlotte, North Carolina 28203
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

WEDNESDAY MORNING, MAY 3, 2017

       (Court called to order at 1:55 p.m.)

       THE COURT:  All right.  Good afternoon.

       ALL COUNSEL:  Good afternoon, Your Honor.

       THE COURT:  We're here after giving the receiver some extra time to do some more discovery and attempt to evaluate what's going on in California.  And we're here on the motion of Victoriabank to dismiss this matter.

       Mr. Mehta, do you plan to argue today?

       MR. MEHTA:  Yes, sir.

       THE COURT:  All right.  And you will be, Mr. Brenner?

       MR. BRENNER:  Yes, Your Honor.

       THE COURT:  All right.  How much time do you think you folks need today?

       MR. MEHTA:  I wouldn think for our side, maybe a half hour or so.

       THE COURT:  I was figuring about a half an hour apiece.

       Does that sound about right?

       MR. BRENNER:  That's fine.

       THE COURT:  All right, sir.  You may proceed.

       MR. MEHTA:  Thank you, Your Honor.

       And may it please the Court, of course, I'm Kiran

1    Mehta.  I'm here appearing specially for Victoriabank since

2    Victoriabank doesn't think it ought to be here at all.  And

3    with me are a couple of my colleagues, Lindsey Mann and

4    Kathleen Campbell, who have entered pro hac appearances in

5    this case as well.

6        Victoriabank is, as you know, Your Honor, a Moldovan

7    bank.  It was created under and governed by the laws, rules,

8    regulations of the Republic of Moldova.  This Court's writ

9    doesn't run to Moldova.  This is, I think, a fact; but a fact

10   that the receiver has so far refused to admit.  Rather, the

11   receiver insists that Victoriabank be treated just like any

12   other domestic financial institution; and he asserts that just

13   like any other domestic financial institution, this Court's

14   2012 Freeze Order freezing the assets preventing their

15   movement and transfer of the underlying receiver -- of the

16   underlying defendants in the receivership action, they say

17   that it does indeed run to Moldova and does indeed bind a

18   Moldovan bank without the need to domesticate that order in

19   Moldova and make it effective under Moldovan law.

20       And further, in this particular proceeding, which is

21   a contempt proceeding, the receiver seeks to elicit the

22   coercive power of this Court through its contempt sanction to

23   effect -- give effect to that order; and, in fact, has already

24   used the coercive power of this Court to seize $13 million in

25   Victoriabank's correspondent bank account at Bank of New York

1   Mellon without notice, without opportunity to be heard,

2   without the service of any process, and without having

3   established that this Court in fact has jurisdiction to do so.

4   And Victoriabank challenges by its motion the notion that is

5   advanced by the receiver that the bank is subject to the

6   Court's power and subject to the contempt sanction that they

7   seek to bring to bear.

8          And Victoriabank's motion is really premised on

9   three concepts, any one of which, if you find in

10  Victoriabank's favor, will -- should result in the grant of

11  its motion.

12         One is basic service of process.  The receiver has

13  not served any paper in this entire matter upon Victoriabank

14  in accordance with either Moldovan law or even the Hague

15  Convention.  They have used the mails and email to send papers

16  to Moldova and think that that is sufficient under the rules

17  governing this procedure.  The matter has been going on over a

18  year and there is still no service whatsoever through Moldovan

19  law or through the Hague Convention.

20         It's axiomatic that in order for this Court to

21  exercise any kind of power and authority over somebody that is

22  before it, that that party needs to be before it in a formal

23  sense and Victoriabank is not because it has never been served

24  with proper service.  Proper service is the foundation to

25  bring parties within your power.  No service, motion should be

1    granted.

2         The second concept is a traditional minimum contacts

3    personal jurisdiction concept.  I'll get to that in a moment.

4         The third deals with principles of international

5    comity, and they are expressed most fully by the Ninth Circuit

6    in the *Reebok* case which we discussed, of course, at length

7    back in June and has been discussed at greater length in the

8    papers, supplemental papers that have been more recently

9    filed.  And this is actually where we left off the hearing

10   last June with Your Honor observing that *Reebok* was, quote,

11   looking pretty heavy, close quote, against the receiver, and

12   with good reason.  That observation is made with good reason

13   because *Reebok* is really on all fours with this case.

14        *Reebok* involved a foreign bank created by and

15   subject to the laws of a foreign country, in that case

16   Luxembourg, and an injunctive order by a federal district

17   court which the bank not only ignored but, according to the

18   district court and its actual factual findings, actively

19   colluded with the enjoined party in what the district court

20   said was a sham lawsuit designed to evade the injunction.

21        Nevertheless, the Ninth Circuit held that the

22   district court did not have jurisdiction against the foreign

23   bank for the same reason that you, with all due respect, do

24   not have jurisdiction to enforce the 2012 Freeze Order against

25   Victoriabank.  Just as your writ does not run to Moldova, the

1  Ninth Circuit held that the Southern District of California's
2  writ did not run to Luxembourg, particularly when the laws of
3  Luxembourg would not permit the bank to follow the American
4  court's injunction.  And we have exactly the same situation
5  here.

6         In order for the 2012 Freeze Order to be effective
7  against a Moldovan national, it would have to be domesticated
8  in Moldova and given effect by a Moldovan court.  The receiver
9  did not do that back in 2012 and has never done it in all the
10  time that has passed since 2012.  And without domestication of
11  that Freeze Order through the Moldovan legal process, had
12  Victoriabank given that order effect, it would have violated
13  Moldovan law which prevents suspension of a bank account
14  absent an order from a state authority, that is a Moldovan
15  state authority.

16         So to paraphrase the Ninth Circuit, and this is at
17  page 1394 of the *Reebok* opinion, though I'm substituting some
18  names, a national of a foreign country, Victoriabank, followed
19  the law of its own country, Moldova, when it did acts within
20  that country.  It did that rather than following an order from
21  a court of another country, the United States, which had no
22  legal effect in Moldova.  It is pellucid -- I had to look up
23  that word.  It's a $20 word for clear.  It is pellucid that
24  Victoriabank has simply behaved as any rational, law-abiding
25  person would.  It has obeyed the law.  It has obeyed the only

1    law applicable to it, the law of its sovereign.

2            Now, the plaintiff in the *Reebok* case, just like the

3    receiver here, relied on a case out of the Fifth Circuit

4    called *Waffenshmidt versus McKay*, and the case is cited again

5    at length by both sides in the papers, in which the Court,

6    this is the Fifth Circuit, held that a federal district court

7    has the power to enforce an injunction even as against

8    nonparties who otherwise would not be subject to personal

9    jurisdiction in that court.

10           But as the Ninth Circuit observed, *Waffenshmidt*

11   involved a purely domestic matter involving U.S. citizens

12   operating within the United States.  The Court held that

13   *Waffenshmidt's* reasoning breaks down when applied to foreign

14   nationals and the district court reaches out to apply its

15   order not made effective in that foreign country to those

16   foreign nationals acting within their own country.

17           And this is the crucial factor that really

18   distinguishes all of the cases that the receiver relies upon

19   except for one, and we'll get to that in a moment.  Those

20   cases do not involve international nonparties.  They only

21   involve U.S. citizens.

22           And the one exception is the *Abi Jaoudi* case from

23   the Eastern District of Pennsylvania which, again, is cited

24   and discussed at some length in the papers.  But that one is

25   very readily distinguishable because foundationally in that

1  case it was the foreign entity that sued in the Eastern

2  District of Pennsylvania, therefore subjecting itself to the

3  jurisdiction of the Eastern District of Pennsylvania.  And

4  when that Court issued an injunction in connection with that

5  lawsuit, it sought to evade that jurisdiction through foreign

6  nonparties and the Court said, no, you can't do that.  You

7  can't try to evade what you've already sought affirmatively to

8  invoke.  Of course, that's not at all the situation here.

9       Now, the receiver tries to get around *Reebok* in a

10  number of ways, but none of them really work.

11       At last June's hearing, the receiver insinuated

12  based on the declaration of Roman Balanko of the U.S. Payment

13  World entity that Victoriabank was in cahoots with the bad

14  actors who engineered the transfer of funds out of the bank.

15  And the Court, in fact, told him, as you mentioned earlier

16  this afternoon, to go ahead and do some discovery to back up

17  and substantiate those accusations.

18       But it turns out that the so-called evidence that

19  the receiver relies on here is just plain old hearsay, rank

20  hearsay.  Statements by other people not before us, not in any

21  way under oath, not anything of that nature, relayed to

22  Mr. Balanko which he then relayed.  And of course, they're

23  coming from Mr. Balanko who the receiver clearly does not

24  believe and, frankly, thinks is a liar and is one of the

25  people who did, according to the receiver, engineer the making

1  off of the funds that had been in Victoriabank. And there is
2  absolutely no evidence, none whatsoever that Victoriabank has
3  any connection to this alleged scheme.

4  So the receiver doesn't even mention what he said
5  back in June in his discussion of the *Reebok* case in his
6  supplemental brief and papers. Rather, he says the law in
7  Luxembourg is more clear than the law in Moldova on this
8  point, but that -- really he can't back that up either. I
9  mean, there's an affidavit from an expert in Moldovan law that
10 is before you and in the record that clearly says that in
11 order to make -- give effect to the 2012 Freeze Order in
12 Moldova, it had to be registered and made effective by a
13 Moldovan court, and it is undisputed that that has never
14 happened.

15 And the expert goes on to say that suspension of a
16 Moldovan bank account cannot occur without an order from a
17 state authority. And again, as to the issues in this case, it
18 is undisputed that no such ever -- no such order was ever
19 sought by the receiver nor was one ever rendered by a Moldovan
20 state authority. These are uncontradicted matters.

21 What the receiver says, and this appears to be the
22 crux of his argument, is that Victoriabank is otherwise
23 subject to this Court's jurisdiction as a result of its
24 maintenance of a correspondent bank account at BNY Mellon and
25 for that reason *Reebok* is distinguishable.

1           Now, in the first place, it's a bit of a stretch
2   because there's nothing in the *Reebok* opinion that even
3   addresses the Luxembourg bank's correspondent banking
4   relationships.  And it would have been highly unusual for it
5   not to have correspondent banking relationships at all,
6   particularly since the Court, you know, recounts in the *Reebok*
7   opinion that the bank communicated with the defendant, the
8   party which its supposed to have colluded to avoid the
9   injunction, communicated with the defendant in California
10  concerning its receipt of funds from the defendant, which
11  suggests that the bank must have had some kind of a
12  correspondent banking relationship in the U.S. in order to
13  have those funds transferred from the U.S. to the bank in
14  Luxembourg.
15          But it doesn't really matter, Your Honor, if you
16  step back and consider what the receiver is arguing here.  He
17  is arguing that any foreign bank that maintains a
18  correspondent account at a U.S. bank is subject to the
19  contempt power of basically any federal district court in the
20  United States.  And because of the primacy of the U.S. dollar
21  in international commerce, what that means is virtually every
22  bank in the world is subject to the contempt power of any
23  federal district court in the United States.  And this is, I
24  guess, a breathtakingly broad argument to make and it is
25  completely unprecedented.  There is no case, not one case that

1  holds what the receiver is arguing and supports that
2  proposition.
3          So the receiver has not been able to negate *Reebok*'s
4  holding and its analysis and that too, just like the failure
5  to effect any service of process, means that the Court should
6  grant Victoriabank's motion as an independent ground.
7          Which brings us to the traditional minimum contacts
8  analysis which is the final ground upon which the motion is
9  based, and here again the receiver fails.
10          To begin with, having obtained -- sought and
11  obtained jurisdictional discovery, the standard the receiver
12  must meet is to show jurisdiction by a preponderance of the
13  evidence.  There are many cases from this circuit that hold
14  that.  We've cited a few in the brief.  There's another one
15  actually from the Western District called *Marx Industries*
16  *versus Chestnut Ridge*.  The cite is 903 F.Supp 2d 358.  It was
17  decided by Judge Voorhees a couple of years ago.  And the
18  receiver has not met this preponderance of the evidence
19  standard.
20          The receiver's argument is based on two steps.
21          First, he indicates that the New York courts would
22  be able to exercise jurisdiction over Victoriabank because of
23  the BNY Mellon account, which is, of course, in a bank in New
24  York.
25          And the second step is that this Court can piggyback

1  on the New York court's exercise of jurisdiction through the

2  interplay of Sections 754 and 1692 of Title 28, but neither

3  step works.

4           First, as to New York, the New York long-arm statute

5  is Section -- the relevant one is Section 302(a)(1) of the New

6  York Civil Practice Code.  And it allows New York courts to

7  exercise jurisdiction with respect to a cause of action that

8  arises from the transaction -- a cause of action that arises

9  from a transaction of any business in a state.

10          And what the receiver has done here is he points to

11  a single wire transfer of what he claims are receivership

12  assets that flowed through Victoriabank's Bank of New York

13  Mellon correspondent bank account, and that is the $15-1/2

14  million transaction on September 25th, 2012, which is, again,

15  set out at some length and described at some length in the

16  papers.

17          Now, the receiver spent a lot of time, money, and

18  effort getting the information he needed out of the Bank of

19  New York Mellon as part of his jurisdictional discovery, so

20  it's important to get the facts of this transaction right.

21  The transaction involved Payment World Moldova taking the

22  money out of its Victoriabank account and sending it to

23  Payment World Hong Kong at its account at the Tusar Bank which

24  is a Russian bank.

25          Now, given the receiver's attitude towards these

 1   various Payment World entities, what he's really saying --
 2   what the receiver is really saying is that Payment World sent
 3   the money to itself and along the way that money flowed
 4   through -- because it's a dollar denominated transaction, it
 5   flowed through the correspondent bank account at BNY Mellon.
 6           But all of the banks in this transaction, all of the
 7   banks in the chain, according to the declaration of the BNY
 8   Mellon representative who testified through declaration in
 9   this case, all of those banks are just conduits in the chain
10   for how the money gets from point A in Moldova to point B in
11   Russia.  The customer, Payment World Moldova, or as the
12   receiver would say, Payment World generally since he collapses
13   all of those entities, the customer is the initiator and
14   controller of those transactions.
15           Now, the general rule in terms of jurisdictional
16   purposes for correspondent banking is set out in a case that
17   we cite in our brief called *Daventree versus The Republic of*
18   *Azerbaijan*.  It's from the Southern District of New York.
19   Essentially it says that merely maintaining a correspondent
20   bank account to facilitate international financial
21   transactions is insufficient under the minimum contacts
22   analysis.
23           Now, the receiver points to a series of cases
24   decided under the federal Anti-Terrorism Act that he says, in
25   effect, modify this rule.  But these cases, like the

1    Anti-Terrorism Act itself, require that the foreign bank must
2    be complicit in the underlying cause of action; that is, that
3    the foreign bank must use its correspondent banking
4    relationship with a New York bank to, quote, knowingly support
5    some terrorist activity.

6           And the necessity of the foreign bank's complicity
7    in the underlying transaction was very recently made clear by
8    the New York Court of Appeals -- which is the equivalent of
9    the Supreme Court, it is the highest court in New York -- in a
10   case called *Rushaid versus Pictet & Cie* which involved a Swiss
11   bank that had allegedly participated in a scheme to embezzle
12   funds from the plaintiff.  And the Court held that the use of
13   a New York correspondent bank in connection with that scheme
14   was sufficient for minimum contacts.

15          This case, Your Honor, it's important to read it
16   very carefully.  It's a four to three decision, with the three
17   dissenters essentially saying this upends our -- our general
18   jurisprudence involving the general rule involving
19   correspondent banking.

20          So crucially, the four-justice majority had two
21   justices who wrote a separate concurring opinion.  And that
22   concurring opinion explained that they were not upending the
23   general rule, and the explanation centered upon the complicity
24   of the bank in the scheme.  So that what is required if you're
25   going to follow the exception to the rule, what would be

1   required is an actual complaint filed with all of the Rule 11

2   strictures that asserts and details that complicity.  And of

3   course, we don't have that here.  The receiver hasn't filed

4   any kind of complaint.  He's not trying to directly go to the

5   bank.  He's really trying to go through the back door through

6   a contempt proceeding to try to get to the bank in that way.

7           Now, we don't have any evidence anyway of any

8   complicity by Victoriabank in any kind of scheme.  Now, at the

9   hearing last June, the receiver posited that Victoriabank

10  being part of the overall worldwide Visa payment system meant

11  that it was complicit.  But again, he's backed off that

12  proposition and doesn't even mention it in his supplemental

13  briefing, which is a wise move because the Fourth Circuit's

14  *Unspam* case, which we cited and discussed at some length in

15  the supplemental brief, says that mere participation in the

16  credit card payment system is -- that's in the ordinary course

17  of business, you know, doesn't -- isn't enough to bring you

18  over the minimum contacts hurdle.

19          And the other allegation of complicity, again,

20  involves the alleged cross-ownership between Payment World and

21  Victoriabank.  And this is, of course, again, what Your Honor

22  expressly told the receiver back in June to bring you

23  substantiating evidence, and here we are eleven months later

24  and he has not been able to bring you substantiating evidence.

25  All he has is hearsay statements from Roman Balanko who he

1   plainly believes to be a liar.

2         So without complicity, the first step in that

3   two-step process fails New York law, the New York law step.

4   It fails.

5         But the second step fails too because the theory

6   here is that this Court may through a combination of 28 U.S.C.

7   Section 754 and Section 1692 exercise the jurisdiction that

8   the New York courts have. But the only transaction identified

9   by the receiver as affording him jurisdiction is the one on

10   September 25th, 2012, and at that time the receiver had not

11   filed any of his appointments with any of the courts in New

12   York. That happened later that year in December. And it's

13   the filing that gives jurisdiction in rem over receivership

14   assets which then could translate into in personam

15   jurisdiction through 754 and 1692. But in December when the

16   receiver filed the 754 certification, there were no

17   receivership assets in the Bank of New York in the

18   correspondent bank account. So therefore, there's no in rem

19   jurisdiction and there's no in personam jurisdiction either.

20         So ultimately, Your Honor, we've got no service of

21   process to bring Victoriabank before you, we've got no minimum

22   contacts, and no piggyback jurisdiction through 754 and 1692

23   of Title 28, and we have no way of getting around *Reebok*.

24         And the core of *Reebok* is that the reach of a

25   federal district court's injunction runs as far as the

1  territory of the United States, but with respect to foreign
2  nationals, runs no further than the territory of the United
3  States.

4          And if you think about it in the reciprocal, that
5  has to be true.  We would not want as a sovereign nation, or
6  in the case of North Carolina a sovereign state, we would not
7  want to have our citizens subject to the injunctive orders of
8  a Moldovan court until and unless those orders, the Moldovan
9  court's injunctive orders were domesticated in the United
10 States or in North Carolina specifically.

11         Your writ may not run -- does not run to Moldova,
12 but Moldova is a sovereign nation.  It has courts.  It has
13 laws.  And domestication of your order has been possible in
14 those courts ever since the order was issued, but it just
15 never happened.  And because it never happened, this Court
16 doesn't have the jurisdiction to enforce through contempt the
17 2012 Freeze Order against Victoriabank.

18         And therefore, Your Honor, you should grant
19 Victoriabank's motion.  You should dismiss this proceeding and
20 you should vacate the order that you signed a little over a
21 year ago freezing 13 plus million dollars in the BNY Mellon
22 correspondent bank account.  And unless Your Honor has some
23 questions, I will sit down.

24         THE COURT:  I've read all of this, believe it or
25 not.

1          MR. MEHTA:  Well, I'm glad.

2          THE COURT:  All right.

3          MR. MEHTA:  No, we all appreciate the time that

4    you've taken on this matter, Your Honor.

5          THE COURT:  Mr. Brenner.

6          MR. BRENNER:  Thank you, Your Honor.

7          Your Honor, we simply ask in this case that the

8    Victoriabank not be treated specially in any way.  We're

9    asking the Court simply to treat them like anyone else that

10   had actual notice of the Freeze Order and deliberately

11   violated it.  And that's -- that's what happened here.

12   There's no question about actual notice.  They had notice both

13   in writing and they had both -- and they had oral notice

14   directly to the president.  So that's -- that's what we're

15   asking to do.

16          Now, Your Honor, the -- this is a -- this is still a

17   preliminary proceeding, and that is important both for the

18   evidentiary standard and for the standard that the Court

19   should use to decide this motion because we're only at a

20   preliminary stage.  And the reason we're at a preliminary

21   stage, although this has dragged on certainly to our

22   disappointment as well, is that we have not gotten the

23   discovery that we need from Victoriabank.  This is not -- I

24   mean, they have said, well, we're not subject to jurisdiction

25   so we're not going to provide discovery.  That's -- the Court

1  has permitted that. That's fine. But that puts us in a place
2  where it's a preliminary proceeding and, like a motion to
3  dismiss, the facts and all inferences from the facts are taken
4  in favor of the receiver, in favor of the moving party.

5         And this -- so that makes the complaints about
6  hearsay incorrect. In a motion to dismiss, in this -- in
7  hearing this motion, the Court would not only consider
8  hearsay -- everything they've produced has been hearsay.
9  We've had no opportunity to cross examine these affidavits or
10 anything else. So the Court not only considers hearsay, but
11 would consider unsworn statements in the moving papers as you
12 do with a pleading and a motion to dismiss.

13         So in here not only do we have sworn statements of
14 Mr. Balanko, who, to be sure, we believe to be
15 self-interested, but what he said with respect to the common
16 ownership between Payment World Moldova and Victoriabank,
17 which is a key, key issue here. What he said is a sworn
18 statement and Mr. Mehta was there. He could have cross
19 examined him on it.

20         For that matter, Victoriabank could have provided
21 this Court by affidavit or otherwise information on the
22 ownership. If it's not right, if this is not correct, well,
23 then why doesn't Mr. Mehta set us straight about that. Why
24 doesn't he put in an affidavit that says this guy had no
25 ownership or this guy had a small ownership or whatever it is.

1   But as it stands, it is unrebutted and unrebutted by a party
2   who has every available resource and incentive to provide
3   contrary information to the Court if it existed that the
4   primary shareholder of Victoriabank is the primary shareholder
5   and the founding member of Payment World Moldova.
6           So that is a key fact and it stands unrebutted and
7   this Court plainly can, should, and must consider it as true
8   for purposes of this preliminary proceeding.
9           Now, they spent a lot of time talking about the
10  *Reebok* case and the Court has mentioned it, so let me go
11  through that case a little bit with you because they said one
12  thing that is -- factually is not -- is clearly incorrect.
13          Mr. Mehta speculated that, well, of course, the
14  Luxembourg bank -- it was Banco something something
15  Luxembourg, Bank of Luxembourg.  He said, well, they had to
16  have some correspondent bank account.  They had to do business
17  in the United States.  Well, Judge, the facts of that case,
18  the unique facts of that case were that they didn't.  I mean,
19  the Court in the very first paragraph of the opinion says
20  about the bank, "It has no physical presence in California nor
21  does it transact any banking business in the United States."
22  And then that's repeated later in the -- later in the opinion.
23  So that is a fundamental difference in that case than this
24  case.
25          Now, also in that case, Your Honor, of course there

1   is no suggestion that there is any common ownership or

2   commonality or anything going on in terms of a joint

3   motivation or between the depositor and the bank.  On the

4   contrary, even though the district court made some findings

5   about -- or made some suggestion of, he said collusion.  I

6   don't know if that's the right word.  But some connection

7   there.  Then the Court of Appeals came in and said, no, we're

8   looking at these facts.  We find that fact to be clearly

9   erroneous.

10          So the Court of Appeals determined, essentially,

11  that the bank in Luxembourg, who does -- who had no -- did

12  not -- does not transact business in the United States, did

13  everything that it could do to try to figure out and to

14  balance the TRO from the American court and whatever

15  obligation it might have from Luxembourg.

16          So here's what it did.  First, it didn't give the

17  depositor the money.  The depositor came in, asked for the

18  money.  The Court said -- I mean, the bank said no.  And work

19  out -- essentially told the depositor, look, you need to go

20  get a court order.  We're not going to do anything until we

21  have a court order from a Luxembourg court.  So they went to

22  the depositor, filed an action in the Luxembourg court.  The

23  bank opposed it and then the Luxembourg court said, depositor,

24  you win.  Bank, you are required to give the depositor their

25  money.  So at that point they give the depositor the money and

1  then the Court of Appeals says, well, okay, what do you expect
2  the bank to do?  They've got -- they've got an order from
3  their own court telling them to do this.
4          This is not a situation like we have here where a
5  bank with common ownership interest of its majority
6  shareholder with the customer one week after receiving notice,
7  or more, spirits the money away through a New York bank
8  account to some bank in Russia which then later, according to
9  Mr. Balanko, mysteriously fails, okay, and millions of dollars
10 are gone.
11         All right.  This reads more like a spy novel when
12 you get into this than it does some kind of an ordinary course
13 of business transaction which is that the underlying false
14 suggestion of Mr. Mehta that somehow the Court, if it were to
15 allow this case to just proceed, okay.  This is a preliminary
16 proceeding for jurisdiction.  If it allows the case to
17 proceed, then somehow every bank in the world that has a
18 correspondent bank account would be at risk.  That is
19 absolutely untrue.
20         What we have said, Your Honor, is that it was the
21 use of this correspondent bank account, not just maintaining a
22 correspondent bank account.  Yes, they have a correspondent
23 bank account.  Yes, hundreds of millions of dollars flow
24 through it.  But it is the use of that bank account.  And
25 that's what these cases, the Lebanese Bank case, the other

1    cases that we've cited where with knowledge that they were

2    doing something wrong, a foreign bank used its American

3    account to help its depositor in violation of a court order,

4    okay, or in violation of some other duty that it had.  And

5    that's the very different situation that we have here.  That

6    was not at all present in *Reebok*.  And it doesn't pose any

7    risk except to banks who with knowledge of an order used an

8    American account to intentionally violate the order.  Okay.

9            They have a different -- if, in fact, they had sent

10   this money directly to this bank in Russia or some other place

11   not through the United States, then the argument would be very

12   different.  They still would be intentionally violating the

13   Court's order, but they would not have, as is the legal

14   standard, purposely availed themselves of the American account

15   that they held to violate the Court's order.

16           And let me mention one other thing to you about the

17   routing of the money.  You'll notice, I think it may be in a

18   footnote, it may be in the text of their papers, they point

19   out that, well, you know, this account had been used

20   previously to route money for the Payza account that was

21   connected to the receivership.  And they said, now, that --

22   before in the summer of 2012, before the SEC got involved and

23   the receiver was appointed, that money, where did it go?  It

24   went to Canada.

25           Well, Your Honor, it doesn't take much to -- we knew

that they had used the account more than just for this one
transaction.  We pointed out this one transaction because it
was post-order, it was in violation of the order before they
had notice of this, before the receivership was even in place.
We're not contending they did something wrong by using this,
although it was obviously in furtherance of the scheme.  It's
not subject to the Freeze Order.  But what is important is you
see that money going to Canada and then as soon as they find
out that there's a court order and a receivership, then rather
than going to Canada where presumably they figured we'd have a
better shot at getting it, then the money starts -- gets
routed to Russia.  But they still used the United States bank
and that's where they tripped up because that's what subjects
them to minimum contacts and this Court's -- this Court's
jurisdiction.

Now, let me mention quickly the service of process
issue.  In a contempt proceeding, Your Honor, formal service
of process is not required and it can be handled during the
course of the litigation according to the Court's order.  All
that's required is actual notice and opportunity to be heard.
Plainly Victoriabank has had all of that and more.

If you think about it, the notion that you could not
get -- bring a party in a contempt proceeding before the Court
without service of process, it would be a playbook for every
fraudster and Ponzi scheme.  You put your money overseas and

1  then if the SEC comes in and shuts you down, well, then, if

2  they got a Freeze Order and you send the Freeze Order there,

3  well, you've got to serve us and so there's a year, and how

4  long do you think the money is going to be there if there's a

5  year of service?  If the Court -- if we were to need to in the

6  Court's view in the context of this contempt motion actually

7  serve some papers on the bank in Moldova through the Hague

8  Convention, then the Court can order it and we can do it, but

9  it doesn't -- the case can proceed without any kind of initial

10 service.  Otherwise, these cases could never go forward.

11          THE COURT:  How do you get around the notion from

12 Moldova, which appears to be undisputed, that compliance with

13 this Court's order would violate Moldovan law?

14          MR. BRENNER:  Well, Your Honor, again, we've had

15 no -- one, no opportunity to do that.  But -- and there are

16 other facts here that might bear on any Moldovan court's

17 decision that aren't addressed in that affidavit.  Principally

18 the common ownership and what he refers to as complicity, and

19 that's a good word for it, those facts are not at all evident

20 in that order.  And I think there's much to be determined,

21 there are many more facts that need to be discovered and the

22 full factual scenario played out if -- to determine if, in

23 fact, the Moldovan courts would say, well, in the case of a

24 customer with common ownership and a U.S. federal court order,

25 then you can't put the money on hold.  That -- I think it's

1  much too early in the case to make that determination.

2        THE COURT: You could have domesticated the order

3  from the Court in Moldova, correct?

4        MR. BRENNER: Well, Your Honor, I don't know the

5  answer to that question to be honest. But I mean -- but the

6  money would have been gone. I mean, as we've seen in the

7  facts, the money was gone a week later. So I mean, to say

8  that you have to domesticate the order is very facile for them

9  because the money was gone a week later. So there would have

10  been no time to do that.

11        THE COURT: That money was gone. What we've got

12  frozen in New York is not that money, right? Fungible, yes,

13  but it's not that transaction.

14        MR. BRENNER: Yes, sir, so far as we know.

15        THE COURT: Okay.

16        MR. BRENNER: But Your Honor, I don't think that the

17  Court can conclude at this point without all the facts before

18  it and without giving the receiver the opportunity to cross

19  examine, that the issue of this Moldovan law, if it even

20  applied, that we can make that -- make that leap at this

21  point.

22        And Your Honor, that really -- the question of

23  whether they were bound by it really goes more to the merits

24  of whether it's a violation as opposed to jurisdiction because

25  the jurisdiction would be founded on the minimum contacts of

1    using the New York court -- I mean the New York bank.  And so,
2    I mean, jurisdiction is just the threshold issue.  It's not a
3    matter of making a final decision now on whether or not there
4    was -- whether there was a violation or not.  Clearly there
5    was a violation.  That would be more in the nature of a
6    defense even by them that, yes, we violated your order, but we
7    were entitled to do so based on Moldovan law.  Again, that's a
8    defense to the merits, not a -- not a jurisdictional out for
9    them.
10           Let me mention, if I can, Your Honor, the response
11   to the Section 754 issue.  With respect to the application of
12   the Court's jurisdiction in New York, jurisdiction is
13   determined not at the time of the wrong, it's determined as of
14   the time in 2016 when we brought the action directly, brought
15   them into the case and asked the Court to rule on their
16   violation.  So long as the Court in 2016 had jurisdiction over
17   that account, then it is -- jurisdiction is appropriate.  The
18   jurisdiction again is founded on minimum contacts which has to
19   do with the use of the account to do the -- to do the
20   violation, to violate the order.  And then long before 2016,
21   the 754 notices were filed in New York.  So we don't believe
22   that that argument should have any bearing on the Court's
23   exercise of jurisdiction.
24           Your Honor, we don't know why Victoriabank used this
25   U.S. account to route the money.  What we do know is that it

1  matters.  And what we do know -- so far as we've been able to
2  determine and for purposes of this proceeding, this
3  preliminary proceeding, there is substantial common ownership.
4  So in other words, you don't just have some independent
5  financial entity.  None of these cases talk about this.  What
6  we have here is a very unique factual situation that gives the
7  Court the opportunity at this preliminary stage to say, okay,
8  I'm going to preliminarily take jurisdiction of this case.
9  And then ultimately, I mean, on the trial of the merits, we're
10  going to have to show -- you know, prove everything by a
11  preponderance of the evidence.  We understand that.

12          But in terms of the applicable law, in terms of the
13  ownership interest, in terms of the complicity, in terms of
14  all of these things, if you look there's a case, and I don't
15  believe we cited it -- either side cited it in the papers, but
16  it's a Fourth Circuit case and I think it's one that looking
17  back on we probably should have cited.  It's *Grayson versus*
18  *Anderson*.  It's at 816 F.3d 262.  And it talks about the
19  standard and the notion of preliminary proceedings, and it
20  talks about the better practice is to decide jurisdiction as a
21  preliminary matter with the lower standard akin to a motion to
22  dismiss, particularly where there's any factual issue
23  important to jurisdiction that's also tied up with the merits.
24  And that's really what we have here.  The issue of common
25  ownership of Victoriabank and Payment World Moldova is

1  relevant both to jurisdiction, the merits of the Freeze Order,
2  and probably to the application of any Moldovan banking law.
3          And so for those reasons, Your Honor, we would ask
4  that the Court at this preliminary stage take jurisdiction of
5  this case and allow it to proceed and we can get discovery of
6  Victoriabank which has so far been denied.
7          THE COURT:  How are you going to do that?
8          MR. BRENNER:  Well, I think if the Court orders them
9  to permit discovery, then --
10         THE COURT:  We're getting right back into do I have
11 the power -- does this Court -- forget me.  Does this Court
12 have power to do that?
13         MR. BRENNER:  Well, I mean, I think you order it and
14 then if they refuse to do it, then it could ultimately go to
15 the Court of Appeals, I assume.
16         THE COURT:  Well, all right.  Mr. Mehta, do you have
17 any rebuttal?  Brief.
18         MR. MEHTA:  Just very brief, Your Honor, on the --
19 on the last point.
20         I mean, it is sort of wrapped up.  Mr. Brenner says
21 this whole issue of whether you have the power, whether your
22 order has any power and effect in Moldova is a matter for
23 later in the proceeding.  But it's not.  I mean, they -- they
24 put the whole -- the cart is always before the horse with
25 them.  The whole crux of the matter is does your order have

1   any power and authority in Moldova, particularly given the
2   Moldovan -- undisputed facts before you which are Moldovan law
3   wouldn't allow that order to be implemented the way it was
4   because it was not registered and because in order to freeze a
5   Moldovan bank account, you have to have a court order from
6   Moldova in order to do it, which is exactly the situation that
7   there was in *Reebok*.  And in *Reebok*, the defendant in *Reebok*
8   actually did go to court -- or actually *Reebok* did go to court
9   seeking to domesticate its judgment in Luxembourg and the
10  Luxembourg courts refused to domesticate it.

11          We don't have that here.  What we have here is an
12  affidavit from a lawyer in Moldova who says you can
13  domesticate it.  You must domesticate it.  And unless it's
14  domesticated it has no effect and obeying it would violate
15  Moldovan law.

16          They have had more than a year to get their own
17  Moldovan lawyer to examine this situation.  If they disagree
18  with what Mr. Bivol who filed the affidavit back in April of
19  2016, if they dispute anything of what he said, they've had
20  plenty of opportunity to bring you contrary evidence.  They
21  just haven't done it.

22          So the state of the record is it would violate
23  Moldovan law.  And that's where the question of can -- can we
24  get to some -- beyond the preliminary process just completely
25  fails.  In some respects the jurisdictional issues and that

1  issue do collapse. I agree with Mr. Brenner about that. But

2  that's the core issue. It's always going to be the core

3  issue.

4          And if you don't have the authority to hold

5  Victoriabank in contempt under the -- under essentially what

6  he says, that they violated your order, then you don't have

7  that power. And whether you call that jurisdiction or whether

8  you call that some kind of a limitation on your power because

9  your power doesn't run to Moldova, it doesn't matter. It ends

10 up in the same place just like seeking discovery would end up

11 in the same place.

12          Now, there is -- Your Honor is exactly correct, and

13 Mr. Brenner was candid in responding to Your Honor. The money

14 from September of 2012 is gone. Everybody agrees with that.

15 That's the only money that the receiver has identified as

16 being receivership assets. But what Mr. Brenner didn't tell

17 you is that there's other money that also flowed into that

18 account past September of 2012 and flowed out of that account

19 past September of 2012, and had they been -- had they, in

20 fact, domesticated your order in Moldova, done everything

21 properly, given the bank the order from a Moldovan court

22 saying freeze this account, implement your order, there was, I

23 think, more than $10 million that flowed through that account

24 after September of 2012 beginning in -- somewhere in October

25 and running for another almost year, maybe a little over a

1  year.  And those circumstances -- you know, they keep saying
2  money is fungible.  Well, had they done what they were
3  supposed to do, they would have at least gotten perhaps
4  $10 million, perhaps more depending on the circumstances of
5  that money tied up.  So they don't want -- they want money to
6  be fungible when it suits them, but they don't want money to
7  be fungible when it doesn't suit them and that's just not
8  right and not fair.

9          Now, Mr. Brenner keeps talking about "they."  You
10 know, they went off and routed this money through Bank of New
11 York and so on.  Well, who exactly is "they"?  If you look at
12 the declaration that they, meaning the receiver, procured from
13 the Bank of New York Mellon, and specifically at paragraph 6
14 of that declaration, the "they" is the customer.  It's always
15 the customer.  It's the customer that directs where the money
16 goes.  And the banks in between operate within their banking
17 conventions and all of the international treaties and compacts
18 and so forth that allow the money to go.  But this money went
19 from Moldova to Russia.  It went from Payment World Moldova to
20 Payment World Hong Kong.  It went, according to the receiver,
21 from Payment World to Payment World.  And that is the state of
22 the record in this case.  That's the "they."

23         He says, well, there's this indication from
24 Mr. Balanko through hearsay of some common ownership between
25 Payment World and Payment World Moldova and...

1          THE COURT:  Victoriabank.

2          MR. MEHTA:  And Victoriabank.

3          Well, what you said was bring me the evidence.  What

4     they brought you is Balanko saying Mr. Platon who I was

5     dealing with told me that he was the majority owner of Payment

6     World Moldova, which according to the receiver Balanko's also

7     involved in, and also a majority shareholder or a major

8     shareholder in Victoriabank.  That's not evidence.  That's

9     Mr. Balanko saying something that somebody else said.  It's

10    rank hearsay.  It doesn't substantiate anything.

11         And the standard here is preponderance of the

12    evidence on that point.  I mean, they can try to weasel around

13    it a little bit, but that is still the standard.  Given the

14    opportunity and taking the opportunity to take jurisdictional

15    discovery, the standard shifts from prima facie to

16    preponderance of the evidence, and this is not even prima

17    facie.  I mean, you can't come in here and say, oh, the guy

18    that I think is a liar is -- told me that somebody else told

19    him that there's common ownership here.  That doesn't even

20    pass any kind of a smell test when you look at what the *Unspam*

21    case, the Fourth Circuit case says in terms of what you need

22    to allege in order to allege a conspiracy between banks in

23    that case who appear to be operating in the normal course of

24    business in the Visa payment scheme.  In our case, of course,

25    it's the normal course of business in a correspondent banking

1  payment scheme.

2          He says -- he says, and I agree with him, this reads

3  like a spy novel.  It does read like a spy novel because it's

4  a work of fiction on the part of the receiver.  It's not real.

5  And that's why it reads like a spy novel.

6          And he says that in the *Reebok* case, the Court in

7  the first opening paragraph said words to this effect:  The

8  Luxembourg bank had no physical presence in California, nor

9  does it transact any business in the United States.  But

10  Victoriabank is exactly the same way.  It has no physical

11  presence in the United States, North Carolina or anywhere else

12  in the United States, nor does it transact any business in the

13  United States.  It has a correspondent bank account in New

14  York.  The correspondent bank account in New York is not

15  transaction -- transacting business by the bank in the United

16  States because a correspondent bank account -- go back to

17  paragraph 6 of the Bank of New York Mellon declaration.  A

18  correspondent bank account exists for the purpose of allowing

19  a customer, in this case Payment World Moldova, of a foreign

20  bank, in this case Victoriabank, to transact business in

21  international commerce.  And this particular business was

22  money flowing from Moldova to Russia, or, in the case of the

23  earlier transactions that Mr. Brenner talked about, money

24  flowing from Moldova to Canada.

25          These are not transacting business in the United

1    States and that's what the *Daventree* and the general rule line
2    of cases on correspondent banking hold.  Just having a
3    correspondent banking account and having it run transactions
4    that are dollar denominated and therefore run through U.S.
5    banks is not transacting business for purposes of the long-arm
6    statute or for purposes of due process, for that matter,
7    because we're talking about minimum contacts, transacting
8    business in the United States.
9            Thank you, Your Honor.
10           THE COURT:  Thank you, counsel.
11           MR. BELL:  Your Honor, may I respond?
12           THE COURT:  You may.
13           MR. BELL:  And I rise to address some of this
14   because obviously I'm the one who did a lot of things -- or
15   didn't do some of the things that have been suggested I should
16   have done.
17           Obviously, I think we're right on the law or I
18   wouldn't have allowed Mr. Brenner to file this pleading and
19   make the argument.
20           But separate and apart from that, I think about what
21   actually happened here and the practical effect of the success
22   of Victoriabank's argument if it were to succeed.  The
23   playbook would certainly be drawn because what happened here
24   as far as we know on the information available to us and to
25   the Court is that Payza entered into a contract with this

1    company Payment World, the U.S. company, which then set up

2    these sort of affiliates, if you will, with Payment World Hong

3    Kong to handle its international business.  And then Payment

4    World Hong Kong is complicit in, if you will, the creation of

5    Payment World Moldova for the sole purpose of processing these

6    funds.  And lo and behold, apparently unrefuted so far, the

7    founder of Payment World Moldova is a large shareholder, maybe

8    the largest shareholder of Victoriabank.

9           Now, it's been argued that the only way we know that

10   is rank hearsay.  Well, actually, that's not even true to the

11   extent that Mr. Balanko quotes this Mr. Platon who is the

12   supposed shareholder.  That would be a party admission.  But I

13   don't want to run down that rabbit hole.  We did -- no one has

14   mentioned yet, we did give to the Court news articles that

15   reported that Mr. Platon was a large shareholder, maybe the

16   majority shareholder in Victoriabank.  So we're not just

17   guessing here and we're not just going off of what Mr. Balanko

18   said.

19          And then -- so in the early part of 2012

20   receivership, so we're talking between August 17th and

21   September 25th, what apparently we should have done is go to

22   Moldova and domesticate this Court's order.  Now, I did

23   consult with Moldovan counsel and was told you can't do it.

24   It can't be done.  And if you want to try, we can charge you

25   some money and we'll try and it will take years, but we can

1  try.  So there was no effective way to do it.

2          Now, even after that, the money -- that account, the

3  Payment World account at Victoriabank, by their own statements

4  of records, that money is gone by December '12 and the

5  accounts are closed.  So even if we had moved at lightening

6  speed under the Hague Convention or any of the efforts to go

7  through Moldovan counsel and get it domesticated, there was

8  essentially no money left in that account.  I guess they

9  weren't closed.  I think there was like $12 left in it or

10  something.  But anyway, there's no money there by

11  December 2012.  There is no way we could have done what we're

12  being told is the easy way to do it that would have been

13  effective.

14          And to make matters worse, so a week after they get

15  the actual notice from us in written form and notice to the

16  president, according to the sworn testimony of Mr. Balanko,

17  that this Court's order is for Victoriabank not to do that, 12

18  days later, or something like that, the money moves out of

19  that account, not to Canada anymore and into the accounts of

20  Payza, but all of a sudden to Russia.  As an insult to injury,

21  they do it through a New York bank, Bank of New York Mellon.

22  Didn't have to do it that way.  And they're saying that

23  doesn't matter either.  That we come through the United States

24  to facilitate this transfer of money at a time we knew that it

25  reflected receivership assets, or may have at least, and that

1  a court in the United States had ordered that we not do that,
2  that we not move that money.
3          And to complete the story, I can't remember now if
4  it's the end of 2012 or early 2013, again, according to news
5  reports and the information we have coming from Mr. Balanko, I
6  think, Mr. Korkin, who, if the Court will recall, is Payment
7  World Hong Kong, becomes a large, if not the largest
8  shareholder of Victoriabank.
9          So all we're asking for at this point -- and
10 Mr. Mehta keeps saying we have now completed jurisdictional
11 discovery.  We have not.  We have not been permitted to obtain
12 any discovery from Victoriabank.  We did talk to them right
13 after this Court's instructions last June.  Can you give us
14 some information?  Can we engage in informal discovery?  What
15 are you willing to do with us to flesh out some of these
16 facts?  Nothing.  They participated in jurisdictional
17 discovery.  They participated in Mr. Balanko's deposition, for
18 instance.  But we haven't finished all that can be done to
19 establish jurisdiction.
20         Now, I think this Court has jurisdiction under the
21 law that we've cited, most prominently because of the
22 finger-in-the-eye use of that correspondent account in New
23 York to facilitate the moving of this money.  I don't know --
24 it certainly would have been a different argument and maybe a
25 losing argument if they had done it some other way, but they

1  cannot avail themselves of a New York bank to move funds that

2  are under order from this Court to be frozen and then say,

3  Your Honor, there's nothing you can do about it.

4          And so again, in addition to the law where I think

5  we're right, the practical effect of this is that the playbook

6  will be written.  It will be employed immediately in every

7  scam that's going on and every future scam.  Here's how you do

8  it to get beyond the reach of a U.S. court.  In fact, if you

9  want to move the money after a court order, if you want to, go

10 ahead and use a U.S. correspondent bank account because that

11 won't hurt you either.  And that precedential effect worries

12 me.

13          THE COURT:  Nobody else has said anything like that.

14          All right.  I'm going to take about a ten minute

15 recess --

16          MR. MEHTA:  Can I just respond very briefly?

17          THE COURT:  Five.

18          MR. MEHTA:  Oh, less.

19          Number one, Your Honor, Mr. Bell says it's not just

20 Balanko, it's news articles.  News articles are just as much

21 hearsay as Balanko saying Platon told me something.  We all

22 know that.

23          Number two, he says I did consult with Moldovan

24 counsel and they said you can't do it.  Well, where's the

25 affidavit from Moldovan counsel that says you can't do it?

 1    There's nothing like that here.  There's nothing in the record
 2    before you from a Moldovan law expert except for Mr. Bivol who
 3    says you gotta do it.  And if he can do that, I can do it too.
 4    I've talked to Mr. Bivol.  He said, I've done it.  It takes
 5    about 30 days max.  So you know, I'm an officer of the court
 6    just as much as Mr. Bell is.
 7          Now, Mr. Bell says the playbook will have been
 8    drawn.  Well, maybe so, but the playbook depends upon there
 9    being a bad actor in the position of Victoriabank and there is
10    nothing beyond hearsay that puts Victoriabank in a bad actor
11    spot and that's just not enough.  It's not substantiation
12    enough which is what you asked him to produce almost a year
13    ago.
14          And if he thinks the playbook has been drawn, it has
15    been anyway because if you do issue essentially a contempt
16    since they've essentially decided already that Victoriabank
17    violated your order, then everybody will use a correspondent
18    bank not in the United States.  Deutsche Bank in Germany can
19    handle dollar transactions just as well as BNY Mellon in New
20    York.  So the playbook will have been drawn in that sense.
21          What they are saying, Your Honor, truly is if you
22    use a correspondent bank account in the United States, you are
23    within the reach of the contempt power of every federal
24    district court in the United States even if you never set foot
25    upon or transact any business in the United States, and that

1  is just flat wrong under due process.

2         THE COURT:  All right.  I'm going to take a brief

3  recess and come back.  I think I'll be ready to give a bench

4  ruling.

5         (Brief recess at 3:10 p.m.)

6         (Court back in session at 3:20 p.m.)

7         THE COURT:  I am ready to rule on the motions from

8  Victoriabank.

9         At the previous hearing, the Court announced it

10 would hold this motion in abeyance and allow the receiver to

11 take limited jurisdictional discovery.  It appears that such

12 discovery was indeed conducted and the receiver has filed a

13 supplemental brief at the Court's direction, as has counsel

14 for Victoriabank.  I've read the supplemental briefs, heard

15 arguments of counsel and I am now prepared to make a ruling on

16 Victoriabank's Motion to Dismiss the Receiver's Motion for an

17 Order Directing Victoriabank to Turn Over Receivership Assets

18 and/or Find Them in Contempt.

19        Because the receiver was allowed by the Court to

20 conduct jurisdictional discovery as to the issue of personal

21 jurisdiction, the burden on the receiver to establish this

22 Court's jurisdiction over Victoriabank is by a preponderance

23 of the evidence.  See *Estate of Thompson v. Mission Essential*

24 *Personnel, LLC*, 214 U.S. District LEXIS 133315 at 4-5 (Middle

25 District of North Carolina September 23rd, 2014).

1      After reviewing the evidence submitted by the
2 receiver, including the deposition of Mr. Balanko, and the
3 declaration of Mr. Wildner, the Court concludes the receiver
4 has failed to show by a preponderance of the evidence that
5 Victoriabank is subject to personal jurisdiction.
6      The Court must disagree with the receiver's theory
7 that maintaining and using the correspondent banking account
8 in New York can give rise to specific personal jurisdiction
9 over a foreign bank.  The cases cited by the receiver in
10 support of his argument are distinguishable.  I find the case
11 of *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316 (New York
12 November 22nd, 2016), to be persuasive.  The *Rushaid* court
13 required the foreign bank's active participation in the scheme
14 in order to permit jurisdiction over the foreign bank under
15 the New York long-arm statute.  First of all, the receiver has
16 not established that Victoriabank actively participated in any
17 scheme to fraudulently divert receivership assets.  The
18 transfer of funds at issue was initiated and directed by the
19 originating customer, Payment World Moldova.  And any
20 relationship between Victoriabank and Payment World Moldova,
21 Payment World USA, and Payment World Hong Kong is murky at
22 best and based upon hearsay.
23      The receiver's next argument, that violation of the
24 Freeze Order itself confers jurisdiction, is likewise
25 untenable.  It is undisputed that Victoriabank has never been

4

properly served with process in compliance with the Hague
Service Convention.  The 2012 Freeze Order was never served on
Victoriabank through Moldovan Central Authority with the
documents translated into Romanian.  The receiver has only
sent informal correspondence to Victoriabank in English.
Because the receiver never complied with Moldovan law in order
to render the 2012 Freeze Order enforceable in Moldova,
Victoriabank was not required to comply with the order and
certainly cannot be held in contempt for failure to do so.

Moreover, Victoriabank has submitted an undisputed
affidavit from Moldovan counsel that establishes that its
compliance with the 2012 Freeze Order would have actually
violated Moldovan law.  The Court finds the Ninth Circuit case
of *Reebok International v. McLaughlin*, 49 F.3d 1387 (9th
Circuit 1995), persuasive in its holding on a nearly identical
fact pattern.  Accordingly, the Court finds that it cannot
hold Victoriabank, a foreign nonparty bank, in contempt for
failing to comply with an injunction that was not enforceable
in Moldova, particularly where the bank's compliance with the
unenforceable order would have violated the laws of Moldova.

The receiver's reliance on *SEC v. Homa*, 514 F.3d 661
(7th Circuit 2008), is misplaced.  First of all, *Homa* involved
the Court exercising personal jurisdiction over U.S. citizens
living abroad, not a foreign entity.  Moreover, the Second
Circuit noted in the *Gucci v. Bank of China*, 768 F.3d 122 (2nd

1    Circuit 2014), that no court has ever extended the holding in

2    *Homa* to a foreign nonparty that is not a citizen of the U.S,

3    see page 137.  The lone case of *Abi Jaoudi & Azar Trading*

4    *Corp. v. Cigna Worldwide Insurance Company*, 216 U.S. District

5    LEXIS 95707 (Eastern District of Pennsylvania July 22nd,

6    2016), is of no help to the receiver because of its unique set

7    of facts not at issue in this case, principally because the

8    foreign entity came and filed suit in the United States thus

9    choosing the jurisdiction of the Court.

10            Because the Court finds that it has no personal

11   jurisdiction over Victoriabank, the Freeze Order of

12   February 12th freezing Victoriabank's account at the Bank of

13   New York Mellon must be dissolved, and Victoriabank's Motion

14   to Dismiss is granted.

15            However, in view of the facts in this case and the

16   murkiness of some of it, I will put in abeyance for a period

17   of 30 days the effect of this opinion giving the receiver that

18   amount of time in which to file an appeal should you desire to

19   do so, and would recommend to the Fourth Circuit if you decide

20   to do so that an expedited appeal occur.  And I will be happy

21   to recommend that to the Court of Appeals if that's the way

22   you guys decide to go.  But if you don't proceed to do that

23   within the 30 days, the order is going to be entered.  The

24   money is going to be cut loose.

25            And I thank you for a banking case that reads like a

1    John le Carre novel.   Thank you very much.

2              MR. BELL:   Thank you, Your Honor.

3              MR. MEHTA:   Thank you, Your Honor.

4              (End of proceedings at 3:27 p.m.)

5                         *****

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF NORTH CAROLINA

3   CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7   Reporter, in and for the United States District Court for the

8   Western District of North Carolina, do hereby certify that

9   pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16         Dated this 8th day of May 2017.

17

18

19                         s/Cheryl A. Nuccio

20                         _____
                           Cheryl A. Nuccio, RMR-CRR
                           Official Court Reporter

21

22

23

24

25