IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____

SECURITIES AND EXCHANGE )
COMMISSION, )
)
            **Plaintiff,** )
)
)
    **vs.** )
) **Civil Action**
**REX VENTURE GROUP, LLC** ) **No. 3:12-CV-519**
**d/b/a ZEEKREWARDS.COM, and** )
**PAUL BURKS,** )
)
          **Defendants.** )
)
_____ )

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OBJECTION TO THE RECEIVER'S FEE APPLICATION FOR THE SECOND QUARTER OF 2017

Plaintiff Securities and Exchange Commission (the "Commission") hereby objects to the Fee Application for the Second Quarter of 2017, Docket No. 633, filed September 15, 2017 ("2Q 2017 Fee Application") filed by Receiver Kenneth D. Bell (the "Receiver") on behalf of McGuireWoods LLP ("McGuireWoods") and FTI Consulting, Inc. ("FTI"), counsel and consultants for the Receiver, and asks the Court to revisit and reduce the interim award of fees based on that application. *See* Docket No. 637 (Interim award of fees).[1]

_____

[1] The Commission reserved its right to object when the 2Q 2017 Fee Application was filed. *See* 2Q 2017 Fee Application, p. 4. During the course of a detailed review of the 3Q 2017 Fee Application, it became clear that the 2Q 2017 Fee Application suffered from similar improper billing practices. Given the common problems, the Commission respectfully submits that it would be best to address these problems now, rather than waiting for the cost benefit review of the Receiver's final fee application contemplated by the Billing Instructions. This approach should allow the Court to work with the Receiver and the Commission to reduce the scope of issues to be addressed at the end of the Receivership and return as much money as possible to injured investors.

The 2Q 2017 Fee Application, which requested fees totaling $571,987 and resulted in an interim award of fees in that amount for McGuire Woods and FTI, includes vague, repetitive entries, block billing and lumping of tasks, and reflects an inefficient staffing model and the impact of a series of undisclosed rate increases. As such, the 2Q 2017 Fee Application fails to meet the requirements of the Billing Instructions and general best billing practices, and the fees requested are unreasonable.[2]

In order to resolve the Commission's concerns with respect to the 2Q 2017 Fee Applications, the Commission respectfully requests that the Court issue an order that provides for the following:

- Reduction of the interim fee award granted based on the 2Q 2017 Fee Applications, in an amount to be determined by the Court, to address (1) the billing practices described herein and (2) the undisclosed rate increase described in detail below; and

- Return to the Receivership Estate of an amount from the current holdback sufficient to address the impact of both issues on prior fee requests.[3]

The Commission also respectfully requests that the Court consult with the Commission and the Receiver to develop a comprehensive plan for the remainder of the Receivership that:

- Identifies the remaining tasks to be completed;

- Includes a robust cost benefit analysis of the remaining work to be performed by the Receiver;[4]

---

[2] The Commission filed an objection with respect to the 3Q 2017 Fee Applications (*see* Docket No. 691), based on many of the same concerns expressed here, and plans to file separate objections as to each subsequent quarterly fee application absent a resolution with the Receiver that addresses the issues discussed herein.
[3] The current amount of the holdback is approximately $1.7 million, well below the approximately $4 million that would represent 20% of the fees billed to date by McGuire Woods and FTI. On several occasions, the Receiver sought the release of a portion of the holdback against the Commission's advice.
[4] Remaining tasks include, *inter alia*, final resolution of outstanding judgments obtained in the Net Winner Class Action, the Payza/Victoriabank litigation, and a final distribution to injured investors with perfected claims.

- Provides a budget and overall cap on fees for the remaining tasks to be completed by the Receiver;[5]

- Clarifies the billing practices to be followed by the Receiver going forward, including the following:

  o New billing rates that reflect a compromise between the original rates agreed to by the parties at the outset of the Receivership (and approved by the Court) and the substantially higher rates reflected in the 2Q 2017 Fee Applications;[6]

  o No further rate increases during the pendency of the Receivership, absent extraordinary circumstances, prior notice to the SEC and express approval by the Court;

  o A holdback of at least 20% of the amount of each fee request, with application of the holdback to be determined by the Court in connection with the final fee request at the end of the Receivership; and

- Addresses the impact on the Receivership of the Receiver's impending departure from McGuireWoods.

Given the Receiver's failure to address many of the issues raised here, and the need for a clear understanding by all interested parties going forward, the Commission's view is that a hearing would be beneficial.

## BACKGROUND

As explained in more detail in the Commission's Objection to 3Q 2017 Fee Applications (the "Commission's 3Q 2017 Objection"), before his appointment in this matter, the Receiver was provided with, and agreed to adhere to, the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "Billing Instructions," attached as Exhibit 1). The Billing Instructions provide that "all applications for compensation are interim and are subject to a *cost benefit review* and final review at the close of

---

[5] Notwithstanding the Receiver's claim that "the Receiver and MW have submitted litigation budgets to the SEC, which include estimated fees through the conclusion of the Receivership," the Commission has yet to receive detailed budgets despite repeated requests. *See* Revised 3Q 2017 Fee Application, p. 5.

[6] By comparison, the Receiver's primary consultant, FTI, has not increased its rates during the pendency of the Receivership.

3

the receivership." Billing Instructions, p. 1 (emphasis added). In order to allow for adjustment of fees and expenses based on a cost benefit review of a receivership as a whole in connection with the final fee application, the Billing Instructions contemplate an ongoing "holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court." Billing Instructions, p.1. The Billing Instructions also require that the Receiver certify, *inter alia*, the following:

> [T]o the best of the Applicant's knowledge, information and belief, formed after reasonable inquiry, the Application and all fees and expenses therein are true and accurate and comply with the Billing Instructions.

Billing Instructions, A.1(b).

As explained in more detail in the Commission's 3Q 2017 Objection, the Receiver's filings confirm that most of the funds recovered in this matter to date (approximately $327 million of $375 million) were recovered by January 15, 2013, within four months after the Commission initiated this lawsuit on behalf of injured investors and sought the appointment of the Receiver.[7] At that point, McGuireWoods and FTI had billed approximately $2.5 million to the Receivership Estate.[8] In subsequent fee applications, the Receiver has requested nearly $19 million in additional fees, representing nearly 40% of the additional $48 million recovered by the Receivership Estate after January 15, 2013.

### THE 2Q 2017 FEE APPLICATION

The 2Q 2017 Fee Application, which requests fees of $405,568 for McGuire Woods and fees of $166,419 for FTI, for a total amount requested of $571,987, repeatedly fails to meet the letter and spirit of the Billing Instructions and violates general best billing practices. Under the circumstances, the fees requested are unreasonable.

---

[7] *See* 1Q 2013 Status Report, Docket No. 120, p.5
[8] *See* 1Q 2013 Fee Application, Docket No. 132.

## Vague, Repetitive Time Entries[9]

In order to allow a reviewer to understand what services were provided and facilitate a substantive cost benefit review, the Billing Instructions require that:

- Time records must set forth "in reasonable detail an appropriate narrative description of the services rendered;" and

- Individual descriptions of tasks performed should include "indications of the participants in, as well as the scope, identification and purpose of the activity that is reasonable in the circumstance."

Billing Instructions, D.2. Time entries for individual McGuireWoods timekeepers in the 2Q 2017 Fee Application generally fail to meet these requirements. Instead, many entries are vague and repetitive, and lack sufficient detail to allow a reviewer to understand what services were provided and perform the cost benefit analysis contemplated by the Billing Instructions. *See* Adams 2Q 2017 Report, pp. 3-7.

For example, time entries for timekeeper "IMB,"[10] an attorney and McGuireWoods partner, include 52 virtually identical entries – *e.g.*, "Communication with net winners re settlement and manage settlement process" – totaling 145.5 hours and $99,558 billed at a rate of $684 per hour.[11] These vague, duplicative entries comprise 46.8% of the total fees billed by timekeeper IMB, and appear to reflect a mix of legal and non-legal activities. *See* MW Chart 1 – 2Q 2017. None of these entries identify "the participants in, as well as the scope, identification

---

[9]     The information summarized here appears in more detail in the 2Q 2017 Fee Application and in a report prepared by expert Fee Examiner Diana G. Adams, Esq., former United States Trustee for New York, Connecticut and Vermont. Her report, dated September 22, 2018, is attached as Exhibit 2 ("Adams 2Q 2017 Report"), and her resume is attached as Exhibit 3. Charts that appear as exhibits to the Adams 2Q 2017 Report are referenced using the same naming convention as the Report, *e.g.*, MW Chart 1 – 2Q 2017.

[10]     This report uses timekeeper initials as shown in the fee applications. The full names of individual timekeepers are listed in Exhibit C to each quarterly fee application.

[11]     By comparison, CJA Panel rates in the Western District of North Carolina were $127 per hour for non-capital cases and $181 per hour for capital cases as of January 2015. *See* http://ncw.fd.org/content/cja-hourly-rates-case-maximums.

and purpose of the activity that is reasonable under the circumstance," as required by the Billing Instructions.[12]

Other attorney timekeeper entries follow the same pattern. For example, timekeeper "MTH"'s records contain 17 virtually identical entries – *e.g.*, "Confer with net winners regarding settlement" – totaling 42.3 hours and $6,651 in fees billed at a rate of $157 per hour, representing 100% of fees billed by MTH. *See* MW Chart 2 – 2Q 2017.[13]

Paralegal time records suffer from many of the same flaws. For example, paralegal timekeeper "DHW"'s time records reflect the same approach, including 57 identical entries – "Assist with processing and documenting RVG settlements" – totaling 347.3 hours and $73,801 in fees billed at $213 per hour. *See* MW Chart 3 – 2Q 2017. Similarly, time records for paralegal timekeeper "AB" include 36 virtually identical entries – *e.g.*, "Attention to settlement agreements and payments" – totaling 46.2 hours and $13,548 in fees billed at a rate of $293 per hour, representing nearly half of AB's time on the 2Q 2017 Fee Application. *See* MW Chart 4 – 2Q 2017. These entries lack the level of detail required by the Billing Instructions and general best billing practices, effectively negating the Commission's and the Court's ability to understand what services were provided and undertake the cost benefit analysis contemplated by the Billing Instructions.

### Lumping

The Billing Instructions also provide that "single time entries of more than one hour in an Activity Category that include two or more activities must include a notation of the approximate

---

[12]    The Receiver's time entries (timekeeper "KDB") are similarly repetitive and vague, including 29 virtually identical entries – *e.g.*, "Calls and correspondence from claimants." Adams 2Q 2017 Report, p.4, n.4.

[13]    As explained in more detail below, MTH's time records, although inadequately detailed, represent a rare example of the Receiver's use of a staff attorney with a relatively low billing rate.

time spent on each activity within the Activity Category." Billing Instructions, D.4. Many time entries in the 2Q 2017 Fee Application fail to meet this requirement, instead accounting for multiple activities in a single large block of time without delineating the time spent on each activity – a practice known as "lumping." *See* Adams 2Q 2017 Report, p. 4, n.5.

For example, many of timekeeper IMB's entries attribute substantial blocks of time to, *e.g.*, "[c]ommunication with net winners re settlement *and* manage the settlement process." *See* MW Chart 1 – 2Q 2017 (emphasis added). In these entries, the timekeeper has made no effort to delineate the amount of time spent on multiple separate tasks – *e.g.*, how much time was spent on "communications with net winners" and how much time was spent "manag[ing] the settlement process" – despite exceeding the one hour threshold in the Billing Instructions.

**Block Billing**

The Billing Instructions further require that time records be recorded in tenths of an hour and that they be kept contemporaneously on a daily basis, a requirement designed to ensure accuracy, but many time entries in the 2Q 2017 Fee Application fail to meet this requirement. Billing Instructions, D.1. Instead, many entries for individual McGuireWoods timekeepers are recorded in whole- or half-hour increments, which may indicate that the time was not recorded contemporaneously, and may therefore be inaccurate. *See* Adams 2Q 2017 Report, pp. 2, 4, 6, 11.

For example, many of timekeeper IMB's entries are in either half-hour or hour increments, rather than tenths of an hour as required by the Billing Instructions, including large blocks of time (up to 7.5 hours). *See* Adams 2Q 2017 Report, pp. 2, 4; MW Chart 1 – 2Q 2017. Similarly, all 57 of paralegal timekeeper DHW's time records are in whole- or half-hour increments, including large blocks of time (up to 10 hours), with 51 entries in excess of 4 hours

7

and 14 separate entries of 7.5 hours in a given day, which may indicate that the time was not recorded contemporaneously, and may therefore be rounded up or otherwise inaccurate. *See* Adams 2Q 2017 Report, pp. 2, 6; MW Chart 3 – 2Q 2017.

Taken together, the Receiver's vague, repetitive entries, lumping and block billing make it virtually impossible for a reviewer to understand the services provided and conduct the cost benefit review contemplated by the Billing Instructions. The Commission, through undersigned counsel, has repeatedly brought these deficiencies to the Receiver's and McGuireWoods' attention during the Receivership – in telephone calls, in writing and in person – and requested that the relevant records be modified to comply with the Billing Instructions and general best billing practices. Notwithstanding these discussions, the Receiver and McGuireWoods have declined to supplement or modify the relevant billing records.

### Inefficient Staffing Model

The Billing Instructions also require that the Receiver certify that:

[A]ll fees contained in the Application are based on the rates listed in the Applicant's fee schedule attached hereto and *such fees are reasonable, necessary and commensurate with the skill and experience required for the activity performed.*

Billing Instructions, A.1(c) (emphasis added). Nonetheless, the 2Q 2017 Fee Application reflects a staffing model implemented by the Receiver where the majority of legal work is performed by McGuireWoods partners with rates approaching $700 per hour, rather than more cost-effective resources as required by the Billing Instructions, non-legal work is performed by attorneys at full billing rates, and clerical work is often performed by high hourly rate paralegals rather than more cost-effective clerical or contract staff.

For example, IMB's time entries, billed by a partner at a rate of $684 per hour, represent 75% of all attorney fees (and 52.4% of all professional fees) requested by McGuireWoods in the 2Q 2017 Fee Application. Conversely, a single staff attorney, billing at a rate of $157 per hour,

8

billed only 42 hours, or about 9.3% of total attorney hours and 2.4% of total attorney fees billed by the Receiver in the 2Q 2017 Fee Applications. *See* Adams 2Q 2017 Report, pp. 4-5, 11 (describing attorney timekeeper MTH).[14] A lone associate billed another 26.8 hours, as compared to 361.6 hours billed by McGuireWoods partners. *See* 2Q 2017 Fee Application, Exhibit C. This "upside down" staffing model does not reflect the cost-effective provision of legal services, and fails the cost benefit review contemplated by the Billing Instructions. *See* Billing Instructions, p. 1. Many of timekeeper IMB's entries also highlight another inefficiency in the Receiver's staffing model – large blocks of time billed by high billing rate attorneys to perform non-legal tasks, *e.g.*, "manage the settlement process." *See* MW Chart 1 – 2Q 2017.

Similarly, paralegal timekeeper DHW's time records reflect the same approach, including 57 identical entries – "Assist with processing and documenting RVG settlements" – that appear to be repetitive, clerical task performed at a billable rate of $213 per hour. *See* MW Chart 3 – 2Q 2017. And paralegal timekeeper AB's time includes 36 virtually identical entries – *e.g.*, "Attention to settlement agreements and payments" – that again shed little light on the services provided, but appear to reflect repetitive, clerical tasks being performed by a paralegal with a billing rate of $293 per hour. *See* MW Chart 4 – 2Q 2017.[15]

Counsel for the Commission has repeatedly raised the issue of cost-effective staffing with the Receiver, including McGuireWoods' "upside down" staffing model and the extensive use of attorneys and paralegals to perform non-legal tasks. Among other suggestions, counsel for the

---

[14] The staff attorney's billable rate of $157 per hour is well below the rates charged by the Receiver and McGuireWoods for paralegals in the 2Q 2017 Fee Application – $208, $213 and $293 per hour, respectively.

[15] Again, even these paralegal rates are substantially higher than CJA Panel rates for attorneys handling death penalty cases in the Western District of North Carolina. *See* footnote 9, above.

Commission encouraged the Receiver to establish lower rates for non-legal work performed by McGuireWoods attorneys and paralegals, but the Receiver has resisted this approach.

**FTI**

As explained in more detail in the Adams 2Q 2017 Report, FTI's time records reflect many of the same problems described above, including vague, repetitive time entries, block billing, and a staffing model where seemingly repetitive, clerical tasks are performed by high hourly rate timekeepers rather than more cost-effective clerical or contract staff. *See* Adams 2Q 2017 Report, pp. 8-11.

For example, FTI timekeeper C_J recorded 36 virtually identical entries – *e.g.*, "Data analysis related to review of specific claims" – to account for 110.2 hours at an hourly rate of $350 and $38,570 in fees, approximately 23% of the total amount sought by FTI in the 2Q 2017 Fee Application. *See* FTI Chart 6 - 2Q 2017. In addition to being vague and repetitive, 24 of the 36 entries are recorded in whole- or half-hour increments, which again may indicate that the time was not recorded contemporaneously, and may therefore be rounded up or otherwise inaccurate.

In addition to problems with the manner in which FTI's time is recorded, it is not clear whether the benefit to the Receivership Estate of FTI's efforts outweighs the substantial cost at this stage of the Receivership. Although the 2Q 2017 Fee Application states that "[t]he Receiver retained FTI as the forensic accountants and litigation and database consultants for the Receivership Estate," forensic accounting should be complete, and any database work should primarily relate to searching established databases for information related to individual members of the Net Winner Class in support of settlement discussions. As might be expected, many of

FTI's time entries describe what appear to be clerical or ministerial tasks, but those tasks apparently continue to be performed by professional staff members with high billing rates.[16]

### Undisclosed Rate Increase

Finally, as explained in more detail in the Commission's 3Q 2017 Objection, the 2Q 2017 Fee Application reflects the impact of a series of undisclosed rate increases by the Receiver in each of the fee applications for the first quarters of 2014, 2015, 2016 and 2017 (collectively, the "1Q Fee Applications").

Before his appointment in this matter, the Receiver submitted an initial proposal to the Commission, by letter dated August 8, 2012, a copy of which is attached as Exhibit 4. The highest billable rate referenced in the proposal was the Receiver's own rate – $610 per hour. Rates charged in the Receiver's first interim fee application were McGuireWoods' individual timekeeper rates minus a 15% discount, resulting in a blended rate of $393 per hour.[17] The identified rates were already high for the North Carolina market,[18] and the Receiver's proposal makes no mention of anticipated rate increases, annual or otherwise, during the pendency of the Receivership, nor was the issue discussed before his appointment.

The Receiver agreed to follow the Billing Instructions, which require, among other things, that "[a]t least 30 days prior to the filing of the Application with the Court, the Applicant will provide to SEC Counsel a complete copy of the proposed Application, together with all exhibits and *relevant billing information* in a format to be provided by SEC staff." Billing

---

[16]    The issues described herein with respect to FTI's time records apply with equal weight to subsequent fee applications.

[17]    The reference to "the Applicant's fee schedule attached hereto" in the Billing Instructions is to the fee schedule attached to the Billing Instructions at the inception of a receivership – here, the fee schedule attached to the Receiver's proposal – not the fee schedules the Receiver attached to subsequent fee applications, which reflect a series of undisclosed rate increases made without notifying the Commission or the Court. Billing Instructions, A.1(c).

[18]    *See* footnote 9, above.

Case 3:12-cv-00519-GCM   Document 700   Filed 10/10/18   Page 11 of 26

Instructions, A.2. (emphasis added). In addition to the Billing Instructions, each fee application submitted by the Receiver refers to and incorporates the N.C. Rules of Professional Responsibility, which clearly contemplate disclosure of all material information, including any change in the billable rates charged by the attorney. *See* Comment 5 to Rule 1.5 Fees. Notwithstanding these requirements, an in-depth review by counsel for the Commission, prompted by concerns regarding the 3Q 2017 Fee Application, revealed substantial, undisclosed rate increases by the Receiver in each of the 1Q Fee Applications.[19]

The overall impact of the undisclosed rate increases is substantial – the blended hourly rate for McGuireWoods attorneys in the 2Q 2017 Fee Applications is $627 per hour, as compared to a blended hourly rate of $393 per hour in the Receiver's initial fee application at the start of the Receivership. *See* Adams 2Q 2017 Report, pp. 7-8.[20] Individual timekeeper rates are substantially higher – approximately 30% higher on average – than those set forth in the Receiver's August 2012 proposal to the Commission and the Receiver's initial fee application, while FTI's rates have remained unchanged.

Pursuant to the Billing Instructions, the N.C. Rules of Professional Responsibility and general best billing practices, any rate increase should have been explicitly disclosed to the Commission and other stakeholders, so that the issue could be addressed by all interested parties and any proposed increase could be expressly approved or rejected by the Court. Here, the Receiver neither sought nor received approval for increased billing rates from the Commission or the Court. Although the 1st Quarter Fee Applications list individual timekeeper rates in an exhibit, the Applications themselves do not disclose that the rates in the attached exhibits include

---

[19] As noted above, FTI has not increased its rates during the pendency of the Receivership.
[20] The increase in blended hourly rate may also reflect the impact of the Receiver's inefficient staffing model, since a single partner's time accounts for 75% of all attorney fees (and 52.4% of all professional fees) billed by McGuireWoods in the 2Q 2017 Fee Application.

a rate increase as compared to prior quarters, nor do the corresponding quarterly status reports filed by the Receiver disclose a rate increase. In order to discover that the Receiver increased rates across the board, a reviewer would have been required to compare individual timekeeper rates in the 1Q 2014 Fee Application, for example, to the rates for the same timekeepers in the 4Q 2013 Fee Application. As explained in more detail in the Adams 3Q 2017 Report, attached to the Commission's 3Q 2017 Objection, individual rate increases were subtle (*e.g.*, the Receiver's rate increased from $612 per hour in the 4Q 2013 Fee Application to $637 per hour in the 1Q 2014 Fee Application), but successive undisclosed increases had a dramatic impact over time on the overall level of billing by the Receiver (*e.g.*, the Receiver's original, agreed rate of $612 per hour rose to $761 per hour in the 1Q 2017 Fee Application, a 24% increase).

ARGUMENT[21]

The Receiver's filings confirm that most of the funds recovered in this matter to date were recovered by January 15, 2013, within four months after the Commission initiated this lawsuit and sought the appointment of the Receiver. At that point, McGuireWoods and FTI had billed approximately $2.5 million to the Receivership Estate. In subsequent fee applications, the Receiver has requested nearly $19 million in additional fees, representing nearly 40% of the additional $48 million recovered by the Receivership Estate after January 15, 2013. McGuireWoods and FTI have billed more than $21 million to the Receivership Estate to date, and most of the funds collected by the Receivership Estate have been distributed to injured investors. Even taking into account ongoing litigation matters, one would expect the Receivership – and the corresponding fee requests by McGuireWoods and FTI – to be winding

---

[21] The Argument Section of the Commission's 3Q 2017 Objection is incorporated herein by reference.

13

down.  Instead, the fees requested by McGuireWoods increased dramatically in the quarters

leading up to 2Q 2017, and FTI also continued to bill substantial amounts on a quarterly basis.

## I. The Court Has Discretion Regarding The 2Q 2017 Fee Applications.

As explained in more detail in the Commission's 3Q 2017 Objection, the award of fees in

a receivership is entrusted to the discretion of the district court. *See* Commission 3Q 2017

Objection, pp.15-19 (citing numerous cases including, *inter alia*, *SEC v. Byers*, Case No. 08 Civ.

7104, 2014 WL 7336454, *5-6 (S.D.N.Y. Dec. 23, 2014) (explaining that in setting a reasonable

fee, the court is to consider "all of the factors involved in a particular receivership," including

"the complexity of problems faced, the benefit to the receivership estate, the quality of work

performed, and the time records presented") (quotations omitted); *SEC v. Striker Petroleum,*

*LLC*, Case No. 3:09–CV–2304–D, 2012 WL 685333, *2 (N.D. Tex. Mar. 2, 2012) (similar

analysis); *SEC v. Goren*, 272 F. Supp. 2d 202, 206, 212-213 (E.D.N.Y. 2003) (explaining that

"[d]istrict courts must scrutinize fee applications to ensure that they are reasonable" and that

"[a]s the amount of an award is within the discretion of the district court, so is the amount of any

reduction") (citations omitted).

In a receivership initiated by the SEC, "[o]pposition or acquiescence by the SEC to the

fee application will be given great weight." *Byers*, 2014 WL 7336454, at *6 (quotations

omitted); *see also Striker*, 2012 WL 685333, at *3 (same). Here, the SEC has well-grounded

concerns regarding the reasonableness of the 2Q 2017 Fee Application.

The general view is that courts should not award "extravagant fees," but only "moderate

ones." *Byers*, 2014 WL 7336454, *6 (citing, *inter alia*, *In re New York Investors, Inc.*, 79 F.2d

182, 185 (2d Cir. 1935)).  Moderation makes particular sense here, where injured investors have

been defrauded, victims are unlikely to recover all of their losses, and total fees billed to date are in excess of $21 million. *See id.*; *Goren*, 272 F. Supp. 2d at 213 (similar discussion).[22]

In determining the appropriateness of a fee request, courts typically scrutinize the type of work performed by a receiver. "In determining the amount of their compensation, due consideration should be given to the amount realized, as well as the labor and skill needed or expended, and other circumstances having a bearing on the question of the value of the services." *Striker*, 2012 WL 685333, at *3 (quoting *City of New Orleans v. Malone*, 12 F.2d 17, 19 (5th Cir. 1926)). Here, as in *Goren*, most of the services provided by McGuireWoods timekeepers "had little to do with complex securities law," instead primarily involving marshaling and managing funds, disposing of assets, implementing a claims process and making distributions to injured investors. *See Goren*, 272 F. Supp. 2d at 219, n.2. Most of the activity described in the 2Q 2017 Fee Applications is clerical or ministerial rather than legal.[23] The primary legal task involved negotiating virtually identical settlements with lay members of the Net Winner class, many of whom appeared *pro se*, a repetitive task that was nonetheless performed by a high billing rate McGuireWoods partner. As noted above, the time entries capturing this activity include 52 virtually identical entries – *e.g.*, "Communication with net winners re settlement and manage the settlement process" – totaling 145.5 hours and $99,558 billed at a rate of $684 per

---

[22] As discussed above, the Receivership Estate had already received approximately $327 million frozen or seized by federal authorities by January 2013. The Receiver has sought fees that account for almost 40% of the total amount recovered in the interim.

[23] For example, the Receiver describes "analyzing correspondence and transactions between RVG and its third-party payment processors. This analysis was performed for: (1) the pursuit of Receivership Assets from financial institutions including Victoriabank, Payza, and Payment World; and (2) support for the Receiver's fraudulent transfer lawsuits and settlements." *See* 2Q 2017 Fee Application, p. 5. Six years into the Receivership, the Receiver should have the facts well in hand with respect to claims against Victoriabank, Payza and Payment World, and the benefit to the Receivership of further "investigation and analysis" of Rex Venture Group's operations would appear to be limited.

15

hour. As in *Goren*, while the McGuireWoods attorneys may be "experienced in their respective fields, their backgrounds did not necessarily assist them in performing the tasks in this case efficiently." *Goren*, 272 F. Supp. 2d at 209, n. 2.

## II.     The 2Q 2017 Fee Application Lacks Sufficient Detail To Support The Fees Requested.

A fee application must be supported by contemporaneous time records which describe with specificity the work done. *Goren*, 272 F. Supp. 2d at 211 (citing *New York State Assoc. for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983)). The burden is on counsel to "keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested." *Id*. at 211-12 (quoting *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1265 (2d Cir. 1987)). And, in fact, the Billing Instructions, which the Receiver specifically agreed to follow, mandate "a cost benefit review and final review at the close of the receivership." *See* Billing Instructions, p. 1 (emphasis added). As explained in detail above, a significant percentage of the time records in the 2Q 2017 Fee Application do not meet these standards, and thwart any inquiry into the "nature of the work done, the need for it, and the amount of time reasonably required," let alone a cost benefit review. *See Goren*, 272 F. Supp. 2d at 211-12.

### A.  The 2Q 2017 Fee Application Contains Vague, Repetitive Time Entries.

The 2Q 2017 Fee Application is rife with vague, repetitive time entries. As noted above, the Receiver agreed before his appointment to adhere to the SEC's Billing Instructions, which require that, among other things:

- Time records must set forth "in reasonable detail an appropriate narrative description of the services rendered;" and

- Individual descriptions of tasks performed should include "indications of the participants in, as well as the scope, identification and purpose of the activity that is reasonable in the circumstance."

Billing Instructions, D.2. Time entries for individual McGuireWoods timekeepers in the 2Q 2017 Fee Application generally fail to meet these requirements. Instead, as described in detail above and in the Adams 2Q 2017 Report, many entries are vague and repetitive, and lack sufficient detail to allow a reviewer to understand the nature of the work, the need for it, or the amount of time reasonably required to complete it, let alone to allow the cost benefit analysis contemplated by the Billing Instructions. *See* Adams 2Q 2017 Report, pp. 3-7.

For example, time entries for timekeeper IMB, an attorney and McGuireWoods partner, include 52 virtually identical entries – *e.g.*, "Communication with net winners re settlement and manage settlement process" – totaling 145.5 hours and $99,558 billed at a rate of $684 per hour. *See* MW Chart 1 – 2Q 2017. None of these entries, which account for 46.8% of fees billed by IMB, identify "the participants in, as well as the scope, identification and purpose of the activity that is reasonable under the circumstance," as required by the Billing Instructions. *Id*. The same holds true for several other McGuireWoods attorney and paralegal timekeepers. *See, e.g.,* MW Chart 2 – 2Q 2017 (attorney MTH); MW Chart 3 – 2Q 2017 (paralegal DHW); MW Chart 4 – 2Q 2017 (paralegal AB).

In *Krear*, the Second Circuit rejected as inadequate time records containing two- and three-word descriptions such as "Rev. docs" and "Clients re: testimony" to support billing for large blocks of time. *Krear*, 810 F.2d at 1265. The same logic applies here, where vague, repetitive entries – *e.g.*, "[c]ommunication with net winners re settlement" and "manage the settlement process" – represent the only support for at least $198,578.57 in fees billed, or 49% of the total fees charged by McGuireWoods timekeepers. *See* Adams 2Q 2017 Report, pp.11-12.

17

### B. Many Time Entries In The 2Q 2017 Fee Application Are "Lumped."

Many time entries are also lumped, describing two or more disparate activities without noting the time spent on each. As noted above, the Billing Instructions require that "single time entries of more than one hour in an Activity Category that include two or more activities must include a notation of the approximate time spent on each activity within the Activity Category." Billing Instructions, D.4. Here, however, many time entries in the 2Q 2017 Fee Applications are "lumped," accounting for multiple activities in a single large block of time without delineating the time spent on each activity. *See* Adams 2Q 2017 Report, pp. 3-7; MW Chart 1 – 2Q 2017 (attorney IMB).

For example, many of timekeeper IMB's entries, which account for the bulk of McGuireWoods billing for attorney time, attribute substantial blocks of time to, *e.g.*, "[c]ommunication with net winners re settlement and manage settlement process." *See* MW Chart 1 – 2Q 2017. These entries, many of which exceed the one-hour threshold in the Billing Instructions, fail to delineate the amount of time spent on two separate tasks – *e.g.*, how much time was spent on "communications with net winners" versus time spent "manag[ing] the settlement process" – despite exceeding the one-hour threshold in the Billing Instructions. In addition, settlement negotiations are a legal task, while "manag[ing a] process" would appear to be non-legal work that should be billed at a lower rate.

Again, as in *Krear*, these entries provide inadequate support for the large blocks of time billed. *See Krear*, 810 F.2d at 1265 (rejecting time entries for large blocks of time supported by vague, repetitive descriptions). And, as the court observed in *Byers*, "[h]ours that are excessive, redundant, or otherwise unnecessary are not 'reasonably expended' and should be excluded from the initial fee calculation." *Byers*, 2014 WL 7336454, *5 (quotation omitted). Applying the

same logic here, many of the hours billed in the 2Q 2017 Fee Applications should have been excluded from any fee calculation, and the interim fee award should be reduced.[24]

### C. Many Timekeepers Use "Block Billing."

The Billing Instructions also require that time records be recorded in tenths of an hour and must be kept contemporaneously on a daily basis, a requirement designed to ensure accuracy and efficiency. Billing Instructions, D.1. However, many time entries in the 2Q 2017 Fee Applications fail to meet this requirement. Instead, many entries for individual timekeepers are recorded in half-hour and hour increments, suggesting that the time was not recorded contemporaneously and may therefore be inaccurate and excessive. *See* Adams 2Q 2017 Report, pp. 3-7, 11-12; MW Chart 1 – 2Q 2017 (attorney IMB); MW Chart 3 – 2Q 2017 (paralegal DHW).

For example, 57 of paralegal timekeeper DHW's entries are in whole- or half-hour increments, including large blocks of time (up to 10 hours), 51 entries in excess of 4 hours, and 14 separate entries of 7.5 hours in a given day. MW Chart 3 – 2Q 2017; *cf. In re West End Financial Advisors, LLC,* Case No. 11-11152, 2012 WL 2590613, at *15, n.7 (Bankr. S.D.N.Y. July 3, 2012) (explaining that "one would expect that 20% of the time . . . would be billed in half-hour or whole-hour increments," while a higher proportion of block billing "indicates that

---

[24]     The Receiver incorrectly contends that "[t]he SEC has suggested that each separate call and email for each net winner or their counsel should have been recorded and billed in .1 hour increments." *See* Revised 3Q 2017 Fee Application, p. 14. In fact, the Billing Instructions clearly allow time within an activity category to be combined (Billing Instructions, D.4), but the entries must provide sufficient detail – *e.g.*, the participants in settlement discussions – to evaluate the activity (Billing Instructions, D. 2). In addition, to the extent that the Receiver's claim that the settlement negotiations described in the 3Q 2017 Fee Applications consisted primarily of phone calls lasting less than one tenth of an hour also applies to the 2Q 2017 Fee Application, the assertion calls into question the complexity of the task and the need to staff such activity with a high billing rate partner.

time was recorded in round numbers without any significant effort to detail the actual time spent on services").

As in *Krear* and *Byers*, these entries provide inadequate support for the large blocks of time billed, and many of the hours billed in the 2Q 2017 Fee Application should be excluded from any fee calculation. *See Krear*, 810 F.2d at 1265; *Byers*, 2014 WL 7336454, *5.

Taken together, the Receiver's billing practices – vague, repetitive entries, lumping and block billing – make it virtually impossible to conduct the cost benefit review contemplated by the Billing Instructions, and the interim award granted based on the 2Q 2017 Fee Application should be substantially reduced.

## III. The 2Q 2017 Fee Application Reflects An Inefficient Staffing Model.

Individual time entries in the 2Q 2017 Fee Application also reflect the Receiver's "upside down" staffing model, where the majority of the legal work is performed by high billing rate partners and senior associates rather than being delegated to more cost-effective resources, while clerical work is handled by high billing rate paralegals rather than more cost-effective clerical staff. As noted above, the Billing Instructions require, among other things, that the Receiver certify that "all fees contained in the Application . . . are reasonable, necessary and *commensurate with the skill and experience required for the activity performed*." Billing Instructions, A.1(c) (emphasis added).

Here, however, the 2Q 2017 Fee Application includes more 300 hours and more than $200,000 billed by a single McGuireWoods partner billing at nearly $700 per hour, representing 75.2% of all attorney fees (and 52.4% of all professional fees) billed by McGuireWoods in the 2Q 2017 Fee Application, resulting in a blended hourly rate for attorneys of $627 per hour in the 2Q 2017 Fee Application, as compared to a blended rate for McGuireWoods attorneys of $393 per hour at the outset of the Receivership. The current fee request for this partner's work

20

includes dozens of repetitive entries with variations on the phrase "[c]ommunications with net winners and manage settlement process."[25] These entries, which total in excess of 145 hours and nearly $100,000 billed by a McGuireWoods partner at nearly $700 per hour, including large blocks of time (up to 7.5 hours) with a single descriptive entry, do not represent an efficient, cost-effective approach to handling a repetitive task like settlement discussions with individual members of the Net Winner class, where such claims are relatively small, are based on a common fact pattern and well-established calculations, and most of the net winners are lay people appearing *pro se*.[26] A more efficient and cost-effective approach could have included, *inter alia*, (1) developing talking points that capture the desired framework for individual settlement discussions, and (2) delegating this activity to more cost-effective timekeepers (*e.g.*, associates, staff attorneys or paralegals).[27]

Nor are such problems limited to attorneys. For example, paralegal timekeeper DHW's time records include 57 identical entries – "Assist with processing and documenting RVG

---

[25]     As noted above, timekeeper IMB's entries also highlight another inefficiency in the Receiver's staffing model – the use of high billing rate attorneys to perform non-legal tasks, *e.g.*, "manage the settlement process." *See* MW Chart 1 – 2Q 2017.

[26]     According to the Receiver, McGuire Woods attorneys "resolved at least 50 [] net winner settlements totaling over $1,050,000" in 3Q 2017 – an average settlement of approximately $21,000 per net winner. Revised 3Q 2017 Fee Application, p. 14. It seems unlikely that negotiating cookie-cutter settlements with lay defendant class members with an average value of $21,000 requires the efforts of a McGuireWoods partner with a billing rate approaching $700 per hour. This conclusion is supported by the fact that, according to the Receiver Garden City Group was able to resolve more than 1,040 similar settlements during 3Q 2017. *Id.*

[27]     The Receiver's explanation of his staffing model (*see* Revised 3Q 2017 Fee Application, pp. 11-14) does nothing to change this analysis. The information provided by the Receiver is insufficient to quantify the services supposedly provided and link them to any particular time entries. The Receiver's numerical analysis also lumps the role of Garden City Group with McGuireWoods attorneys and paralegals. Although incomplete, this analysis only serves to highlight (1) the rote nature of class member settlement discussions and (2) the relative efficiency and cost-effectiveness of specialized, non-legal resources such as Garden City Group, as compared to a high billing rate McGuireWoods partner performing the same task for settlements above an arbitrary threshold established by the Receiver.

Case 3:12-cv-00519-GCM   Document 700   Filed 10/10/18   Page 21 of 26

settlements" – totaling 347.3 hours and $73,801 in fees billed in large blocks of time (including large blocks of time, up to 10 hours, 51 separate entries in excess of 4 hours, and 14 separate entries of 7.5 hours in a given day) billed to the Receivership Estate at $213 per hour. *See* MW Chart 3 – 2Q 2017. And paralegal timekeeper AB's time records include 36 virtually identical entries – *e.g.*, "Attention to settlement agreements and payments" – totaling 46.2 hours and $13,548.24 in fees billed at a rate of $293 per hour. *See* MW Chart 4 – 2Q 2017. Again, these entries, which appear to reflect clerical tasks rather than legal or paralegal work, and include large blocks of time with a single descriptive entry, do not meet the requirements of the Billing Instruction, nor do they represent an efficient, cost-effective approach to handling the repetitive clerical tasks inherent in administering a class action settlement.[28]

As noted in *Goren*, "the requirement of time records [is] not an invitation for the distortion of the value of the required services or the proliferation of unnecessary unwarranted activity in the light of the overall objective requirements of the case." *Goren*, 272 F. Supp. 2d at 213. The same logic applies here, where the Receiver's billing records reflect an inefficient, top-heavy staffing model. *See* Adams 2Q 2017 Report, p.11.[29]

---

[28]    To the extent that the Receiver continues to claim that "[t]he issues addressed by the Receiver and MW have been and continue to be highly complex, requiring investigation of an alleged fraud that included approximately 2.2 million Affiliates and 1 million Affiliate-Investors (1 million Affiliate-Investors, and an additional 1.2 million non-investor Affiliates)" (*see* Revised 3Q 2017 Fee Application, p. 26), that assertion is unsupported by the 2Q 2017 Fee Application. As described in detail herein, many time entries in the 2Q 2017 Fee Application describe repetitive, non-legal tasks performed by high billing rate attorneys and paralegals long after the complex issues relevant to the Receivership were resolved.

[29]    To the extent that the Receiver continues to claim that "[n]ot reflected in the billed time entries are hundreds of hours per quarter in McGuireWoods employee time which is not billed to the Receivership" (*see* Revised 3Q 2017 Fee Application, pp. 15-16), his position is unsupported by the 2Q 2017 Fee Application. Clerical support and other overhead are typically included in law firm billing rates, and the Receiver and McGuireWoods have made no request to be reimbursed for such services.

**IV.     The 2Q 2017 Fee Application Reflects An Undisclosed Series Of Rate Increases.**

As explained in more detail in the Commission's 3Q 2017 Objection, the 2Q 2017 Fee Application reflects the impact of substantial, undisclosed rate increases by the Receiver in each of the 1Q Fee Applications for 2014, 2015, 2016 and 2017.[30]

Pursuant to the Billing Instructions, the N.C. Rules of Professional Responsibility and best billing practices, the burden is on a receiver to disclose any proposed modification of agreed rates prior to seeking court approval of a fee application. A receiver has an undivided fiduciary duty to the stakeholders in the receivership estate, including injured investors and the Commission. Here, the Receiver failed to alert injured investors, the Commission or the Court.

To the extent that the Receiver continues to claim that his unilateral, undisclosed rate increases were disclosed in the billing rate charts attached as an exhibit to each fee application, his position is disingenuous. Although the overall impact of the increases is substantial, individual rate increases were small – a reviewer would have to compare individual timekeeper rates in each fee application to prior rates in order to notice a change, and would have had no reason to do so. The Receiver should have (1) alerted the SEC in advance of any proposed rate increase and (2) obtained express approval from the Court for the proposed increase.[31]

**V.     The Interim Award Based On The 2Q 2017 Fee Application Should Be Substantially Reduced.**

Based on the foregoing concerns, the interim award granted based on the 2Q 2017 Fee Application should be substantially reduced. As explained in more detail in the Commission's 3Q 2017 Objection, which is incorporated herein by reference, courts have routinely reduced fees computed under the lodestar methodology by deducting a percentage from the number of

---

[30]     *See* Adams 2Q 2017 Report, pp. 7-8.

[31]     *See* Adams 2Q 2017 Report (incorporating by reference discussion of rate increases in Adams 3Q 2017 Report); *see also* Billing Instructions; N.C. Rules of Professional Conduct.

hours reasonably billed or by deducting a lump sum. *See* Commission 3Q 2017 Objection, pp. 27-28 (citing cases including, *inter alia*, *Goren*, 272 F. Supp. 2d at 213 (endorsing "percentage cuts as a practical means of trimming fat from a fee application"); *Carey*, 711 F.2d at 1146 (30% reduction due to, *inter alia*, vague entries); *SEC v. Mobley*, 2000 WL 1702024, *2 (S.D.N.Y. 2000) (lump sum reduction due to inefficiency and lumped time entries)).

Here, immediately upon receipt of a draft of the 3Q 2017 Fee Application in December 2017, counsel for the Commission raised the issues described herein with the Receiver, as discussed in detail above. The Receiver was unwilling to discuss any meaningful resolution, and the improper billing practices described herein – vague, repetitive entries, lumping and block billing – continued largely unchanged in subsequent quarters. Given the volume and complexity of the time records involved, the Receiver's apparent unwillingness to conform to the requirements of the Billing Instructions, and the substantial impact of the Receiver's inefficient staffing model and unilateral, undisclosed rate increases, a percentage or lump sum reduction of the amount requested in the 2Q 2017 Fee Application is appropriate. Therefore, the Commission respectfully asks the Court to determine an appropriate reduction in the interim award granted based on the 2Q 2017 Fee Application in order to address the improper billing practices and undisclosed rate increase described herein.[32]

---

[32]     The Receiver's analysis of anticipated fees in subsequent quarters is inapposite, since anticipated lower fees in the future do nothing to reduce the fees sought in the 2Q 2017 Fee Application or address his failure to meet the requirements of the Billing Instructions and general best billing practices.

24

## CONCLUSION

Based on the foregoing, the Commission respectfully asks that the Court issue an order that provides for the following:

- Reduction of the interim award granted based on the 2Q 2017 Fee Application, in an amount to be determined by the Court, to address (1) the billing practices described herein and (2) the undisclosed rate increase described in detail below; and

- Return to the Receivership Estate of an amount from the current holdback sufficient to address the impact on prior fee requests of (1) the billing practices described herein and (2) the undisclosed rate increase.

The Commission also respectfully requests that the Court consult with the Commission and the Receiver to develop a comprehensive plan for the remainder of the Receivership as described above.

Respectfully submitted this 10th day of October, 2018.

/s/John J. Bowers
John J. Bowers (NC Bar No. 23950)
J. Lee Buck, II
Alfred C. Tierney
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Telephone: (202) 551-4645 (Bowers)
Facsimile: (703) 813-9359
Email: BowersJ@sec.gov

Attorney for Plaintiff
Securities and Exchange Commission

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that on this 10th day of October, 2018, the foregoing was filed with the Court's CM/ECF system, which will send electronic copies to counsel of record registered to receive electronic service.

/s/ John J. Bowers
John J. Bowers
*Attorney for Plaintiff*
*Securities and Exchange Commission*