**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> REX VENTURE GROUP, LLC d/b/a ZEEKREWARDS.COM, and PAUL BURKS, <br><br> Defendants. | Case No. 3:12-cv-519-GCM |

**NON-PARTY BANCA COMERCIALA VICTORIABANK SA'S
REPLY BRIEF IN SUPPORT OF ITS OPPOSITION TO RECEIVER'S
STATEMENT ON THE APPROPRIATE COURSE OF THE PROCEEDINGS
AND RENEWED MOTION TO DISMISS**

In its Response in Opposition to Non-Party Banca Comerciala Victoriabank SA ("Victoriabank")'s Renewed Motion to Dismiss, the Receiver relies on the same tired arguments already rejected by the Court in its Order granting Victoriabank's initial Motion to Dismiss. The Receiver raises no new allegations, nor does he cite any new authorities in his quest to seek jurisdiction over a foreign nonparty to the litigation. Victoriabank did not conduct the September 25, 2012 asset transfer in New York ("September 2012 Transfer") in connection with any Ponzi scheme; rather, it did so at the behest of its client, Payment World LTD SRL ICS ("PW-Moldova"), a company independent of Victoriabank. Moreover, it is undisputed the Receiver failed to acquire jurisdiction in New York prior to the September 2012 Transfer. Even had Victoriabank initiated or otherwise been complicit in directing the September 2012 Transfer, which Victoriabank disputes, no jurisdiction over Victoriabank could have attached at that time. Nor can Victoriabank's alleged failure to comply with this Court's August 17, 2012 Order Freezing and Preserving Assets ("Freeze Order") provide a jurisdictional hook. Incontrovertibly, the Receiver

failed to domesticate the Freeze Order in Moldova, Victoriabank's home country. Because the Freeze Order was not domesticated in Moldova, Victoriabank's compliance therewith would have violated Moldovan law, and Victoriabank's alleged non-compliance therewith is not addressable through the Court's contempt power, which is the relief that the Receiver seeks.

No additional jurisdictional discovery is necessary. The Receiver's "attenuated" claim of jurisdiction and "bare allegations in the face of specific denials made by [Victoriabank]" belie the Receiver's baseless claim that another round of discovery would be anything more than a fishing expedition. *Rich v. KIS Cal., Inc.*, 121 F.R.D. 254, 259 (M.D.N.C. 1988). Nor does Victoriabank request the Court credit purportedly "disputed" evidence in holding that the Receiver has failed to provide a *prima facie* showing of jurisdiction. Under that standard, as in the consideration of a motion to dismiss for failure to state a claim, the Court need not "accept as true unwarranted inferences, unreasonable conclusions, or arguments" and "need not accept as true any allegations in the complaint . . . that are directly contradicted by the exhibits." *Muir v. Winston-Salem State Univ.*, No. 1:11-cv-282, 2012 U.S. Dist. LEXIS 27861, at *12 (M.D.N.C. Mar. 2, 2012). "The Court should grant the motion to dismiss if there is no genuine issue as to any material jurisdictional fact and the jurisdictional defect appears as a matter of law." *Gemini Enters., Inc. v. WFMY Tele. Corp.*, 470 F. Supp. 559, 565 n.4 (M.D.N.C. 1979). Because the Receiver's allegations are belied by the record evidence the Receiver already presented to the Court, the Court can dismiss the Receiver's baseless accusations as untrue.[1] And even if the Court were inclined

---

[1] The Receiver's reliance on *Bell v. Brownie*, No. 3:15CV70, 2016 U.S. Dist. LEXIS 13622 (W.D.N.C. Feb. 4, 2016), as supporting the Receiver's claim for jurisdiction is misplaced. In *Bell*, this Court concluded that it could exercise jurisdiction over a defendant to the lawsuit who had "repeated, consistent and extensive contacts" with North Carolina by "voluntarily and intentionally sign[ing] up for a scheme stated to be 'headquartered' in North Carolina and then [conducting] daily purposeful interaction with the scheme." *Id.* at *11. The Court reasoned that the defendant was subject to specific jurisdiction because it was "these contacts with North Carolina, including

to allow the Receiver another shot at discovery, the Court should direct the Receiver to comply with the Hague Convention because Victoriabank is a foreign nonparty to the litigation.

Under the *prima facie* standard, the Receiver has failed to demonstrate this Court's personal jurisdiction over Victoriabank. The Court should rule on Victoriabank's Renewed Motion to Dismiss without further discovery and dismiss and deny the Receiver's Amended Motion and dissolve the 2016 Freeze Order.[2]

## ARGUMENT

**I. THE RECEIVER HAS FAILED TO MAKE A *PRIMA FACIE* SHOWING THAT THIS COURT HAS JURISDICTION OVER VICTORIABANK.**

**A. The Receiver's Conclusory Allegations Regarding Victoriabank's Use of a Correspondent Bank Account Do Not Provide a *Prima Facie* Showing of Personal Jurisdiction.**

Specific jurisdiction exists only when the proceeding arises out of Victoriabank's contacts with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). The Receiver asks this Court to exercise jurisdiction over foreign nonparty Victoriabank for the purposes of a contempt proceeding against Victoriabank, not the alleged Ponzi Scheme undergirding the lawsuit itself. The Receiver contends Victoriabank is in contempt and violated this Court's Freeze Order by transferring funds after receiving notice of the Freeze Order on

---

the repeated requests and payments of money by and to [the defendant] in and from North Carolina, which are the genesis of the claims against him in this action." *Id.* at *12. Evidence of such purposeful and repeated conduct—or even allegations thereof—are wholly absent from the proceeding against Victoriabank.

[2] Contrary to the Receiver's claim that Victoriabank ignores "the letter and spirit" of the Fourth Circuit Court of Appeals' mandate by requesting the Court dismiss the Receiver's Amended Motion because the Receiver has failed to make a *prima facie* showing of the Court's jurisdiction over Victoriabank (Doc. 696 at 1), the Court of Appeals remanded for this Court to determine "in the first instance" whether to apply a *prima facie* or preponderance of the evidence standard in conducting a jurisdictional review. *SEC v. Receiver for Rex Ventures Grp., LLC*, 790 F. App'x 133, 137 (4th Cir. 2018).

3

September 18, 2012. Accordingly, the *only* fund transfer that can give rise to specific jurisdiction is the September 2012 Transfer through Victoriabank's correspondent bank account at BNY Mellon. That transfer does not support a *prima facie* showing of specific jurisdiction.

> 1. <u>Without a Showing of Victoriabank's Involvement in the Underlying Conspiracy, Victoriabank's Use of the Correspondent Bank Account Cannot Give Rise to Personal Jurisdiction.</u>

Despite the Receiver's repeated claim that the basis for this Court's jurisdiction is Victoriabank's use of its correspondent bank account in New York, undisputed evidence decisively refutes the Receiver's conclusory accusation. Victoriabank did not use its correspondent bank account in New York to execute the September 2012 Transfer as an active participant of any Ponzi scheme. Rather, its client, PW-Moldova, initiated the September 25, 2012 transfer of funds. The Receiver's own evidence establishes this fact and disproves the Receiver's allegation otherwise. (*See* Wildner Decl., ¶¶ 6, 26.) A bank's transfer of funds through a correspondent bank account at the direction of a client cannot subject a foreign bank to personal jurisdiction. *See, e.g.*, *Daventree Ltd. v. Republic of Azer.*, 349 F. Supp. 2d 736, 765 (S.D.N.Y. 2004) (granting foreign bank's motion to dismiss for lack of personal jurisdiction, reasoning that the bank's wire transfers and accepting checks on behalf of a client, including through a correspondent bank account, could not subject a foreign bank to personal jurisdiction); *c.f. Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 452-53 (4th Cir. 2000) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'" (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958))).

The Receiver attempts to sidestep the irrefutable fact that the September 2012 Transfer was made at the behest of a client by blurring the September 2012 Transfer with conclusory allegations concerning Victoriabank's use of the New York correspondent bank account in other transactions.

4

(Doc. 696 at 12-13 ("Victoriabank conducts a significant amount of business . . . through its BNYM correspondent account" and "the transfer of Receivership funds through the account following the Freeze Order was not the first time that Victoriabank had used the account to assist in the Ponzi scheme.").) But the jurisdictional hook here for the purposes of the contempt proceeding is the September 2012 Transfer, which alone must be considered for the purposes of specific jurisdiction.

The cases relied upon by the Receiver are readily distinguishable from the facts at issue. Each case cited by the Receiver involves a bank's repeated use of a correspondent bank account that evidenced a deliberate, active participation in the conduct underlying the basis of the lawsuit. In *Licci v. Lebanese Canadian Bank*, 732 F.3d 161 (2d Cir. 2013), the victims of terrorist acts filed an action against a defendant foreign bank accused of supporting terrorist organizations by knowingly and repeatedly permitting the terrorist organization to make transfers through a correspondent bank account in New York. Similarly, in *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316 (N.Y. 2016), a foreign bank accused of aiding and abetting customers in laundering money through its correspondent bank account was found to be subject to jurisdiction in New York based on its active participation and significant involvement in the unlawful scheme:

> [The foreign bank defendant in *Rushaid*], it is alleged, had a shared purpose with [the customer] – to further [a] kickback scheme – in the same manner the Lebanese bank in *Licci* was alleged to have shared Hizballah's terrorist goals. Use of a correspondent bank account in New York was a deliberate step by clients in both cases to move funds central to these shared goals. In neither case was the use of a New York correspondent account merely "coincidental."

*Id.* at 18 (Garcia, J., concurring). Two justices in the 4-justice majority filed a concurring opinion making clear that it was this active participation in the allegedly unlawful scheme, similar to the knowing and repeated conduct by the bank in *Licci*, that provided sufficient basis under the long-arm statute to permit jurisdiction over the foreign bank in New York. *Id.* at 13-18.

5

The Receiver's conclusory allegations that Victoriabank was acting as a "willing insider" and held an "active and significant role" (Doc. 672 at ¶¶ 28, 33) fall well short of a *prima facie* showing that the September 2012 Transfer evidences an active participation by Victoriabank or a "deliberate step" by Victoriabank and PW-Moldova "central" to a "shared goal" to unlawfully divert receivership assets. The September 2012 Transfer is the only transfer capable of giving rise to jurisdiction over Victoriabank for the purposes of a contempt proceeding, and the September 2012 Transfer alone cannot possibly constitute the sort of deliberate use of a correspondent account that warranted the extension of personal jurisdiction over a foreign bank in *Rushaid*. Even taking the Receiver's well-pleaded, non-conclusory allegations as true, no indication exists that the use of the New York correspondent bank account for the September 2012 Transfer was anything more than "coincidental." The Receiver has set forth nothing more than conclusory speculation indicating that Victoriabank engaged in anything other than "arms length transactions" with PW-Moldova in the ordinary course of business. *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 330 (4th Cir. 2013).[3]

The Receiver attempts to manufacture jurisdiction by relying on its unfounded speculation that Alexander Korkin or Vyacheslav Platon controlled Victoriabank such that PW-Moldova's decision to initiate the September 2012 Transfer was one and the same with Victoriabank. In support of its allegations, the Receiver relies on the tenuous accusation by Roman Balanko that Korkin and Platon informed him that they were shareholders of Victoriabank. Not only is the

---

[3] The Receiver attempts to distinguish *Unspam* by claiming that, unlike the speculative conspiracy accusations underlying the plaintiffs' jurisdictional theory in *Unspam*, the Receiver has alleged that the September 2012 Transfer was executed by Victoriabank through its controlling shareholder. However, for the reasons discussed *infra*, the Receiver's allegation regarding the controlling shareholder(s) of Victoriabank not only is unfounded, it is belied by the very evidence the Receiver has collected through discovery.

6

Receiver's specious claim based entirely on hearsay, but even taken as true, this allegation itself does not remotely establish that PW-Moldova engaged with Victoriabank in any sort of scheme to defraud anybody.[4]  The Receiver requests the Court draw an unreasonable inference that simply has no basis in fact.  Nor can the Receiver rely on indeterminate news articles—which are nothing more than tabloid fodder and even the Receiver concedes are inadmissible (Doc. 696 at 8)—to prop up his allegations; rank hearsay challenged for its reliability fails to push the Receiver's conclusory allegations across the line to satisfy a *prima facie* showing.

> 2. At the Time the Receiver Recorded His Order of Appointment in New York, Victoriabank Held No Receivership Assets in New York.

Nevertheless, even if Victoriabank had "used" a correspondent bank account in New York to transfer Receivership assets on September 25, 2012, the Receiver cannot establish jurisdiction over Victoriabank in North Carolina because the Receiver had not recorded his order of appointment in New York when the transfer occurred.  28 U.S.C. §§ 754 and 1692 allow the Receiver to acquire nationwide jurisdiction, but those statutes do not grant him nationwide jurisdiction automatically.  The Receiver does not dispute that he did not record his order of appointment in New York until December 2012, three months after the September 2012 Transfer occurred.  (Doc. 696 at 19; *see also* Doc. 681 at 14-15.)  No Receivership assets were held by Victoriabank in December 2012 (or later).  Personal jurisdiction is determined at the time the action is filed, but, as discussed above, it is the defendant's contacts underlying the lawsuit that trigger

---

[4] The Receiver concedes that Victoriabank is not subject to jurisdiction of this Court based on a conspiracy theory; rather, he alleges that jurisdiction is "based on Victoriabank's own actions instead of the actions of others." (Doc. 696 at 14.)  Thus, by the Receiver's own admission, Victoriabank is not subject to jurisdiction based on the September 2012 Transfer unless the Receiver can set forth a *prima facie* showing that Victoriabank itself deliberately used its correspondent bank account as an active participant in a Ponzi scheme at a time when the Receiver had obtained jurisdiction in New York.

7


specific jurisdiction.[5] And when the September 2012 Transfer occurred—the only transfer capable of giving rise to jurisdiction over Victoriabank for the purposes of the contempt action—the Receiver had not acquired jurisdiction in New York.

The Receiver invites the Court to craft new law permitting a Receiver to extend his jurisdiction retroactively. However, the filing of the order of appointment is the critical "stepping stone" for the Receiver's exercise of *in rem* jurisdiction over receivership assets located in a remote district, which in turn is the necessary "stepping stone" to *in personam* jurisdiction. *SEC v. Bilzerian*, 378 F.3d 1100, 1103 (D.C. Cir. 2004). The filing of an order of appointment in a remote district "cannot establish jurisdiction retroactively," *SEC v. Vision Communs.*, 74 F.3d 287, 291 (D.C. Cir. 1996), and the receiver has offered utterly no reason (much less any extreme circumstances) as to why his jurisdiction should be extended to New York at the time of the September 2012 Transfer. Ultimately, the Receiver simply made no effort to comply with 28 U.S.C. § 754 in New York until December 2012. He cannot exercise jurisdiction over Victoriabank based on a contact Victoriabank may have had with New York prior to that time.

### B. The Receiver Has Failed Under Any Standard to Demonstrate that Victoriabank's Alleged Violation of the Freeze Order Gives Rise to Personal Jurisdiction.

Victoriabank never violated the Freeze Order because it was never subject to the Freeze Order in the first place. It is uncontested that Victoriabank is not a United States citizen and that the Receiver did not domesticate the Freeze Order in Moldova. The Receiver's failure to domesticate the Freeze Order in Moldova is fatal to the exercise of jurisdiction over Victoriabank on the grounds that it purportedly violated the Freeze Order.

---

[5] Even so, the Receiver does not allege that any Receivership assets were held by Victoriabank in New York at the time he initiated the contempt action in 2016.

8

The Ninth Circuit's decision in *Reebok Int'l v. McLaughlin*, 49 F.3d 1387 (9th Cir. 1995), all but resolves this case.[6] Just like the foreign nonparty bank in *Reebok* that the Ninth Circuit held was not subject to personal jurisdiction in California because compliance with the United States freeze order absent domestication would have required the foreign bank to violate the laws of its own country, *id.* at 1388-94, Victoriabank is a foreign nonparty bank that is alleged to have failed to comply with a freeze order that was not domesticated in Moldova. As in *Reebok*, Victoriabank's compliance with the Freeze Order absent its domestication would have caused Victoriabank to violate Moldovan law. The Receiver fails to contend otherwise, instead complaining only that he was never afforded a full opportunity to cross-examine Sergiu Bivol regarding the statements in Bivol's Affidavit showing that Victoriabank's compliance with the Freeze Order would have violated Moldovan law absent that Order's domestication. The insignificance of the Receiver's spurious criticisms aside,[7] the Receiver has been afforded more than two years to research Moldovan law or to identify a Moldovan law expert to dispute the statements made in the Bivol Affidavit. The Receiver has submitted no such rebuttal testimony, presumably because he has found no such Moldovan law expert who will support the Receiver's groundless theory of Moldovan law. The ***only*** evidence on the record irrefutably provides that Victoriabank's compliance with the Freeze Order would have violated Moldovan law.

---

[6] Contrary to the Receiver's insinuation (Doc. 696 at 15), Victoriabank does not rely on *Reebok* for the proposition that the use of a correspondent bank account fails to establish personal jurisdiction. Rather, *Reebok* demonstrates that the Court has no jurisdiction over Victoriabank, a nonparty foreign bank, on the basis that Victoriabank purportedly violated the Freeze Order.

[7] For example, the Receiver criticizes the affidavit for failing to address how long it would have taken to domesticate a United States order in Moldova. (Doc. 696 at 17.) The length of time it would have taken the Receiver to comply with Moldovan law is irrelevant to determining whether the Freeze Order was enforceable in Moldova.

9

Rather than submit literally any evidence demonstrating that Victoriabank's compliance with the Freeze Order absent its domestication would not have violated Moldovan law, the Receiver simply attempts to distinguish *Reebok* by suggesting that the Ninth Circuit's decision hinged on the fact that a Luxembourg court has issued an order that in effect mandated non-compliance with the district court's freeze order. However, the Ninth Circuit in *Reebok* found that, even in the absence of this order from a Luxembourg court, the district court's freeze order was not enforceable in Luxembourg because it had never been domesticated in Luxembourg:

> In fact, however, the TRO had no effect in Luxembourg because it was never registered there. Unless recognized by the Luxembourg government, foreign judgments do not have any force in that country. . . . Without an enforceable order, Reebok had no business crying foul over any steps [the foreign nonparty bank] took to avoid turning over all of Mr. McLaughlin's funds immediately upon demand.

*Reebok*, 49 F.3d at 1392. Rather than comply with Moldovan law to domesticate the Freeze order and compel Victoriabank's compliance therewith, the Receiver would turn Moldovan law on its head by placing the onus on Victoriabank to obtain a Moldovan court order holding the Freeze Order unenforceable. As established by the unrebutted Bivol Affidavit, the proper procedure for enforcing a United States freeze order in Moldova requires the party seeking enforcement—the Receiver—to obtain a court delegation pursuant to Article 465(1) of the Civil Procedure Code of Moldova. The Receiver did not do so.

The Receiver trods a familiar path in claiming that *Reebok* purportedly runs counter to the "weight of authority," but the case law on which the Receiver relies is readily distinguishable and previously has been rejected by the Court. The four cases the Receiver cites holding that U.S. citizens may be subject to personal jurisdiction for aiding and abetting the violation of a U.S. court's order clearly are inapplicable because Victoriabank is not a U.S. citizen. *See ClearOne Communs., Inc. v. Bowers*, 651 F.3d 1200, 1215-16 (10th Cir. 2011); *SEC v. Homa*, 514 F.3d 661,

674-75 (7th Cir. 2008); *United States v. Barnette*, 129 F.3d 1179, 1185 n.10 (11th Cir. 1997); *Waffenschmidt v. Mackay*, 763 F.2d 711, 714 (5th Cir. 1985). Indeed, in *Reebok*, the Ninth Circuit explicitly rejected the plaintiff's argument that *Waffenschmidt* established jurisdiction over the nonparty foreign bank, noting:

> Although *Waffenschmidt* speaks in expansive terms, it was speaking about the authority of district courts within the United States. The court grounded its decision on the simple fact that the "mandate of an injunction issued by a federal district court runs nationwide. . . ." That being so, the court could hold enjoined parties in contempt, no matter in what state they violated the court's orders.

*Reebok*, 49 F.3d at 1392 (quoting *Waffenschmidt*, 763 F.2d at 716). The Court went on to hold that "the strength of the analysis begins to crumble when a district court seeks to reach out across the Atlantic in an attempt to impose conflicting duties on another country's nationals within its own borders." *Id.* at 1392; *see also Gucci Am. v. Bank of China*, 768 F.3d 122, 137-38 (2d Cir. 2014) (noting that the Court had found no case extending the analysis of *Waffenschmidt*, *ClearOne Communications*, or *Homa* to a foreign nonparty).

Contrary to the Receiver's repetitive claim, the Court is ***not*** dealing with a domestic issue. The Court is dealing with an international issue, whereby the Receiver inappropriately asks the District Court to "reach out across the Atlantic" and enforce its injunction against "another country's nationals within [that country's] own borders." The Court recognized this very fact during the May 3, 2017 hearing on Victoriabank's Motion to Dismiss, stating that the Receiver's reliance on *SEC v. Homa* is "misplaced" because *Homa*, unlike here, involved the exercise of jurisdiction "over U.S. citizens living abroad, not a foreign entity." (Doc. 601 at 44.)

The Receiver's continued reliance on *Abi Jaoudi and Azar Trading Corp. v. Cigna Worldwide Ins. Co.*, No. 91-6785, 2016 U.S. Dist. LEXIS 95707 (E.D. Pa. July 22, 2016), likewise is inapposite. *Abi Jaoudi* is limited to a very specific set of facts not remotely present in this case.

11

In *Abi Jaoudi*, the court held that it had jurisdiction over nonparty, foreign citizens who were acting as agents of a foreign corporation that had invoked the court's jurisdiction in the first place by filing a prior, related suit in the Eastern District of Pennsylvania. *Id.* at *4-6, 27-34. As this Court recognized during the May 3, 2017 hearing, *Abi Jaoudi* "is of no help to the receiver because of its unique set of facts not at issue in this case, principally because the foreign entity came and filed suit in the United States thus choosing the jurisdiction of the Court." (Doc. 601 at 45.)

In sum, the Receiver cites no case law at all standing for the proposition that a foreign nonparty to the litigation may be held in contempt for failing to comply with a United States court order that was never domesticated in the nonparty's home country. The Receiver's reliance on his allegations regarding Victoriabank's purported notice of the Freeze Order similarly misses the mark; even had Victoriabank been put on notice of the Freeze Order prior to the September 2012 Transfer, the Receiver still failed to domesticate the Freeze Order and allow Victoriabank to comply with the Order without violating Moldovan law. Because Victoriabank's noncompliance with the Freeze Order cannot give rise to contempt or personal jurisdiction in the United States under any standard, this Court should dismiss the Receiver's Amended Contempt Complaint.[8]

## II. THE COURT SHOULD REJECT THE RECEIVER'S REQUEST FOR ADDITIONAL JURISDICTIONAL DISCOVERY OR, AT A MINIMUM, REQUIRE THE RECEIVER TO COMPLY WITH THE HAGUE CONVENTION.

The Court should deny the Receiver's request for additional discovery. As highlighted by the Receiver's opposition brief, the Receiver's allegations regarding Victoriabank's involvement

---

[8] Although the Receiver does not appear to contend otherwise, Victoriabank is not subject to general jurisdiction for the reasons provided in its initial brief. (*See* Doc. 681 at 15-16.) And contrary to the Receiver's claim that Victoriabank "does not reprise its meritless 'due process' against personal jurisdiction," (Doc. 696 at 14 n.13), Victoriabank has not forfeited its argument that the exercise of jurisdiction over Victoriabank would violate due process. Rather, "[i]n connection with its Renewed Motion, Victoriabank incorporates by reference its prior briefs submitted to the Court." (Doc. 681 at 1.)

12

in the September 2012 Transfer are attenuated and based on nothing more than rank hearsay that Victoriabank has repeatedly denied. Courts regularly deny requests for discovery under similar circumstances. *See, e.g.*, *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 716 (4th Cir. 2002); *Reynolds & Reynolds Holdings, Inc. v. Data Supplies, Inc.*, 301 F. Supp. 2d 545, 554-55 (E.D. Va. 2004).

Even if the Receiver could demonstrate that further jurisdictional discovery would be anything more than a fishing expedition, courts regularly require that a party comply with the Hague Convention in propounding discovery to a foreign nonparty. *See, e.g.*, *Rich*, 121 F.R.D. at 258 ("Compulsory discovery of non-party foreigners may only be accomplished through use of the Hague Evidence Convention."). The authorities the Receiver cites fail to suggest otherwise; each of the cases discussed by the Receiver indicates solely that a court may impose the Federal Rules of Civil Procedure on a foreign ***party*** to the litigation, and not a foreign nonparty. *See Societe Nationale Industrielle Aerospatiale v. United States Distr. Court for S. Dist.*, 482 U.S. 522, 524-27 (1987); *In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 45, 48 (D.D.C. 2000). Even so, those authorities support the application of the Hague Convention, rather than prohibit it. Moldovan sovereign interest weighs heavily in favor of compliance with the Hague Convention in this case—discovery under Federal Rules of Civil Procedure requiring Victoriabank to disclose information related to account activities would force Victoriabank to violate Moldovan law—and no evidence exists that the Hague Convention procedures would be ineffective, other than the Receiver's unfounded allegation that that such procedures purportedly would "delay the discovery process." (Doc. 696 at 24.) The Court should deny the Receiver's request to re-open discovery or, at a minimum, require the Receiver comply with the Hague Convention in propounding discovery to Victoriabank, a foreign nonparty to the litigation.

13

# CONCLUSION

For the reasons set forth above and in briefing on Victoriabank's Motion to Dismiss, Victoriabank respectfully requests that this Court (1) dismiss and deny the Receiver's Amended Motion, on the grounds of lack of personal jurisdiction and failure of the Receiver to effect appropriate service of process; and (2) dissolve the 2016 Freeze Order, on the grounds that the Court lacked personal jurisdiction over Victoriabank when it entered that Order, and the Order is otherwise void.

Respectfully submitted, this 23th day of October, 2018.

By: *s/ Kiran H. Mehta*
Kiran H. Mehta
NC Bar No. 11011
TROUTMAN SANDERS LLP
301 S. College Street, Suite 3400
Charlotte, NC 28202
Telephone: 704.998.4072
Facsimile: 704.998.4051
Email: kiran.mehta@troutman.com

Lindsey B. Mann (*Admitted Pro Hac Vice*)
Kathleen M. Campbell (*Admitted Pro Hac Vice*)
TROUTMAN SANDERS LLP
600 Peachtree Street, N.E., Suite 3000
Atlanta, GA 30308-2216
Telephone: 404.885.3000
Facsimile: 404.885.3900
Email: lindsey.mann@troutman.com
kathleen.campbell@troutman.com

*Attorneys for Banca Comerciala Victoriabank, S.A.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing *Non-Party Banca Comerciala Victoriabank SA's Reply Brief in Support of Its Opposition to Receiver's Statement on the Appropriate Course of Proceedings and Renewed Motion to Dismiss* was electronically filed with the Clerk of Court using the CM/ECF system, which automatically serves notification of such filing to all counsel of record.

This 23th day of October, 2018.

                                          *s/ Kiran H. Mehta*
                                          Kiran H. Mehta
                                          North Carolina Bar No. 11011